EQUITY.

## WINTER v. LUDLOW.

Appropriation in favor of creditors and the rights and remedies there-under at law and in equity. Rights of holders and endorsers of bills of exchange. Commercial agency. Agency of bankers and factors defined and distinguished. What constitutes assignment for the benefit of cred-itors and the nature of the trust thereunder. Effect thereon when informally made and after an attempted revocation of ratification by one holding interdependent relations with the assignor as to the pos-session of funds covered by the assignment. Privity. Effect of a general letter of credit on the liability of party by whom it is given. Nature and effect of the answer in equity practice. Discovery. What interest of a party requires that he should be made a defendant in equity in the Federal courts before final decree. Effect of an interest acquired by complainants subsequent to filing bill upon proceedings to bring in, as a new defendant, the party through whom such interest had been acquired. Original bill in the nature of a supplemental bill, when proper. Process of the Federal courts, its scope, and to whom it should be directed.

1. A., residing and doing business in California, remitted gold and bills to B., residing in Philadelphia, through the in-strumentality of C., residing in New York. B. gave to A. a gen-eral letter of credit authorizing the drawing of drafts upon him. Drafts were accordingly drawn and accepted by B. to an amount larger than the remittances. B. became insolvent and, after-wards, A. B. then made an unsealed and informal assignment to D., appropriating future remittances, first, to secure any balance due him, and his outstanding acceptances of A.'s drafts, and, secondly, of A.'s drafts upon him at sight and on time. Information was sent by letter of this appropriation by B. to A. and it received A.'s ratification in terms extending its operation to all funds lying in B.'s hands to his, A.'s, credit. The ratification was not received or dated until after the suit was commenced. Notice of the assignment was sent to the

I

complainants. Afterwards, and before the ratification by A., B., at the instance of C., to whom B. was largely indebted, but who as regards A.'s remittances was merely an agent for their transmission to B., revoked the assignment to D. and made a new appropriation in favor of C., by whom the avails of the remittances were applied in payment of B.'s debt to him. *Held,* that the appropriation made by the assignment was valid and subsisting from its date, and constituted, in effect, one instrument with the ratification by A.

2. At the time of filing the original bill, A. was a resident of California. He afterwards became a resident of the Western District of Pennsylvania. He was not made a party to the bill. On this ground objection was made to the entering of a final decree. *Held* that under the act of Congress of 28th February, 1839, the objection was well taken; that, as a resident of the Western District, he was amenable to process in a suit in equity directed to the marshals of both districts, and that under the circumstances of the case, the complainants having acquired a new or modified interest by his act of ratification performed after the filing of their bill, he could not be brought upon the record by mere amendment, but that the correct practice was by an original bill in the nature of a supplemental bill in which he was named as defendant.

### STATEMENT OF THE CASE.

THIS was a suit in equity brought by Winter, Latimer & Co. and Johns Hopkins, citizens of the State of Maryland, against Robert McKinney Ludlow and Robert M. Ludlow, citizens of the State of Pennsylvania, residing in Philadelphia, trading under the firm name of Ludlow & Co. The bill alleges that the complainant, Hopkins, was the purchaser and holder, and the complainants Winter, Latimer & Co. the purchasers and endorsers of certain drafts drawn by S. Beebee Ludlow & Co., of San Francisco, upon Ludlow & Co., and accepted by them, to meet payment of which, and of other drafts drawn and accepted in like manner in the hands of various individuals, large amounts of gold and gold dust had been remitted by S. Beebee Ludlow

& Co. to the defendants, or their agents, for that purpose; and that other large sums for the purpose were then in the course of remitting and transportation. One such invoice is conjecturally stated as amounting to $150,000. Complainants averred that S. Beebee Ludlow & Co. appropriated the said gold and gold dust, or the proceeds thereof, as a fund in the hands of Ludlow & Co. for the protection and payment of the drafts, and that on receiving the same Ludlow & Co. acceded to said appropriation and were bound thereby.

The bill further alleges the failure in business of said Ludlow & Co. and their refusal to apply the remittances to the payment of the drafts; and it sets out that they had advised the complainants by letter that they had assigned all expected remittances to pay and satisfy, first, a balance alleged to be due by S. Beebee Ludlow & Co. to them; second, to pay the drafts accepted by Ludlow & Co. and such sight and time drafts as may have been drawn on them. It denies the legality of so much of the said assignment as provides for the payment of Ludlow & Co.'s alleged balance; but alleges that upon application to them they have not only refused to apply the remittances according to their original intention, but even partially to apply them, reserving the balance due them, according to the assignment, as to which they refused all information, concealing even the name of the assignee. It avers that, in consequence, complainants are deprived of all benefit under the assignment, and can have no recourse to the property, and that if the appropriation first made thereof be not faithfully carried out they will be in danger of losing the amounts of the drafts held by them or on which they are liable as endorsers.

The bill is filed on behalf of the complainants above named and of all other parties having like equities. It prays: 1. Discovery. 2. An injunction to restrain defendants, or other parties to whom the gold and gold dust may have been transferred or in whose possession it may be, from transferring. 3. For a receiver. 4. For an account between S. Beebee Ludlow and Ludlow & Co. to ascertain what balance is due Ludlow & Co. from S. Beebee Ludlow and its character, and if the court

should be of opinion that said balance should be paid to Ludlow & Co. out of said remittances then, first, to pay said balance, and then the said drafts, otherwise in full to the payment of said drafts.    5. That the court shall determine the respective rights of the parties.    6. General relief.

The defendants in their answer admitted having received remittances composed of drafts as well as gold and gold dust to the time of their failure, amounting to about $50,000.    Admitted and produced assignment dated 1st September, 1851; admitted having sent notice thereof to the complainants; admitted a letter of credit given by them to S. Beebee Ludlow & Co. authorizing him to draw upon them, and the drawing and acceptance of drafts upon them including those held or endorsed by the complainants; admitted extensive business transactions with S. Beebee Ludlow & Co.    They denied that any specific appropriation of the remittances had been made to meet the drafts; that there was any agreement or understanding to that effect between themselves and S. Beebee Ludlow & Co., or any promise, undertaking or expressed intention that they should be so applied.    No accounts between themselves and S. Beebee Ludlow & Co. were produced, which was sought to be excused on the ground that they were running accounts on which S. Beebee Ludlow & Co. were always in debt to them, and that no entries were made after their failure and they could give no items.    No correspondence between them was produced, it being avoided on the ground that it related chiefly to family affairs, S. Beebee Ludlow being the son of Robert M. Ludlow.    They claimed that the course of business between them and S. Beebee Ludlow & Co. being simply to place the remittances to their credit in general account of their indebtedness, and such and no other being the understanding between the firms, the holders of the drafts had no lien thereon, nor any right to take them out of their hands or control; that the assignment of 1st September was void for various informalities; that it made no appropriation and conveyed no title, and that it had been cancelled by them within a few days after it was made on being advised of its nullity.    As to remittances

since its date they had no knowledge, except that they were informed they had been attached at the suit of some of the draft holders.

It will be seen that the District Judge was early impressed with the insufficiency of the matter in denial in this answer, and with the importance of its admissions.

The original bill was filed 8th October, 1851. The answer on the 14th of the same month. On the 15th October the court appointed a master with power to appoint a receiver who was accordingly appointed. The duties of the master were to some extent superseded by an agreement of counsel, alluded to in the opinion, that certain testimony only should be reported to the Court. The proceedings were very voluminous. Repeated amendments to the bill were made, due in great measure to the necesarily. imperfect knowledge of the facts of the case possessed by the complainants at the commencement of their suit. There was great difficulty in obtaining testimony from witnesses who were either actually or potentially parties, some of whom were at great distances. Attachment suits by others of the draft holders had been commenced in the State courts of New York and Pennsylvania against Beebee & Co., a New York firm to whom Ludlow & Co. were indebted, and to whom they had, to say the least, improvidently, transferred the remittances in payment of their debts after the assignment to Taylor of 1st September. It was desirable that these cases should be first determined. A difficulty existed from the non-joinder of S. Beebee Ludlow as a party defendant, and an attempt had been made to bring him in by simple amendment to the bill. At the hearing of 1858 it was objected that no decree could be entered unless he were first made a party. The consideration of this question forms the main subject of a separate opinion, that of 11th July, 1859, and is not the least valuable of the matters treated.

When Judge Cadwalader came to the bench in April, 1858, the questions in the case, intricate in themselves, were thus spread over an immense accumulation of documentary material. It was his habit, while giving the utmost attention to the argu-

ments of counsel, to read every paper bearing in the smallest degree upon the question to be decided. There is a tradition that his first act in this case was to have the papers, which filled a barrel, wheeled to his office. Labor of this kind to him, if not exactly pleasure, was certainly not formidable. It may be said that before he took the work in hand a decision had seemed almost hopeless—much more a decision that should elucidate and satisfy. The reader of the opinions will judge how far that result has been accomplished. No attempt will be made here to follow the case in detail or *seriatim*. The last results of the evidence and the arguments are ascertained and analyzed in the opinions in a way to render such an attempt, for any useful purpose, wholly superfluous.* In this as in most of the cases now published, no paper-books or notes of argument have come to the hands of the editor.

The points on which the case ultimately turned were two: 1. A special undertaking by the drawees that drafts drawn upon them should be honored and paid; in other words upon the effect to be given to their letter of credit to S. Beebee Ludlow & Co. 2. The appropriation made by the assignment of 1st September, 1851, with the notification thereof to the complainants and the ratification by S. Beebee Ludlow & Co.

*Charles Ingersoll*, for complainants.
*De Witt C. Morris* and *Leonard Myers*, for defendants.

11TH JULY, 1859.    CADWALADER, J.

Ludlow & Co., of Philadelphia, gave to S. Beebee Ludlow, of San Francisco, a letter of credit, authorizing him to draw upon them to an unlimited amount. He drew from time to time, under this authority, selling his drafts upon them at San Francisco, and investing the proceeds in bullion, and in bills of

---

* It will be perceived that the opinions are not in the chronological order of their delivery. As they were so published while Judge Cadwalader was living, and presumably with his approbation, and as a change in this respect would involve some small textual alterations, it has been thought proper not to disturb them. The final decree of 1st May, 1861, is now added and published for the first time.

other drawers in California upon other drawees on the Atlantic side of the continent. He remitted by mail to Ludlow & Co. these bills of exchange endorsed by himself to their order. He shipped the bullion deliverable at New York to Beebee & Co., his receiving and forwarding agents, to whom he transmitted the bills of lading, with orders to send the several shipments to Ludlow & Co. at Philadelphia; and he advised Ludlow & Co., in every instance, by letter, that the bullion was thus transmitted to *them*. They received these remittances in bills and bullion, by every semi-monthly mail steamer; collected the amounts of the bills when due, crediting him with the proceeds; and caused the bullion to be coined at the mint, crediting him with the mint certificates of its product, as cash. These arrivals of the remittances of each description were thus credited in the same general account in which they charged their payments of his drafts upon themselves at maturity. After some time, his remittances having been of less value than the amount of his drafts upon them, and his account with them being largely overdrawn, they failed in business, and refused, from thenceforth, to honor his drafts. He continued to draw and remit semi-monthly, until the news of their failure was received at San Francisco, when he also failed, and ceased transacting business. He and Ludlow & Co. were permanently insolvent. If Ludlow & Co. had received all of his remittances, and credited their full avails, and had paid all of his drafts, he would, in the end, have been largely in their debt. Ludlow & Co. after their failure, but before the arrival of any of the remittances which came after it, subscribed an appropriation of these remittances, in the form of an unsealed assignment of them to W. Taylor in trust to secure the payment first of the balance due by S. B. Ludlow to themselves, and their outstanding acceptances of his drafts, and secondly of his drafts upon them at sight, and on time. If the avails of the remittances which afterwards arrived had been thus applied, there would, after payment of the balance due to Ludlow & Co., have been a large surplus for the holders of the accepted and other drafts. Before the arrival of any of these remittances Ludlow & Co.

wrote to S. B. Ludlow. informing him of the appropriation, and advising him to confirm it. When the first remittance reached New York, they wrote to certain of the draft holders, informing them of the appropriation, and stating its effect; and, not long afterwards, wrote to Beebee & Co., the receiving and forwarding agents at New York, informing them that it had been made. Ludlow & Co., moreover, endorsed bills of exchange which composed a part of the first remittance, making them payable to the order of Taylor as assignee. Taylor also endorsed them, describing himself as assignee; and sent them by mail to be presented for acceptance. After all these recognitions of this appropriation, and acts under it, when more than twelve days had elapsed since its date, and more than a week since the arival of the first of the appropriated remittances at New York, Ludlow & Co. cancelled the paper by which the appropriation had been made, and executed other papers, whose intended effect was to appropriate this remittance, and the remittances expected, in payment of a debt of their own to Beebee & Co., the receiving and forwarding agents of S. B. Ludlow, in the discharge of which he was not in any manner interested. Beebee & Co. desired and suggested this misappropriation of the funds. It was at first opposed by Ludlow & Co. But their opposition soon ceased; and they became, under an expectation of receiving pecuniary assistance from Beebee & Co., direct participants in the measures by which it was carried into effect. Ludlow & Co. while prosecuting these measures, wrote to S. B. Ludlow requesting him to destroy their previous letters to him, and, instead of remitting to Taylor, to remit, as formerly, to Beebee & Co. S. B. Ludlow, after the receipt of this communication destroyed Ludlow & Co.'s previous letters. His remittances had ceased before its receipt. He had, before its receipt, received intelligence of their previous appropriation of his remittances in the form of an assignment to Taylor, and had written a letter to them approving of it. He never, so far as appears, did anything manifesting a disposition to impair the effect of this letter of ratification. But, this letter was not written by him at San Francisco until after the present suit had

been instituted, and was not received until after some important proceedings in the suit had occurred.

The same draft holders who had been informed by Ludlow & Co. of the existence and effect of their appropriation to secure the drafts were complainants. An indorsee of some of the drafts of which they were payees was a co-plaintiff. When the bill was filed, there had, since the date of that appropriation, been three semi-monthly arrivals from California. The complainants may have suspected that the remittances received, in this interval, had been, in part, misapplied; but they do not appear to have known that the writing of appropriation had been cancelled, or to have suspected the character, or extent, of the intervening malappropriation which had occurred. Ludlow & Co. were the only defendants in the original bill. Its purpose was to secure the funds, and ascertain and enforce the rights and interests of the draft holders. The complainants asserted that, independently of the writing, the remittances had been expressly or impliedly appropriated for the security of the drafts; and even insisted that the drafts ought to be paid before the reimbursement of the balance due to the defendants in general account. But the bill was framed so as to render the appropriation made by this writing available for the security of the draft holders, if it was required, and so far as might be required for the purpose. The answer of the defendants disclosed the cancellation of the writing, without giving any information as to the remittances except so far as the avails had been actually credited by them to S. B. Ludlow in cash before their failure. It was, in many particulars, evasive, and manifested a disposition to suppress material truths as to the past, and conceal their purposes as to the future. A receiver was, therefore appointed; and the case was referred for investigation, under specified heads, to a master, who was authorized to take testimony and examine the parties. Pending this reference, the general replication was filed, Taylor was made a party defendant, and an order was made that the bill, as to him, should be taken as confessed. The master examined one of the original defendants upon interrogatories, and took the depositions of Taylor and

S. B. Ludlow as witnesses. The deposition of Taylor had been thus taken before he was made a party. Witnesses at New York and in California had been examined, and their depositions returned, and much documentary evidence had been adduced, when an agreement of parties was made, and reported by the master, that he should report merely the testimony taken, without making any other report. The evidence taken was returned accordingly, with his report.

The defendants, notwithstanding this agreement, objected, at the subsequent hearing, to any use of the testimony thus reported being made for the general purposes of the cause. This objection was overruled. On particular questions which arose, the court was of opinion that the original defendants having been partners in the transactions which were the subject of controversy, the examination of one of them could be used at the hearing, on the same footing with admissions in an answer, as evidence against both; also, that the deposition of Taylor, who, though a party had no interest in his own right, and against whom no decree was to be executed, could be read. When the suit was brought, S. B. Ludlow was beyond the jurisdiction of the court, and therefore could not have been made a party. The complainants allege that he is now a citizen of Pennsylvania, residing in the other district of the State. In order to make him a party, they have instituted proceedings of which the sufficiency for the purpose is contested. In consequence of these proceedings, his deposition can be used in the cause for a very limited purpose only; and perhaps ought not to be used at all. His deposition, that of Taylor, and the answers of the defendant who was examined before the master, might be excluded entirely from consideration, without affecting any result in the cause, as all the material facts are proved by the other testimony, and by the papers in evidence.

Portions of the bullion which arrived before the suit was commenced, and a small quantity which arrived afterwards, are alleged to have been arrested and detained at New York under foreign attachments, at the suit of draft holders interested in the present proceedings. Of course, no draft holder plaintiff in

an attachment under which any portion of the remittances in question may have been detained, can be permitted to participate in the benefit of any decree in this cause without accounting for the amount thus detained as an addition to the fund for distribution. But no competent evidence of the existence of any such attachment has been adduced, as yet, either in court or before the master. The remitted bills which arrived after the present suit was commenced, were taken into the custody of the receiver. All of the remitted bills which arrived before the suit was brought, and all of the remittances in bullion except such portions as may have been detained under attachments, passed into the hands of Beebee & Co., and were converted by them to their own use. They credited the avails to Ludlow & Co., in an account which exhibits all of the amounts misappropriated except those alleged as above to have been detained under attachments.

The subjects of controversy are, first, the amounts credited by Beebee & Co., to Ludlow & Co., on account of their debt to Beebee & Co.; secondly, the amount or value of such bullion as may have been detained under attachments through the defendant's omission to reclaim it, or so much of its amount or value as may be taken into account for the adjustment of equities among the draft holders in the distribution of amounts not attached; and thirdly, the fund in the hands of the receiver. The specific products of the remittances from which the first two subjects were derived cannot be traced. Cognizance of them is, therefore, to be taken with a sole view to the question of the personal accountability of the original defendants to the draft holders. But the third subject is composed of specific product of S. B. Ludlow's remittances which arrived after the present suit was instituted. This fund involves distinct considerations with reference to the question whether distribution of it can be decreed until S. B. Ludlow shall have been made a party.

Independently of this question, the case was very fully investigated, with an extended reference to authorities, in an opinion which, for a reason hereafter mentioned, was never formally read or filed, though its effect was orally stated in

court.   The propositions of law and fact, directly or incident-
ally involved in it, are here abstracted as follows :

1. The defendants, having accepted some of the drafts in
question, and having engaged, by the letter of credit, to honor
the others, though principal debtors to the draft holders, were,
as to S. B. Ludlow, *sureties,* whom he was under an obligation
to keep indemnified against these liabilities, by seasonable re-
mittances.

2. There was no direct original appropriation, express or
symbolical, of the remittances for the security of the drafts.
The draft holders, therefore, had no cognizable independent in-
terest, in their own right, in the subjects of controversy.

3. Though there had been such a direct appropriation for the
security of the drafts, the defendants would, on paying any of
them, with funds of their own, have been entitled to reimburse
themselves before applying any subsequently received avails of
the remittances to the payment of other drafts.   Consequently,
the balance due by S. B. Ludlow to the defendants in general
account, having arisen from such advances, must, at all events,
have been first paid out of the funds which were the subject of
controversy.

4. As between S. B. Ludlow and the defendants, his letters
of advice, and other parts of his correspondence, his endorse-
ment and transmission of the bills of exchange, and the ship-
ment by him of the bullion to middlemen, with orders for its
ulterior transmission to the defendants, had constituted an *ap-
propriation* of the remittances to secure to the defendants the
reimbursement of their advances, and their indemnification
against liability under the acceptances and letter of credit.   This
appropriation had vested in the defendants the *qualified* interest
only in the remittances, which was required for their intended
*security.*

5. This *interest* was vested in them from the commencement
of the transit of the remittances from California.   It was inde-
pendent of the *lien* which, for a like purpose of security, was an
incident of the defendants' agency, but could not attach to the
remittances until in their actual possession.

The appropriation, which thus took effect before such a mere lien could attach, continued, moreover, to operate after the lien might have expired. Thus, if their agency had been such that their *lien*, like that of simple bankers, would not have prevented S. B. Ludlow from drawing occasional cash balnaces to his credit out of their hands, and leaving their accruing liabilities for him unsecured, the *appropriation* would have enabled them to retain such balances for their security.

6. Subject only to this qualified interest of the defendants, the ownership of the remittances was in S. B. Ludlow, who, on payment of their advances, and of his accepted and unaccepted drafts upon them, so as to exonerate them from their liabilities on his account, could have revoked their agency, and resumed the possession of his remittances, including even that of the bills remitted with his endorsement upon them, if no rights of other persons had intervened.

7. The *duty* of the defendants, under their agency, to apply the funds, after the reimbursement of their advances, to the payment of his drafts, was coincident and co-extensive with their *interest* under the appropriation for their security. So long as they continued to honor, and punctually pay the drafts, they would, from the special character of their agency, or from the particular course of the transaction of its business, have been at liberty, if the balance of their account had, at any time, been in his favor, to use, as their own, such avails of his remittances, bearing interest, as they duly credited to him, in cash, or its equivalent. But this right ceased when they ceased punctually to honor his drafts. They were bound afterwards to apply the specific proceeds of the remittances remaining after the reimbursement of their advances, to the purposes of their agency alone.

8. Their inability, after their failure, to continue to honor the drafts, had, beyond this, no effect upon the rights or interests of the parties other than resulted from the non-payment of the drafts.

It did not prevent the original appropriation of the remit-

tances from taking effect, as intended, for the security of the defendants.

Had no letter of credit existed, S. B. Ludlow's account with them not been overdrawn, and his remittances, arrived and in transit, not been of inadequate value to secure their advances and liabilities, the *consideration of the irrevocability* of the intended security might, by the dishonor of the drafts, have so failed as to have justified him in countermanding the delivery to them of the subsequent remittances. But if he had not thus countermanded the delivery, or otherwise revoked the appropriation, it would, with its incidents, continue even then to subsist for *his* benefit, in order that the remittances might be turned to account for his profit, and their avails applied afterwards in the mode originally intended, to the payment of his drafts, notwithstanding their dishonor. *Other* persons, at all events, could not then, on account of the dishonor of the drafts, have contested the existence of the defendants' qualified interest in the remittances.

As, however, his account with the defendants was overdrawn, and their accrued and accruing liabilities for him were inadequately secured by the remittances, including those in transit, the relation betwen them of debtor and creditor had so been superadded to that of principal and surety, as to render him, independently of any effect of the letter of credit, incapable of revoking the appropriation of the remittances in transit, until the defendants' advances had been reimbursed, and other adequate provisions for their liabilities had been made.

The effect of the letter of credit was, at all events, notwithstanding the dishonor of the drafts, to render the appropriation, so long as any one of them remained unpaid, irrevocable by S. B. Ludlow without the defendants' consent. When the drafts were negotiated, value was obtained on the Pacific side of the continent through the use of the defendants' commercial credit and standing. Their engagement, in the letter of credit, to honor the drafts, had thus been an *executed* part of the consideration of the intended security. The defendants, in consequence of S. B. Ludlow's failure to make adequate and season-

able provision for their indemnification, would not have been suable by him for a breach of this engagement. He could not successfully sue for it without averring and proving that he had thus provided for their indemnity. But they were not, for this reason, the less liable to be sued for breach of the engagement by the parties to whom the drafts had been, on the faith of it, negotiated. The liability of the defendants, under this engagement, having been thus absolutely incurred, the consideration of the intended security could not *wholly* fail, whether they were, or were not, as between themselves and S. B. Ludlow, justifiable in afterwards refusing to honor the drafts.

9. A surety is entitled, in equity, to the benefit of every security which, even without his knowledge, the principal debtor may have given to the creditor; but the creditor has no such equitable right *of his own* to the benefit of a security which the principal debtor has given to the surety. The latter of these two propositions is peculiarly applicable where the surety is an agent, and the subject of his agency is also the subject of the security. When the relation of principal and surety, and that of principal and agent, are thus combined in the same parties, as was the case with S. B. Ludlow and the defendants, they may by *mutual* agreement, revoke such an appropriation as that in question, and make any new arrangement as to the subject of it, without the concurrence of creditors in the relation of these draft holders, and without any regard to the present or ultimate security of such creditors. While the relations between S. B. Ludlow and the defendants were such as they could thus, by mutual consent, revoke or modify, the circumstance that the remittances were, *as between these parties,* appropriated for the security of the *defendants,* vested no cognizable interest in the *draft holders.*

10. S. B. Ludlow having no right, against the will of the defendants, to take from them any part of his remittances without first repaying their advances, and exonerating them from liability to the draft holders, and the defendants being unable, without his consent, to apply the proceeds of his remittance remaining after the reimbursement of their advances, to any pur-

pose other than the payment of the drafts, the relations between him and the defendants were not revocable by *either* party, without the concurrence of the other, and, unless rescinded or modified, by his and their *mutual* agreement, enured *incidentally* to the benefit of all, or some of the draft holders, though *not in any right of their own.*

If it had, in any manner, become *relatively impossible* for S. B. Ludlow and the defendants to *concur* in any different arrangement for the disposition of the remittances, the draft holders could not be deprived of the benefit thus incidental to the original appropriation. This appropriation, though the draft holders were not privy to it, would then become cognizable in a court of equity, as an indirect security for their benefit. In order to prevent circuity of remedy, or work out equities of the original parties, or of parties derivatively interested, which could not be othewise reached, the security might then be rendered available for the benefit of the draft holders in a proceeding in equity at their own suit.

This might have occurred through the insolvency of S. B. Ludlow and the defendants, and the death of him, or of them, or such a judicial or conventional divestiture of interest in their lifetime, as would occasion an administration of the fund on the footing of a recognized insolvency.

The jurisdiction of the court might then be exercised at the suit of the draft holders, as a means of reaching equities vested not in themselves, but in the original parties to the appropriation, which could not be otherwise adjustable between their estates.

The mere insolvency of these original parties, without any divestiture of the former interests, gave, however, to the draft holders no such derivative right of suing.

Consequently, the present proceeding cannot be sustained at their suit, unless they acquire an interest in the subject of controversy through the appropriation for their security made by the writing which the defendants, for a time, acted upon, as above, but afterwards cancelled.

11. Between S. B. Ludlow and the defendants, as *parties to*

this writing, his ratification of it, operating retroactively to its date, gave to it the effect of his and their concurrent act of appropriation. The submission of it for his ratification having been thus acted upon, before any countermand of it can have been received by him, such a countermand, if any was ever sent, could not alter, or qualify this effect of it as a *concurrent* act..

If the destruction of their letters had, in any respect, involved this part of the case in obscurity, the rule of evidence as to the spoliation of papers would sanction the utmost latitude of presumption, on the point of doubt, in favor of the draft holders.

12. But, except between S. B. Ludlow and the defendants as parties to the paper, it was not operative as *his* act until his ratification. As to such intervening transactions with *other* persons as were not immediately dependent upon his potential ratification, its effect, therefore, was that of an act of the defendants alone.

13. Though neither he, nor the defendants, could, without the other's consent, have made an effectual appropriation of the remittances for any purpose *different* from that expressed in this writing, yet, an appropriation of them *for that purpose* might have been effectually made either by him alone, or by them alone.

If made by him alone it would, whenever made, have the same effect as if the remittances had been appropriated for that purpose when they left California.

If made by the defendants alone, it could only take effect in subordination to the requirements of the duties of their agency. They could not, without his authority, delegate the performance of its functions for any other than ministerial purposes; and could much less without his approval, substitute for it a trust permanently vested in another person. The confirmation of the writing in question by S. B. Ludlow, was, therefore, indispensable to its validity as an *assignment* of the subject of their agency.

But the defendants having a qualified interest of *their own* in the remittances, coincident and co-extensive with the *beneficial* purposes expressed in the paper, it would, in equity, though

never confirmed by S. B. Ludlow, have been effectual from its date, not as an assignment, but as a declaration by them of a trust attaching to the ultimate avails of the remittances, when they should be received in cash, or its equivalent. The effect of such a declaration of trust was to render the defendants, from its date, incapable of concurring, as they otherwise might have concurred, with S. B. Ludlow, in any different disposition of the remittances. Unless he or the defendants paid the drafts from other sources, no such different disposition could be made. While they were unpaid, the security for their holders in the surplus of the proceeds of the remittances that might remain after the reimbursement of the defendants' advances could not be frustrated.

As an equitable appropriation, this writing, therefore, took effect sufficiently for its intended purpose, through the original qualified interest of the defendants in the remittances. Upon this derivative support it rested until complete effect was afterwards given to it, as an assignment, by S. B. Ludlow's ratification. From its date until this ratification, as well as afterwards, the defendants thus had, under it, an interest which was cognizable in a court of equity.

14. The debts and liabilities which it secured sufficed, as a *consideration,* to support it without a *seal.*

15. As it imposed upon the draft holders no burden, and required of them no relinquishment of any right, or performance of any condition, in order to entitle them to the benefit of the security, their acceptance of its benefit was legally presumable without any proof of their actual assent, or even of their knowledge of the existence of the paper.

16. Had this been otherwise, and had the appropriation made by it been revocable by the defendants before it was acted upon or its existence made known, it nevertheless became irrevocable when they communicated its existence to parties interested, in a manner to induce reliance upon its availability, and acted upon it in other modes as an existing security.

17. The appropriation having taken effect, the subsequent cancellation of the writing, and attempted annulment of the

security which it had created, could not prevent or impair its continued operation.

18. As the writing, when ratified, became effectual as an *assignment,* and as the draft holders benefited by it were *creditors,* it was, in one sense, an *assignment for the benefit of creditors.* But within the meaning of the legislation of the State as to instruments of this denomination, it was neither an assignment, nor a partial assignment for the benefit of creditors. This legislation is not applicable to an assignment of what cannot be transferred at the assignor's option for the benefit of other creditors than the parties particularly secured. Here, though the draft holders had no previous interest in their own right, they would have derived incidentally the same benefit of the previous appropriation, if it had never been revoked, as was by this writing secured to them irrevocably. It created, therefore, no *new* security, so far as the interests of general creditors might be concerned. Had it never been executed, and had the defendants and S. B. Ludlow severally made general assignments for the benefit of their respective creditors, the funds in question could not, as we have seen, have been distributed as a part of the general estate under either assignment. The writing in question appropriated them in the very mode in which a court of equity would have made the distribution, *under such circumstances,* if no such writing had existed.

The writing, in whatever sense it may be denominable an assignment, being therefore unaffected by this legislation, the question whether the parties in the cause were not placed, by the writing, in such a relation of privity of interest as would have here excluded the application of these laws of the State, does not arise.

The opinion which has been thus, in part, abstracted, defined particularly the purposes of such a reference for an account, and report of distribution, as, according to the principles from which these propositions resulted, would have been ordered at once, if the cause could have been decided between the draft holders and the original defendants. But an imme-

diate decision of the cause, according to these principles, was prevented by the necessity for considering an objection which had been suggested—that a decree could not be made until S. B. Ludlow should have been brought into court as a party. This objection is the subject of present consideration.

S. B. Ludlow is not a person against whom, as a party, an enforcement of any decree by judicial process would be necessary. The question whether he was a necessary party, depended, therefore, upon the species of necessity which is determinable with a sole reference to the *right of contestation* recognized by courts of equity as belonging to every person who has an *interest* in the subject of controversy.

The act of 28th February, 1839, provides that where, in any suit at law, or in equity, commenced in any court of the United States, there shall be several defendants, any one or more of whom shall not be inhabitants of, or found within the district where the suit is brought, or shall not voluntarily appear thereto, it shall be lawful for the court to entertain jurisdiction, and proceed to the trial and adjudication of such suit between the parties who may be properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties not regularly served with process, or not voluntarily appearing to answer; and the non-joinder of parties who are not so inhabitants, or found within the district, shall constitute no matter of abatement, or other objection to said suit. Under this act a decree might have been made, without S. B. Ludlow as a party, so far as the amounts for which the original defendants were pecuniarily liable to the draft holders were concerned. But such a decree, if these defendants were still insolvent, might have been of little avail to the complainants. The question principally considered, therefore, has been whether under the act, or independently of it, the objection could be disregarded as to *the fund in the hands of the receiver.* Of this fund the resulting ownership is in S. B. Ludlow, who, if the complainant's case were fully sustained, has an option to

redeem the fund by payment of the drafts in question from other sources.   Independently of this right, he has an interest entitling him to contest every allegation of the bill on which a decree in favor of the draft holders might be founded, and to avoid, if he can, the effect of the complainants' allegations, by introducing new matter.   The act of 1839 does not sanction a decree that may affect such an interest unless its proprietor is before the court as a party.   Shields *v.* Barrow, 17 Howard, 130; Coiron *v.* Millaudon, 19 How. 115, and Green *v.* Sisson, 2 Curtis, 177, show that the present case, as to the fund in the receiver's hands, must, therefore, be determined independently of that act.

In the Circuit Courts of the United States, in consequence of "the peculiar structure of their limited jurisdiction over persons," the general rule of equity practice, that all persons interested shall be brought in as parties, has not been applied without some qualification.   Its unqualified application, in cases not within the act of 1839, would often divest these courts of their jurisdiction as it is defined in the Constitution and acts of Congress.   Therefore, if a plaintiff has done all that lies in his power to bring every person interested before the court, a decree upon the merits may be made, though an interest exists in some person whom, as the resident of another State, the process of the court cannot reach, if the case may be *completely* decided as between the parties in court.   But this relaxation of the rule has been admitted only where "the right of the party before the court did not depend upon the right of the party not before the court; each of their rights stood upon its own independent basis; and the ground upon which it was necessary, according to the general principle, to have both before the court, was, to avoid multiplicity of suits, and to have the whole matter settled at once."   No exception from the rule has ever been allowed where the rights of the parties before the court are not separable from, and independent of, the rights of the person who is not made a party.   In such a case there can be no adjudication affecting the subject of his interest.   This appears from the case of Mallow *v.* Hinde, 12 Wheaton, 197 to 199, cited in

Shields *v.* Barrow, and in other decisions which might be mentioned.

According to these rules of decision, the objection of the want of S. B. Ludlow as a party prevented a decree from being entered in favor of the complainants. For any reason other than to facilitate an appeal from a decision in support of this objection, the court was not willing to dismiss the bill hastily upon the objection. As between the complainants and the original defendants, this fund had been rightly taken into the custody of the court for the purpose of preventing its malappropriation. There was no want of jurisdiction between these original parties; and at the stage of the cause at which the receiver was appointed, the objection of the want of *other* necessary parties would not have prevented his appointment. (See 12 Wheat. 198; 2 Russell, 149, 152; 3 Hare, 62, 63.) It might then have been expected that S. B. Ludlow, when apprised of the proceeding, would become a co-plaintiff. If, in an ulterior stage of the proceeding, the court found itself unable, without having him before it as a party, to make a decree upon the merits, the suggestion of the difficulty was by parties who did not support the objection upon any equity of their own. Whether a decree of dismissal could have been made at the instance of these defendants, without some provision for the future security of the fund in court, is a question which it was not necessary immediately to decide. The fund could not be restored to *them,* to be handed by them to Beebee & Co., under the wrongful acts of appropriation which have been mentioned, without permitting a palpable violation of honesty. Certainly, no decree, other than one in favor of the draft holders, would have been proper while there was any probability that, if the cause were retained, the impediment in the way of such a decree on the merits might be removed. In the above cited case of Mallow *v.* Hinde, an injunction against proceeding under judgments at law had been granted in an early stage of a suit in equity, in which the objection of want of parties finally prevailed. The necessary parties who could not be served with process were named Taylor and the Beards.

The Supreme Court said : "We have no doubt the Circuit Court had jurisdiction between the complainants and the defendant Hinde, so far as to entertain the bill, and grant an injunction against the judgments at law, until the matter could be heard in equity. And if it had been shown to the Circuit Court, that from the incapacity of that court to bring all the necessary parties before it, that court could not decide finally the rights in contest, the court, in the exercise of a sound discretion, might have *retained the cause,* and the *injunction,* on the application of the complainants, until they had reasonable time to litigate the matters of controversy between them and Taylor and the Beards in the courts of the State, or such other courts as had jurisdiction over them; and if then it was made to appear, by the judgment of a competent tribunal, that the complainants were equitably interested with the rights of Taylor, the trustee, and the cestuis que trust, * * * the Circuit Court could have proceeded to decree upon the merits. * * * Such a proceeding would seem to be justified by the urgent necessity of the case, in order to prevent a failure of justice. (12 Wheat. 198, 199.)

The court suggested its readiness to dismiss the bill without prejudice, founding the dismissal upon the want of S. B. Ludlow as a party, if such a dismissal would expedite an appeal from such a decision of the point. But the complainant's counsel intimated no desire of an immediate decision for this purpose. The cause was retained, therefore, with a suggestion, however, from the court, that perhaps it could not be thus retained indefinitely.*

At this period the belief was that S. B. Ludlow, as a citizen of California, and resident of that State, was not amenable to the process of the court. He had, however, as the complain-

* The practice in England, as Mr. Daniel states it on the authority of 2 Atk. 14, 3 Atk. 111, and 5 Bro. P. C. 504, is, not to dismiss a bill for want of parties immediately, when the objection is sustained, but to order the case thus to stand over. In *Herndon v.* Ridgway, 17 How. 425, a cause appears to have been retained twelve months before dismissal, for want of parties upon motion in an earlier stage of the proceedings.

ants allege to have been afterwards ascertained by them, become, in the meantime, a citizen of Pennsylvania, by having resumed his residence in the State, but in the *western* district. The complainants have since adopted measures for making him a party. An objection to the sufficiency of these measures for their intended purpose has been interposed. It is made, not on his own part, but on that of the original defendants. Nevertheless, it must be considered, so far as it involves the question whether he has been effectually made a party in the cause.

The complainants appear to have assumed that, as to S. B. Ludlow, the necessary proceeding is for the simple *addition* of a party by way of *amendment*. This is a mistake. The foundation of the right of suit in this case is the appropriation made on the 1st September, 1851, by the original defendants. But S. B. Ludlow had, as we have seen, a right of ratifying this act so as to make it his own. His letter of 14th October, 1851, which appears to have been his first adoption of it, was not written until after the original bill in this case had been filed. If this letter had not operated as a ratification, it would have constituted in itself a sufficient independent appropriation for the security of some, if not of all of the draft holders. Regarded as a ratification, its effect was to modify materially the character of the interest which had previously been equitably vested in the draft holders under the appropriation, as an act of the original defendants alone. Until thus ratified it had taken effect only as the declaration of a trust, attaching to these defendants' own interest in the ultimate proceeds of the remittances in their hands. It operated afterwards as an assignment of the immediate property in the remittances themselves upon a direct trust for the security of the draft holders.

Even if the necessity for the proceeding against S. B. Ludlow had not, in part, arisen thus from a material occurrence happening after the filing of the original bill, he could not regularly have been brought in as a party by way of simple amendment in so late a stage of the cause. When a cause, after evidence taken or a master's report made, has been heard upon bill, answer and replication, a new party who might, in an earlier

stage, have been added by amendment, cannot regularly be brought in otherwise than by supplemental bill.

But, a bill simply supplemental, or a supplemental bill in the nature of an amended bill, is a proceeding essentially different from that which must be instituted where parties have acquired, as the complainants had here acquired, a *new* or *modified* equitable or legal interest in the subject of litigation *after* the commencement of the original suit, or where the relation of defendants to the subject of controversy may be determinable, in part, by the effect of an *occurrence happening,*—or, as in this case, an *act performed,*—since its commencement. Such a new proceeding may, according to the circumstances of different cases, approximate, in its character, in various degrees, to that of an original bill; and, so far as a new party is concerned, may sometimes even become a bill entirely original. In 1 Eq. Abr. 2 (B.) pl. 1, reasons are given for the rule, which was recognized nearly two centuries ago, that a devisee cannot bring a bill of revivor, for want of privity, but must bring his *original bill.* When a new party is to be added in respect of such an interest as was in question in the present case, and the effect of the proceeding against him depends, or may depend, upon the effect of an act which, like S. B. Ludlow's ratification of the paper in question, has occurred after the former suit was brought, the bill, though *supplemental,* as to the *former* parties, is, as to *him,* an *entirely original bill.* This is distinctly apparent in Vice Chancellor Shadwell's opinion in Woods *v.* Woods, 10 Simons, 210, 213, a case which, much less than the present, required such a decision. He founded his opinion upon texts of Lord Redesdale's treatise which he quoted. The following additional passages may be cited from the 4th edition of the treatise. On pp. 72, 73, and 98, 99, Lord Redesdale specifies cases in which "the suit cannot be continued by a bill of revivor, and its defects cannot be supplied by a supplemental bill; but *by an original bill in the nature of a supplemental bill* the benefit of the former proceedings may be obtained." He says (p. 99) : "This bill, though partaking of the nature of a supplemental bill, is *not an addition* to the original bill, but

*another original bill,* which, in its consequences, may draw to
itself the advantage of the proceedings on the former bill." He
had on pp. 63, 64, defined cases in which parties to the suit are
able to proceed in it to a *certain extent,* though, from an event
subsequent to the filing of the original bill, the proceedings are
not sufficient to attain their *full* object, as when the subsequent
event gives a new interest in the matter in dispute to any person
not a party to the former bill, or, a *new interest to a party.* He
observed, in effect, that, in such case, the defect may be sup-
plied by a bill which is usually called a *supplemental bill,* and
is, in fact, merely so with respect to the rest of the suit, though
with respect to its immediate object, and especially against any
*new party,* it has also, in some degree, the effect of an original
bill.    He says on pp. 72, 73; "There seems to be this difference
between an original bill in the nature of a bill of revivor, and an
*original bill in the nature of a supplemental bill.*    Upon the
first, the benefit of the former proceedings is absolutely ob-
tained, so that the pleadings in the first cause, and the deposi-
tions of witnesses, if any have been taken, may be used in the
same manner as if filed or taken in the second cause; and, if
any decree has been made in the first cause, the same decree
shall be made in the second.    But, in the other case, a new
defence may be made; the pleadings and depositions cannot be
used in the same manner as if filed, or taken, in the same cause;
and the decree, if any has been obtained, is not otherwise of
advantage than as it may be an inducement to the court to make
a similar decree."    This passage was commented upon by Lord
Eldon (9 Ves. 54, 55), in the case of a tenant in tail, who, upon
the death of a preceding tenant in tail party to a suit in equity,
succeeded to the right of suit, not as heir of the former party,
but as remainderman, "claiming," as Lord Eldon expressed it,
"by force of a new limitation, and not by succession."    He
thought the right of such a party to the benefit of the former
proceedings, including the depositions, dependent upon such
order as the court might make upon a view of the circumstances
of the case.    (See also 13 Simons, 287, 288; 2 Hare, 95, 96.)
In the case in 10 Simons, from which Vice Chancellor Shad-

well's opinion has been quoted, a bill was filed against a trustee with power to sell, and a purchaser from the trustee, to set aside the purchase on the ground of fraud. The purchaser, after filing his answer, died. The plaintiff then filed against his devisees the bill which Sir Lancelot Shadwell denominated *original* as to them, though supplemental as to the trustee. The question was, whether the insertion by the pleader in the latter bill of nearly the whole of the contents of the original bill was, or was not, according to the rules of equity practice, objectionable. It would have been objectionable if the proceedings in question had been, as to the *new* parties, a continuance of the original proceeding. The Vice Chancellor decided that it was not objectionable, because the suit, as to them, was an entirely new one. It was, he thought, not less a suit newly brought as to them because the former proceeding was continued against the original parties. In our practice, a supplemental bill which, as to a new party, is an original bill, would, no doubt, be sustained if references to the contents of the original bill on file were so made as to incorporate the parts referred to, without repeating them at length. In the case which has been cited, the decision was, not that they *must,* but that they *might* be thus repeated.* The omission to repeat them would not render the substantial character of the proceeding less that of a suit newly brought against such a party.

The case thus decided was not one in which the point arose, as it here arises, upon an *act* of the new defendant *himself,* performed after the commencement of the original suit. The present case is, therefore, even more clearly that of a new suit against S. B. Ludlow, in respect of his act of ratification, than the case decided by Vice Chancellor Shadwell.

The proper character and form, in this respect, of a proceeding for the purpose of bringing in S. B. Ludlow as a party, having been thus determined, we may, before considering further the sufficiency of the particular measures which have been

---

* Since the decision the practice in England has been modified by statute and by orders in chancery.

adopted for the purpose, inquire whether the process of the Circuit Court for *this* district of the State can, in *any* mode, be executed for the purpose in the *other* district.

The compulsory exercise of the jurisdiction of the courts of the United States, through the execution of process by the marshals of the respective districts, may, where a State has been divided into two or more districts, depend upon the division of the State in which a party resides, or may be served with process. The marshal, where his authority has not been, for special purposes, enlarged by particular legislation, can "execute throughout the district" for which he has been appointed, all such lawful precepts issued under the authority of the United States as may be directed to him; but cannot go out of his district. The occasional consequent limitation of the *exercise* of the jurisdiction of the Circuit Courts is, however, not a limitation of the *jurisdiction* itself. This jurisdiction of the Circuit Courts never depends upon the district of a State in which one of her citizens resides or may be found. The jurisdiction, as to all persons, except aliens, depends upon *citizenship* alone of the respective States. In the present case, therefore, the question is not one of *jurisdiction,* but of its *exercise.* (See Wheat. 699; Pet. C. C. 491.)

Under acts of Congress now in force, there are States of which each constitutes a single judicial district. The other States are divided, each, into two or more districts. No State is divided into districts which are in different circuits; and no district is composed of parts of any two States. Under the judicial system of the United States, the relations within a State, of two districts into which it has been divided, are, for many purposes, different from the relations of each, or both, to the district of any other State. The differences depend as well upon considerations of uniformity in the exercise of jurisdiction, as upon those of the separate sovereignties of the several States, which require, for the one case, provisions not needed for the other. For some purposes, the several districts of a State are little else than divisions of a district composed of the entire State.

The general motives and purposes of the series of statutes which have organized the system, and regulated the course of procedure under it, have been consistent and uniform.    The act of 13th February, 1801, by which the courts were temporarily reorganized, should not, however, be regarded as one of the series.    If a deviation, or tendency to deviate, in some particulars, from their otherwise uniform policy may be detected in certain provisions of this act, the extreme shortness of the time during which it was permitted to remain in force, and the complete restoration of the previous system effected by its early repeal, furnish sufficient reasons to dismiss it from consideration under this head, and render any recurrence to the well-known historical causes of its repeal unnecessary.

The judiciary act of 1789 contained peculiar provisions as to Kentucky and Maine.    These provisions have ceased to be in force; but their former motives require explanation.    Kentucky, though a part of Virginia, was, under the provision in the constitution for the admission of new States, on the very point of becoming a separate State. · As to her, the legislation was for her prospective condition of a State.    Maine, though a part of Massachusetts, was territorially detached.    So far as the course of procedure might be concerned, she was to be treated as a separate jurisdiction, in order that crossing and recrossing the intervening State of New Hampshire, in the service of process, might be avoided.

This act made Kentucky and Maine each a separate district. Neither of these two districts was made a part of any judicial circuit.    The act conferred the jurisdiction of a Circuit Court upon the District Court of each of them, so far as this could be done without making it a Circuit Court.    Eleven other judicial districts, created by the act, were composed, each, of one of the eleven States which had then ratified the constitution.    These eleven States, as districts, were divided into three circuits, each composed of two or more such States as districts.    The two other original States, having afterwards ratified the constitution, each of them was, in the year 1790, made a district, and annexed to one of the three former circuits.    In 1792, under

an act passed in 1791, Kentucky was admitted as a State, without any immediate change in the provisions, concerning her, of the act of 1789. Vermont, having also become a State, was, in 1791, made a district, and annexed to one of the original circuits. There thus were sixteen judicial districts. Each of the fifteen States constituted an entire district, except Massachusetts, whose detached territory, constituting a separate district, was not a division like any of the divisions of States into districts which were afterwards made.

Lest a doubt should arise whether, under this organization of the courts of the United States, their process might not, in certain cases, run beyond their *jurisdiction,* the act of 1789 provided, or, as Judge Washington says, *declared* that no civil suit should be brought before either of the said courts against an inhabitant of the United States, by any *original process* in any other district than that in which he is an inhabitant, or in which he shall be found at the time of serving the writ. In the reported cases, the effect of this enactment has been considered with a sole reference to the constructive, or actual service of process beyond the limits of the State, as well as district, for which the court issuing it was held. These cases recognize, as independent of the enactment, the rule that a controversy is not cognizable by a tribunal which has *jurisdiction* of neither the *thing* nor the *person* against whom proceedings are directed. They regard the prohibition in the act as a measure of precautionary legislation to prevent a departure from this rule in the procedure of the courts of the United States. Toland *v.* Sprague, 12 Peters, 300; Picquet *v* Swan, 5 Mason, 35; Exp. Graham, 3 Wash. C. C. 456; 4 Wash. C. C. 54, 211; Allen *v.* Blunt, 1 Blatchf. 487, 488; Day *v.* Newark Co., *ib.* 630.

A suit in equity, in which the original process is a writ of *subpœna to appear and answer,* was, of course, included in this prohibition. In the Introduction to Crompton's Practice, published three years before the act was passed, this writ, as used on the equity side of the English Court of Exchequer, in imita-

tion of the course of proceeding in chancery, had been denominated "an original process in a civil action." It was perhaps the original process as to which the precaution of such an enactment was, most of all, necessary. As a process directed *immediately* to parties defendant, it differs from the original process in suits at law, which is directed to the marshal, sheriff, or other local officer by whom it is to be executed. In consequence of this difference from process *ministerially directed,* it was, at one time, supposed in England that service of a subpœna upon a defendant in Scotland, or even beyond the four seas, if personally made, would be sufficient. (2 Madd. Pr. 2d ed. p. 199.) The opinion was apparently sustained by reported cases. But upon examination of the Registrar's book, it was afterwards discovered that these cases had been misreported. A service of the subpœna made *beyond the jurisdiction* of the court which issues it, except in modes, and under circumstances in which it has, from time to time, been authorized by statutes, is now regarded in England either as an absolute nullity, or as an insufficient foundation for any process of contempt for non-appearance. (2 Simons, 544; 4 Paige, 429; 1 Molloy, 244, 245; 1 Hogan, 79, 131; 6 El. & Bl. 824, 825; and see the reports of the last case in 2 Jur. N. S. 787, and 36 Eng. L. & Eq. 179.) The same rule now applies as to service of the writ in Jersey, Guernsey, and the other Norman Isles, which are under British dominion, but in which English laws are not in force, and the jurisdiction of English courts is not exercisable. (Fernandez *v.* Corbin, 2 Simons, 544; see 4 Inst. 286; 11 Exch. Rep. 64, 67, 68.) A case reported as having occurred in the year 1781, shows, however, that at the date of the act of 1789, there was in England a contrariety of opinion upon the general subject. (2 Dickens, 587.)

While every State, except Massachusetts with reference to Maine, constituted still a single entire district, the act of 2d March, 1793, s. 6, enacted that subpœnas for witnesses required to attend a court of the United States, in any district, may run into any other district, provided that, in civil causes, the witnesses do not live out of the district at a distance greater than

one hundred miles from the place of holding the court. This, it is believed, is the only law of the United States which, for any purpose whatever, authorizes any process issued on behalf of a private party to cross the line of a State.

By an act of 9th June, 1794, "the State of North Carolina" was "divided into three districts, in which the district court of the said State" was to "be held at such times and places as" were "already ascertained by law" for the stated sessions of the court. The act defined the territorial extension of the respective districts. It created no new or distinct court. The judge, clerk, and marshal, a single officer of each denomination, retained respectively their former positions for the whole original district, of which the so-called new districts were thus divisions. An act of 1797 reunited them as a single district; but an act of 29th April, 1802, again divided the State into three such districts or divisions.

The same act of 29th April, 1802, divided Tennessee which had, in the meantime, been admitted as a State, into two districts. The court of each district was to be held by the judge of the former district in whose office no change was made; but the districts were not the less distinctly organized with a different clerk, marshal, and attorney of the United States for each. The subsequent acts as to Tennessee prior to one of the year 1822, which will be particularly mentioned under a distinct head, require no citation.

An act of 9th April, 1814, "for the more convenient transaction of business in the courts of the United States within the State of New York," divided that State into two districts. But there was no marshal in the State other than the former one officiating under his previous commission, until after the 3d March, 1815, when an act authorizing the appointment of a marshal for the northern district impliedly limited the official character of the former incumbent and his successors to that of marshal for the southern district.

By an act of 20th April, 1818, Pennsylvania was divided into an eastern and a western district, each separately organized, with a judge, district attorney, and marshal of its own; and by

an act of 4th February, 1819, Virginia was divided into two similar districts.    These respective acts conferred upon the district court of the western district of each of the two States, in addition to the ordinary jurisdiction and powers of a district court, the jurisdiction of all causes, except appeals and writs of error, cognizable by law in a circuit court, subject to writs of error in modes respectively provided.    The law dividing Pennsylvania contained an enactment in the words, "all actions, suits, process, pleadings, and other proceedings of a civil nature, except in cases of appeals and writs of error, commenced and pending in the district or circuit court of said district of Pennsylvania, in which no verdict shall have passed, or plea to the merits shall have been decided, and which, by law, should have been had or commenced in said district court of said western district, if the same had been had or commenced before the passing hereof, and where the parties shall not otherwise agree, shall be and hereby are continued over to the district court of the western district established by this act, and shall there be proceeded in with like effect and in the same manner as if originally had or commenced therein."

No other States had been divided into districts when the Supreme Court, at February term, 1822, under the authority of the act of 8th May, 1792, s. 2, prescribed "rules of practice for the courts of equity of the United States."    A comparison of the acts which had thus divided five of the States indicates that there had not been any uniform system of legislation on the subject.    The general purpose of these acts, indeed their sole purpose, had been a convenient partition of the judicial business within the respective States.    An extinction of any part of the former business of the courts was not intended.    So far as it had occurred indirectly through the provisions of the acts, it was a result of defective legislation.    The result, perhaps, may not have been produced at all in North Carolina, where one marshal still officiated for the whole State.    However this may have been, the result in New York, Pennsylvania, and Virginia was, that in suits at *law,* as the process could not be directed otherwise than to the marshal of the district in which

it was issued, it could not be *served* in another district of the State. Where the jurisdiction existed, its *exercise* was thus prevented in cases in which the defendants, though citizens of the State, did not appear, and could not be served with process in the district. For such cases, a partial remedy of this evil was provided by the above-mentioned act of 1839, and a complete remedy by an act of 4th May, 1858, which will be mentioned hereafter.

In the case of a subpœna to testify, the act of 1793 had been intended merely to sanction crossing the line of a *State* for the purpose of service of the writ upon a witness not living more than one hundred miles from the place of trial. After certain States had subsequently been divided into districts, the act, of course, authorized the service of it upon such a witness beyond the line of the district, but within the limits of the State in which it was issued, if a legislative authority for such a service of it was required. But in the case of a witness living within the State, more than one hundred miles from the place of holding the court, who has been served within the State, but out of the district, though service of the subpœna should be deemed regular, there cannot be an attachment if he disobeys its mandate. Whether the service of the subpœna would be deemed regular or not is, therefore, a question of little, if any, practical importance, and one which, in practice, can scarcely arise.

But the case of a subpœna to appear and answer in an equity suit is, in this respect, different in the courts of the United States. The difference has existed since the adoption of the rules of 1822, if not from an earlier period. The effect of the prior legislation which has been mentioned, upon the case of defendants in a suit in equity, citizens of the same State, but not residing or found within the same district of the State, had been different from its effect in suits at law.

The writ of subpœna to appear and answer in equity, as process directed immediately to the defendants themselves, has already been distinguished from original process *at law*. The subpœna differs in like manner from the subsequent processes of contempt for not appearing in obedience to its mandate, or

for not answering after appearance.  These processes, of which the attachment is the first, are directed in England to the sheriff or other local officer.  A marshal of the United States cannot execute one of these processes beyond his district.  But it by no means followed that the process of subpœna, when issued by the Circuit Court for one of the districts of a State, could not, in any case, be served in another district of the same State. Until the promulgation by the Supreme Court of the rules of 1842, this process might have been served by *any person.*  The rules of 1822 had not required that it should in any case be served by a marshal.  The 8th of those rules merely required that it should be executed by a sworn officer, *or* that affidavit of the service of it when executed by any *other* person should be made.  The 15th of the rules of 1842 is that "the service of all process, mesne, and final, shall be by the marshal of the district or his deputy, or by some other person specially appointed by the court for that purpose, and not otherwise.  In the latter case, the person serving the process shall make affidavit thereof."  The subpœna, when there is no special order of the court, is, under this rule, in substance and effect *process directed to the marshal,* but it is not in *form* directed to the marshal.  Other process is directed to him, and cannot be directed, even by the court's order, to any other person, except in the case in which he or his deputy is a party, as provided by the act of 1789.  The distinction between such other process and the subpœna to appear and answer is recognised in the rule of 1842, which does not limit the court's power to direct that the subpœna shall be served by another person in this case alone, in which the marshal is a party.  This power, under the rule, is exercisable, therefore, whenever its exercise may, in the opinion of the court, promote the ends of justice, conformably to the rules prescribed by Congress in organizing the courts and regulating their procedure.

  We have seen that in England the service of such a subpœna out of the realm is not regarded as effectual, because the writ cannot run beyond the limits of the *jurisdiction.*  But the process of subpœna always ran, throughout the realm, into its

.territorial divisions, in which *ministerially directed* processes of the Court of Chancery, including the processes of contempt, could not be executed by any local officer to whom they might have been addressed. The subpœna was the former process to bring in a party to answer a charge before the King in Council (see Hale's Jurisd. H. L., pp. 7, 44), and was, for some remedial purposes, a usual process of the Court of Chancery as early as the reign of Edward III, when the jurisdiction of the court was beginning to show traces of a partial independence of that of the Council. (See the records in 1 Ro. Abr. 372.) The present equitable jurisdiction of the court, if not that which was thus exercised at that period, originated in it; and the process was indubitably the same. If a question could have arisen as to the *propriety,* there could be none as to the *power* of sending this original process into any part of the realm. (See 2 Burr. 856.) Chief Baron Gilbert (For. Rom.) appears to have thought that the subpœna to appear and answer had been adopted from the common law process to bring in a witness to testify. The subpœna to testify, like the subpœna to answer, cannot be served beyond the *jurisdiction* of the court which issues it. But it runs into every part of the territory which is *within* the court's jurisdiction. Thus, in Pennsylvania, when it issues from one of the courts of the respective counties, it runs into every county of the State. 2 Serg. & Rawle, 349.

The distinction between the process which is directed to a local officer, and the process of subpœna directed to the party, has been exemplified in England in the case of a defendant residing in one of the counties palatine. The peculiar jurisdiction of the court of equity of the palatinate is exercisable only "between parties dwelling within the same, and for lands there, and for other local matters." (Hales *v.* Daniel, Nels. Ch. 67, 68, 1 Ca. in Ch. 41; Moor *v.* Somersett, Nels. Ch. 51.) Thus defined, it is an exclusive jurisdiction. But if the suit is not of a local nature, or if any one party sued resides elsewhere, or if complete justice cannot, for any other cause, be rendered in that court, the Court of Chancery of England, or the Court of Exchequer on its equity side, has the jurisdiction. The legal

presumption is always in favor of the jurisdiction of the Superior Court until a case has been shown, *upon plea,* to be exclusively cognizable and sufficiently remediable by the local court. A subpœna to appear and answer in an equity suit in chancery, or in the Exchequer, may, therefore, be served in a county palatine. (Cheetham *v.* Crook, 1 McClel. & Y. 307; Egerton *v.* Derby, 4 Inst. 213, 12 Co. 114; Edgworth *v.* Davis, Nels. Ch. 66; Owen *v.* Holt, Hob. 77, 78; Lord Redesd. Tr. 224, 225, 4th ed., and the cases there cited.) But, independently of the statute 27 H. 8, c. 24, s. 3, and some other acts of Parliament, the Court of Chancery, if the defendant had not appeared, could not have issued an attachment or other process of contempt to be executed within the palatinate. The act provided that, after a day named in it, all process in every county palatine should be made in the name of the King by the person having the royalty, and should be tested in the name of such person. Under this enactment the process could not regularly be issued out of the Chancery in the name of the King, directed to the Sheriff of the county palatine. The practice was to issue out of the Chancery of England a writ in the name of the King, directed to the chief judicial officer* of the county palatine, requiring him, under the seal of that county, in the name of the King, to command the sheriff of the county to attach the defendant. (See Lord Cholmondeley's Case, cited by Lord Kenyon in 6 Durnf. & E. 73.) If the writ were addressed directly to the sheriff of the county palatine, it would, on motion, be quashed. (Bradshaw *v.* Davis, 1 Chitty, 374; and see Bracebridge *v.* Johnson, 1 Brod. & Bingh. 12.) The effect of British statutes of the present century has been to alter this practice as to the palatinates of Durham and Chester. But it was followed as to the Duchy of Lancaster after their enactment. Lord Kenyon thought that so soon as the writ of attachment, properly tested, had been made out in the county

---

* The writ was directed to the Bishop of Durham, who alone of the proprietors of the palatinates, had an appellate judicial cognizance of suits in equity in their courts. It was directed to the Chamberlain of Chester, and to the Chancellor of the Duchy of Lancaster.

palatine, and been delivered there to the sheriff, he became responsible directly to the Court of Chancery for his acts and omissions under it. The practice in the chancery, when obedience by the sheriff is to be enforced, is, however, to make an order upon the judicial officer of the palatinate to return the writ directed to him, and afterwards to make an order upon the sheriff of the county palatine to return the second writ.

In England these distinctions between the process of subpœna and processes of contempt have been matters rather of form than of substance. Judgment that the bill be taken as confessed cannot there be entered until the defendant, after appearance, has been proceeded against as in contempt for not answering. Consequently, the question of the regularity of the place of service of the subpœna has usually arisen upon a subsequent application for an attachment, when it has, for practical purposes, been resolved into a question whether the attachment could be executed there. If it could not, the regularity of the service of the subpœna had usually been a point of no practical importance.

But in the courts of the United States a different practice, which had prevailed in some of the States before the judiciary act of 1789, and had been followed under it in some of the circuits, was established on a uniform footing for all of them by the rules of 1822. According to this practice, if the defendant did not appear and file his answer within a prescribed period after the proper day for his appearance, the complainant, at his option, instead of proceeding by attachment, might "proceed to take his bill for confessed," or he might have a general commission to take depositions, and proceed to a hearing as if there had been an answer and replication. The rules of 1842, omitting the latter alternative, require that, at the bottom of the subpœna, shall be placed a memorandum that the defendant is to enter his appearance on or before the return day, "otherwise the bill may be taken pro confesso"; and provide for the entry of an order that it be so taken if he do not answer within a prescribed period.

The judiciary act of 1789 would thus have given cognizance

of the present case to this court; and the acts which have since divided the original district have neither taken the jurisdiction away, nor prevented its exercise. According to the practice recognized or established by the rules of 1822, and continued under those of 1842, if an equity suit was *properly brought in any district* against certain defendants, there could be no difficulty, doctrinal or practical, in the service of a subpœna upon other defendants, citizens of the same State, residing in another district of the State. Under the rules of 1822, this writ might have been served upon them by any person. Under the rules of 1842, there could be no difficulty in obtaining, in a proper case, a special appointment by the court of a person to make the service. After waiting the prescribed time to afford an opportunity for contestation by the party served, an order might, if he did not appear, be obtained, that the bill, as to him, should be taken as confessed. As no further decree, and no enforcement of any decree, would, as to S. B. Ludlow, be necessary in this cause, it might, after such an order, proceed against the other parties without further impediment under this head.

This, it has been said, would have been the practice in a case like the present, *properly brought* in the district in which the process was issued. In the present case, the question whether this was the *proper* district could have been attended with no difficulty. The principal, as well as the primary, cognizance of the cause was here.

But, in cases of a different character, the question which district was the proper one for the cognizance of an equity suit against defendants within the jurisdiction, but residing in different districts of the same State, must often have been attended with embarrassing difficulties. A simple rule would have been, that the filing of the bill in either district, and primary service of process within its limits upon any one defendant, should always vest the cognizance of the cause in the Circuit Court of such district. In an equity suit, however, the casual primary service upon a mere formal party, having an insignificant interest, or, perhaps, no interest whatever in his own right, might, under such a rule of practice, have taken away the right of adju-

dication from the court of the district in which the controversy
would seem, in a particular case, to be principally cognizable.
But the objection thus founded upon the contingent occasional
occurrence of such a case was outweighed by considerations in
favor of a rule of certain and uniform applicability.   Therefore,
a series of particular statutes, beginning in the year 1822, de-
termined, according to this rule, the practice of the Circuit
Courts for the several districts of the respective States of Ten-
nessee, Alabama, Mississippi, Georgia, Iowa, Ohio, and Texas.
The last of these particular enactments was in 1857.   The first
of them had been passed on 30th March, 1822.   It enacted as
to suits by citizens of the United States in the Circuit Court of
the United States for either the district of East or of West Ten-
nessee, against two or more citizens of the State of Tennessee,
some of whom should reside in East and some in West Tennes-
see, that the plaintiff might cause the clerk of the Circuit Court
in which he should elect to commence his suit to issue duplicate
writs, one directed to the marshal of East and the other to the
marshal of West Tennessee, which writs it should be the duty
of the respective marshals to execute and return, and that, when
returned, they should be docketed and proceeded in to judgment
as one case only.   A provision authorizing executions to run
from one district of the State into the other was added.   An act
of 18th January, 1839, divided the State into three districts,
and re-enacted the above provisions of the act of 1822, confin-
ing, however, its provisions to suits not of a local nature, but
omitting the restriction which had confined their application to
cases in which citizens of the United States were plaintiffs.
The form of the acts passed, before 1839, as to Alabama and
Mississippi, and after 1839, as to Georgia, Iowa, Ohio, and
Texas, differed from the act as to Tennessee only in the degrees
in which the language used in them, respectively, approximated
that of a general act passed on 4th May, 1858, for the apparent
purpose of regulating the practice, under this head, upon a uni-
form footing throughout the United States.

   This general act of 4th May, 1858, is entitled "An act to
provide for the issuing, service, and return of original and final

process in the circuit and district courts of the United States in certain cases." The first section enacts, "that all suits not of a local nature *hereafter to be brought* in the Circuit and District Courts of the United States, in a district in any State containing more than one district, against a single defendant shall be brought in the district in which the defendant resides; but if there be two or more defendants residing in different districts in the same State, the plaintiff may sue in either district, and issue a duplicate writ against the defendants *directed to the marshal* of any other district within the State in which any of the defendants reside, on which duplicate writ the clerk issuing the same shall endorse that it is a true copy of a writ sued out of the court of the proper district; and such original, and duplicate writs, so issued, shall, when executed, be proceeded on accordingly; and upon any judgment rendered in a suit so brought, process of execution may be issued and directed to the marshal of any district in the same State. And in suits of a local nature, where the defendant resides in a different district in the same State than the one in which the suit is brought, the plaintiff may have original and final process against such defendant directed to the marshal of the district in which he resides." The second section enacts, "that in all cases of a local nature, at law, or in equity, where the land, or other subject matter of a fixed character, lies partly in one district, and partly in another district within the same State, the plaintiff may bring his action or suit in the circuit or district court of either district; and the court in which any such action or suit shall have been commenced as aforesaid, shall have jurisdiction to hear and decide the same, and to cause mesne or final process to be issued and executed as fully as if the land or other subject matter were wholly within the district for which such court is constituted."

In suits which are within the enactments of this law, every case which can arise, in practice, under this head, appears to have been provided for. The provisions of the second section include, certainly, suits in equity as well as actions at law. The provisions of the first section likewise apply to suits in equity, if

the phrase "writ against the defendant directed to the marshal" includes the subpœna to appear and answer.  Unless the phrase is interpreted so as to include this writ, the uniformity in the practice under the act throughout the United States which it appears to have been intended to secure, cannot be attained. This will be seen upon a recurrence to the above-mentioned particular statutes as to Tennessee, in the first of which, passed, as above, in 1822, the legislation in question originated.  These acts were an adaptation to the Courts of the United States for Tennessee of a practice which appears to have been familiar in the courts of the State in suits in equity.  (6 Yerger, 85.)  Such suits must, therefore, have been within the intended application of the above-mentioned acts of 1822 and 1839 as to the districts of Tennessee.  The words of these acts were not more applicable to suits of the kind than the words of the act of 1858. While Tennessee was a part of North Carolina, "an act for giving an equity jurisdiction to the superior courts" for the respective districts of that State, passed in 1782, had conferred upon them the jurisdiction previously exercised by the Court of Chancery under the British government.  It enacted that, upon the filing of the bill, the clerk should "issue a writ of subpœna as is usual in cases of chancery," or, upon a special order of a judge to hold the defendant to bail, should issue, for this purpose, a writ in a prescribed form, directed to the sheriff. "Upon such writ, or subpœna being duly served, and a copy of the bill delivered in proper time, proof being made to the satisfaction of the court, by return of the sheriff, or by affidavit, the defendant" was to "appear, and put in his answer, or plea, agreeable to the practice in chancery, or demur, or, on failure thereof, the plaintiff's bill" was to "be taken pro confesso."  The subpœna in equity seems to have been regarded, in some of the States, from a period prior to the judiciary act of 1789, and, in some of the circuit courts of the United States, from a period long anterior to the adoption of the rules of 1842, as process directed, in the State courts to the sheriff, and in the federal courts to the marshal.  A statute of New Jersey, passed on 13th June, 1799, enacted "that it shall be the duty of the *sheriff,*

or coroner, as the case may require, of any county in this State, to whom any *subpœna,* order, attachment, process of sequestration, writ of execution, or other process issuing out of the court of chancery shall be *directed* or *delivered,* to *serve,* or *execute,* the same, and to make return thereof at the time and place therein mentioned, which shall be filed by the clerk"; and "that every subpœna, or process for appearance shall be *served* on the person to whom it is directed, or a copy thereof left at his dwelling house, or usual place of abode, at least ten entire days prior to its return." In this act, the subpœna, though, in form, directed to the person to be served, is classed with process ministerially directed. From the case of Kennedy *v.* Brent, 6 Cranch, 191, it may be inferred that in the Circuit Court of the United States for the Eastern Dirtrict of Virginia,* the practice, adopted from that of the State, was, in the year 1810, that the subpœna in equity might be served by any person, but that its delivery to the marshal to be executed imposed upon this officer a duty to serve it not less obligatory than if it had been formally directed to him. Its delivery to a sheriff in England imposed no such obligation upon the sheriff.

If the act of 1858 had been passed before the adoption of the rules of 1842, the writ of subpœna to appear and answer in equity could not, however, in *this* court, have been regarded as process *directed to the marshal,* in any sense in which the phrase could have been understood *here.* But even here, the process may, *under those rules,* be understood as one of this description. The rules having been promulgated under the authority of an act of Congress, have, in some degree, the force of statutory regulations. They provide, as above, that the service of all process in equity, including the subpœna, shall be by the marshal of the district, or his deputy, or by some other person specially appointed by the court. Independently of the act of 1858, when an order for service by another person is not

---

* The case occurred in that portion of the District of Columbia which had been ceded by Virginia. The opinion of Marshall, C. J., and the decision of Chancellor Wythe, cited in the argument, sustain the inference stated.

applied for, the process cannot, under the rules of 1842, be served otherwise than by the marshal of the district, or his deputy.   In such a case the record of the proceedings may, with great propriety, recite the filing or exhibition of the bill, and, after setting it forth, state that process of subpœna was thereupon awarded and issued, to be served by the marshal of the district, or by his deputy.   The writ also might, with equal propriety, be endorsed by the clerk, at the complainant's instance, that it was to be served by the marshal, or his deputy, according to the rules. (See 6 Cranch, 189.) With or without such an endorsement, the subpœna appearing by the record to have been thus awarded, is, as has already been suggested, in substance and effect, under the rules of 1842, process *directed to the marshal.*   In the case of Allen *v.* Blunt, 1 Blatch. 487, 488, Judge Nelson appears to have thought that, in the absence of everything like such an entry of record, or endorsement, the subpœna could not be regarded as process directed to the marshal.   In that case the question was, whether service of a subpœna, in equity, upon the defendant, appeared by the marshal's return to have been made in the district of Massachusetts. The return did not state *where* it had been served.   Judge Nelson, remarking that the fact of the service upon the defendant in the district of Massachusetts rested wholly upon the subpœna and return, said: "The writ of subpœna is not *directed to the marshal* for anything that *appears in the record;* and the return speaks of the service of a *notice* upon Blunt, which might very well refer to the memorandum accompanying the subpœna, directing that the appearance of the defendants must be entered on or before the return-day of the writ, or the bill would be taken pro confesso."   These observations would seem to import that, though the subpœna is, in the body of it, directed to the defendant, and not the marshal, yet the record of the proceeding under which it has been issued, and is to be served, *may* contain what renders it *process directed to the marshal* by whom it is to be served, and whose return is to attest the service.

Under the act of 1858, a bill averring the residence of the

defendants in different districts of the State, might very properly pray that the process, in duplicate, should be awarded for execution by the respective marshals, according to the provisions of the act. The clerk, in making out the record, would then very properly set forth an award of process accordingly; and he might endorse the duplicates of the subpœna with a direction that service of it by each of the respective marshals be made upon the defendants residing in his district. Each duplicate would thus become process directed to the marshal of one of the districts. These formalities might, perhaps, all, or some of them, be dispensed with, leaving the act of 1858 and the rules of 1842 to define their own effect. The ascertainment of their effect is, however, facilitated by stating thus a case of the fullest compliance with such formalities.

This act of 1858 may, therefore, be interpreted as applicable to a suit in equity.

Had it been interpretable as a measure entirely of intended new legislation, and *thus* applicable to suits in equity, it would show that, in the opinion of Congress, the subpœna in equity did not, in any case, run out of the district in which it was issued into another district of the same State. The circumstance that the act, in express terms, is limited in its application to suits *brought after* its enactment, would then have added force to this argument. In part, the purpose of the act was to remedy absolute defects in the previous legislation. Thus, in certain States, including Pennsylvania, it restored, in suits at *law,* the *exercise* of the jurisdiction on a footing as extended as before any division of the respective States into districts; and rendered the practice in them the same as that already established, by particular acts, for Tennessee and certain other States. But its purpose was also to settle the practice under other heads, according to rules applicable alike in all parts of the United States. We have seen that although, before its enactment, the subpœna from a district in which a suit in equity was *properly* brought, might have run into another district of the same State, yet the question, in *which* of two districts of a State the cause was properly cognizable, might often have been involved in

embarrassing uncertainty. Under the act, the residence of *any one* defendant in either district in which the bill may be filed, suffices always to determine the question and sustain a service of process in the other district. The act thus furnishes as to suits in *equity* a uniform rule of proceeding, where the practice might otherwise have been uncertain and variable.

This law certainly contains enactments which are *not* new. Its first enactment, that all suits not of a local nature, "in a district in any State containing more than one district, against a *single* defendant," should be brought in the district in which he resides, is clearly declaratory. It, moreover, attracts attention from the omission of any such provision, in express terms, for the case of a suit against a plural number of persons, all residing in the *same* district. The latter case, and the case expressly provided for, do not seem, either of them, to have required statutory regulation. Again, a general act of Congress, passed on 20th May, 1826, had enacted that all writs of execution upon any judgment or decree obtained in any of the District or Circuit Courts of the United States, in any State which had been, or might thereafter be, divided into two judicial districts, might run and be executed in any part of such State, but should be issued from and made returnable to the court where the judgment was obtained. Notwithstanding this general enactment, the act of 1858 has re-enacted its provisions. They had in like manner been unnecessarily re-enacted for Tennessee in 1839. Their original enactment for Tennessee in 1822 had, however, been a useful provision for that State, at *that* period.

This repetition in the act of 1858 of the general enactment of 1826 as to executions, the general conformity of the provisions of the act of 1858, concerning original process to those of the prior particular laws which have been mentioned, and the mode above defined in which the act of 1858 applies to suits in equity, show that this act was not intended as an entirely new measure of legislation. Therefore the argument that the act, if applicable at all to suits in equity, manifests an opinion of Congress that the subpœna could not, before the act, have

been served, in any case, in another district of the same State, cannot prevail.

To recapitulate. The act of 24th September, 1789, divided the United States into judicial districts, with a sole reference to the *jurisdiction* of the respective courts which it created. Process directed to a marshal could not be served beyond the limits of his district. He could not have crossed its line in serving the process, if nothing on the subject had been contained in the act. But the subpœna to appear and answer in equity was not, in form, or in effect, process directed to the marshal. At the date of the act, opposing opinions were entertained upon the question whether in England such a writ could be served beyond the limits of the *jurisdiction.* That no doubt upon this or any similar question might be entertained in the practice under this act, the 11th section provides that no *civil suit* shall be brought against an inhabitant of the United States, by any *original process* in any other district than that of which he is an inhabitant, or in which he shall be found at the time of serving the writ. This enactment was applicable not less to the subpœna, than to process—ministerially directed. But its only effect, at its date, was to prevent the boundary of a State from being crossed in the service of original process of either kind. Under this act the former defendants, and S. B. Ludlow, could have been served with process at law or in equity, in the same suit. The intended effect of the act which afterwards divided the State into two districts was a mere partition of the jurisdiction conferred by the act of 1789 between the courts of the two infraterritorial divisions. That these two acts, in their combined effect, prevented, *in any case,* the exercise of this jurisdiction where it had before been exercisable, was the result of an oversight in legislation since remedied. Where it occurred, it was not a direct consequence either of the prohibition in the 11th section of the act of 1789, or of any enactment in the law dividing the State. It occurred in suits at law when compulsory process was required against necessary parties residing in different districts of the same State, because the process in such suits could be directed to the marshal only.

But when a suit in equity was brought against such parties, the subpœna, being directed immediately to themselves, could be served upon them all. The act of 1789 fulfilled its office in rendering service out of the district ineffectual, when, in order to make the service, the boundary of the State, or original district, was crossed. The rules of 1822, and the previous practice in some, if not in all parts of the United States, dispensing with processes of contempt, enabled the complainant, without issuing any writ ministerially directed, to obtain, as to such defendants as did not appear, an order that the bill should be taken as confessed. It was questionable whether a complainant could, under this practice, have claimed an arbitrary option to proceed in either district of the State, without reference to the question in which district his cause was the more properly cognizable. Particular acts of Congress, however, gave him this option in certain States, in suits both at law and in equity. The rules of 1842 gave to the courts in Pennsylvania and other States to which no such act applied, a control in this respect of the proceeding by preventing the service of process in equity otherwise than by the marshal of the district, unless a special order was made authorizing the service by another person. When there was no such order of court, the subpœna became, under these rules, in substance and effect, process directed to the marshal of the district. But this character of the writ could, in a case like the present, have been changed under these rules, by an order of the court appointing another person to make the service upon a defendant residing in the other district. The act of 1858, containing general provisions like those of the particular statutes already mentioned, gave to the plaintiff in every suit not local, against parties residing in different districts of a State, an election of the district in which to proceed; and thus rendered the practice on the subject uniform throughout the United States. The subpœna issued in duplicate under this act is, in effect, a writ directed to the respective marshals of the two districts, to be served by each upon such defendants named in it as reside in his district.

In suits in equity, the average number of original parties is very much greater than in suits at law, and the necessity for adding other parties often develops itself as the suits proceed. This act must, therefore, have been intended to apply to suits in equity, unless the remedial purposes of its provisions had already been attainable in such suits under the former practice established by the rules of the Supreme Court. If the act were inapplicable to such suits, the complainants might, therefore, with even more certainty as to the correctness of the practice, proceed in this case, under an appointment of a person other than the marshal of this district, to serve the process upon a new defendant in the western district.

Had the decision been that a subpœna issued by this court, in a suit in equity, could not, independently of the enabling provisions of this act of 4th May, 1858, have been served in the western district, the present case would be embraced within these provisions of the act. It is true that the act applies only to suits brought after it was passed. But the complainants can proceed properly, for the purpose in question, in one way only. This, as we have seen, is by an *original bill in the nature of a supplemental bill,* which would be, as to the former defendants, a *supplemental,* but, as to S. B. Ludlow, an *entirely original* bill (ante, pp. 25, 27). The reason and spirit of the act of 1858 cannot require the complainants to go through the absurd formality of obtaining an order for the dismissal, without prejudice, of their original bill, as against the former defendants, for the mere purpose of bringing the case within the literal application of the words of the act, by recommencing the proceeding against those parties. By so doing, they could certainly bring themselves within the letter of the act. But it is, to S. B. Ludlow, unimportant whether he is made an additional party under such a proceeding, or in the other mode. The proceeding would not, as to him, be less original, in the one case than in the other. So far as the proceeding is against "two or more defendants residing in different districts in the same State," the suit would, for the first time, be *brought,* when the original bill in the nature of a supplemental bill might be filed.

The case is, therefore, perhaps, within the *words,* but certainly within the *reason and meaning* of the law.

The result appears to be that, under an original bill in the nature of a supplemental bill against the former defendants and S. B. Ludlow, service of a duplicate writ of subpœna could be made upon S. B. Ludlow, in the western district, either under the act of 1858, or independently of its provisions.

The complainants, having proceeded by simple amendment and addition of a party, could not avail themselves of the provisions of this act as to the service of process. They applied, by motion, for the appointment by the court of a person to serve the subpœna, in the western district, upon S. B. Ludlow. Whether this motion should be allowed, was a question depending upon the practice prior to that act. Their proceeding, having been instituted otherwise than by original bill in the nature of a supplemental bill, was irregular. S. B. Ludlow might, after service of the subpœna, have made any objection to which the proceeding would, on this account, have been liable. But he must have appeared for the purpose of making such objection. He might have waived the objection, and have acquiesced in, or disclaimed opposition to, the prayer of the bill. The objection was one, therefore, which the original defendants could not urge. Whether the court would sanction service of the process of subpœna out of the district, though within the State, by making such an order as was asked, was, however, an independent question. Upon this question, as the court is now advised, the motion should have been allowed. Its allowance might, indeed, have been productive of additional delay, or of results even more unfavorable to the complainants. But this concerned them, and not the court. When the motion was heard, however, the court had not so fully considered the subject as to be prepared to act advisedly upon it, and the return-day of a subpœna which had been isued, passed before the order could be made. Certain occurrences which afterwards took place do not, at present, require consideration. The subject

will probably be brought again before the court in such a mode
as may present the case in a different aspect.

It is a case of which the principal difficulties have arisen
from incidents of the litigation.   The agreement made before
the master by the parties, without the sanction of the court,
dispensing with his report of the general account and dispo-
sition of the remittances, and with his report upon the specific
points on which it had been ordered, was an act which would
not have prevented the court, if the master had been living,
from sending the case back to him for the report which had
been ordered.   As he was dead when the case was afterwards
heard, it would probably have been referred to another master
for such a report, if the parties to the agreement before the
late master had been alone interested in the proceedings.   But
other persons, on whose behalf also the suit is prosecuted, are
interested, and the delays in its progress have been great.   The
court, therefore, assumed upon itself the performance of the
duties which had been delegated to the late master.   A report
of the facts of the case, resembling somewhat a master's report,
was consequently made, and the particulars of the account
which the master should have stated, were, to some extent, set
forth incidentally by the court in the opinion prepared as above,
but not as yet read or filed.   The foregoing statement of the
facts is a syllabus of those detailed in this former opinion.

Some of the questions involved have, during the pendency of
the suit, been litigated in courts of the State, in proceedings
against other parties, upon evidence partially deficient on some,
and wholly deficient on other material points of the controversy,
which has here been considered.   The form of the proceedings
in the State Courts was, moreover, not adapted to the proper
adjudication of such questions.   Thus, in a case in which con-
siderations of commercial convenience, and those of social
morality, were to be doctrinally reconciled, the proceedings
were embarrassed with technical difficulties even more than
those in this court have been thus embarrassed.   As a conse-
quence of the two-fold litigation, the points of argument have

been inconveniently multiplied.  The importance of some of the questions, and the novelty of some of the aspects in which they were presented, caused an unusually extended reference to authorities in the former opinion which has been mentioned.

For this, and the above, reasons, its length was very great. In order to avoid increasing unnecessarily that of the record, it was not filed while the probable course of proceedings in the cause appeared uncertain.  It is now subjoined and filed.  To facilitate the application of the foregoing abstract of the propositions considered in it, occasional notes of reference to them have been inserted.  Some references to reported cases which have been since published have also been added.

## OPINION PREPARED AFTER THE HEARING IN 1858.

The substance of this opinion was orally stated in Court on 23d July, 1858. A note of it, as then delivered, was taken by a gentleman of the bar. From this note, and from previously made memoranda, it was afterwards written out, with some additions, but no alterations. It was not formally read or filed, because the case was standing over upon the objection of want of parties, and the ultimate result of this objection appeared to be uncertain, as is explained in the foregoing opinion.

### CADWALADER, J.

The complainants, Winter, Latimer & Co., and Johns Hopkins, filed their original bill on 8th October, 1851, against Robert M. Ludlow and R. McKinney Ludlow, transacting business at Philadelphia under the name of Ludlow & Co.  These defendants had failed in business on 25th August, 1851.  It was known that the arrival in California of the news of their failure must have caused that of Samuel Beebee Ludlow, who transacted business at San Francisco under the name of S. Beebee Ludlow & Co.  He had been in the habit of drawing upon the defendants, negotiating the drafts at San Francisco, investing the proceeds in bullion or bills of other drawers upon other persons on the Atlantic side of the continent, and remitting these investments to the defendants at Philadelphia.  The suit was founded upon the allegation that there had been an

express or implied appropriation, special or general, of these remittances in bullion and bills for the security of his drafts upon the defendants. The purpose of the suit was the ascertainment of the interests and enforcement of the rights of the holders of these drafts in the remittances received and expected, and, in aid of this purpose, discovery, an account, injunction, and the appointment of a receiver. The complainants, Winter, Latimer & Co., were payees and endorsers of certain of the drafts which the defendants had accepted. The complainant Hopkins held some of these acceptances thus endorsed by Winter, Latimer & Co., payees, and also some other acceptances of S. Beebee Ludlow's drafts upon the defendants in favor of and endorsed by other parties. The complainants, in the original, and in an amended bill, declare that they sue on behalf of themselves and of all other holders of such of his drafts as were, or ought to have been, accepted by the defendants.

The word *appropriation* has no peculiar definite legal applicability. It may be used in the sense of an *agreement,* express or implied, on the part of a remitter, or consignor, that a qualified or absolute property in a remittance or consignment shall vest in another person at the commencement of its transit, or from some earlier or later period before or after its actual delivery. The doctrine of *appropriation,* when the word is thus understood, is dependent, first, upon an *ascertainment of the subject,* and secondly, upon the *agreement* that the property shall *vest.* The agreement that it shall vest may be *implied* from the relations of the parties to each other, and from the circumstances of the transaction. But an *agreement,* express or implied, is essential. Property, indeed, never changes its ownership among living persons otherwise than through judicial divestiture, unless under an agreement of some kind. The general, though perhaps not universal, tendency of the rules of the Roman law, as to movable property, was, that its ownership could not be changed, effectually, by agreement alone, without a transmutation of the possession. The impression of these rules has influenced the doctrinal tendencies of the modern

jurisprudence of Continental Europe, though exceptions from their operation are allowed in certain cases, including some in which the effect of a constructive or symbolical transfer of possession is attributed to certain commercial proprietary documents. The general rule of English law adopted in this country is, that "property may pass by an *agreement*" *alone,* when it is founded upon a sufficient consideration. The decisions in England and in this country, therefore, sustain conventional changes, absolute or qualified, of the ownership of property in its transit from one place to another, and assignments, by way of security or otherwise, of effects or funds in the possession of persons not parties to the tranaction. These decisions rest upon principles of general and uniform applicability rather than, as on the continent of Europe, upon peculiar or exceptional reasons. See 2 Welsb. Hurlst. & G. 6; 6 Robinson, 321; 4 Mees. & Welsb. 791; 9 Mees. & Welsb. 419-422; 12 Mees. & Welsb. 17, 18; 1 Bos. & Pul. 563; 8 Ad. & El., N. S. 1; 1 Peters, 445-449; 8 Howard, 384; 4 Wash. C. C. 422, 423; 3 Hurlst. & N. 497.

Under the principles upon which these, and other decisions, depend, a qualified or absolute property in a commercial remittance or consignment may vest in the intended receiver at the time of the commencement of the transit, or even sooner. Whether he is an absolute purchaser, a creditor, a bailee, an agent, or a trustee for third persons, if the purpose of the contract under which he is to receive it apparently requires that an absolute or qualified property shall vest in him, any act by which the remitter or consignor determines its destination to him, is, in the absence of proof of a different intention, interpretable as an *appropriation* of it for the purpose thus required. Such an appropriation, whether thus implied or made in express terms, is, if upon a sufficient consideration, irrevocable. The interest, qualified or absolute, of the intended receiver, vests in him from its date, and continues in him afterwards, during the transit, and also subsequently.

This doctrine is in general applied at law as it is in equity.

But its application is in some respects more extended in courts of equity than in courts of law. Under one head the jurisdiction of courts of equity in such cases of appropriation is exclusive. This is where the owner of an existing or expected fund in the hands of another person appropriates less than the whole of it, or appropriates the whole in fractional parts, in such a manner as to divide an otherwise entire and sole accountability of a holder of the fund. Such a holder, if he has not acquiesced in the appropriation, cannot be sued at law by the several parties respectively interested under it in the fund. The only action maintainable against him at law is an entire one at the suit of the party who made the transfer or appropriation. (See 5 Wheat. 286, cited in 5 Peters, 598.) The decisions on the subject at law* were examined, and the rule enforced in the cases reported in 5 Peters, 580, 584, 602; 16 Barbour, 501, and 2 Casey, 90. But the holder of a fund thus appropriated may be proceeded against in a court of equity where the rights of every one of the several parties interested under the appropriation may be taken care of in a single proceeding. (See 3 Swanston, 393; 4 Mylne & Craig, 702, 703, and 5 Peters, 602.) On this point, a case, after concurring adjudications *at law* in the King's Bench and Exchequer Chamber, has been differently decided *in equity* by the Commissioners of the Great Seal in England, affirming a decree of the Vice Chancellor. (7 Sim. 109.)

An appropriation of the remittances in question might have been so made by S. B. Ludlow as to constitute a direct equitable security for his *drafts* upon the defendants. This appropriation would then have enured to the benefit of the payees and endorsees, including even holders who, when they received the drafts, were ignorant that any such appropriation had been made. Exp. Gladstones, 3 Mont. & De G. 109, cited in the

---

* The leading English decision is Williams *v.* Everett, 14 East, 582; and see Grant *v.* Austen, 3 Price, 58; Yates *v.* Bell, 3 Barn. & Ald. 643, and Moore *v.* Bushell, 27 L. J. Exch. p. 3. The decisions on the subject in Pennsylvania will be particularly mentioned in a subsequent part of this opinion.

argument, shows that a bill of exchange may be so drawn as to include such an appropriation, and that if one of S. B. Ludlow's drafts upon the defendants had contained a direction to place the sum drawn for to the account of his remittances, or of any one remittance in particular, this would have constituted an effectual appropriation of the proceeds for the payment of such bill. An appropriation in this precise form or mode is unfrequent. But appropriations, express or symbolical, of remittances or consignments, for the security of the holders of bills of exchange may be made in various other modes, all equally effectual, except in the degrees of protection which they may afford against fraud. (See 4 Wash. C. C. 418, 662; 1 Peters, 445; 4 Peters, 291.) The party to whom the bill of exchange to be secured is negotiated frequently requires a transfer to him, or deposit with him, of the bill of lading, or carrier's receipt, for the property to be appropriated. When the shipment has been made by a bill of lading for goods deliverable to the remitter himself or his order, the possession of the bill of lading, endorsed in blank, or endorsed specially to the order of the party to be secured, or of his designated agent, may constitute a sufficient appropriation. When the bill of lading is to the order of the consignee of a shipment which is owned by the consignor, an effectual pledge or appropriation is not always obtainable so simply. But it is nevertheless often obtainable satisfactorily. The party who takes a bill of lading of this form inquires as to the relation of the consignee to the remitter. If this relation be that of an agent of the remitter, an assignment by the remitter, on the back of the bill of lading or otherwise, answers equitably, if not legally, the purpose intended. But the remitter usually delivers with it a letter of instructions to the consignee appropriating the proceeds of the shipment specifically to this purpose. When the business has been transacted wholly by the remitter, who has dispatched such a letter of instructions with a shipment which is already abroad or in the course of transportation, the bill holder may afterwards wish to obtain proof to accompany the bill, showing that it has thus been secured. He may obtain such proof in the form of

a copy or extract from the remitter's letter book certified by him to contain the instructions as to the disposition of the consignment which have been transmitted to the consignee as his agent. Such an extract or copy is often annexed to the triplicate of the bill of lading which had remained with the consignor, and, with a policy of insurance, accompanies the draft in its circulation. In these and in other modes in which the practice might be further exemplified, appropriations of property to the value of countless millions are of constant recurrence. They secure, in the remotest parts of the world, the remittances, or their proceeds, or the investments and reinvestments of such proceeds in various forms, to the respective bill holders, the substitute for the original remittance, wherever it can be traced and identified, retaining the impression of the special ownership created by the appropriation until its purposes have been fulfilled. (1 Peters, 447, 448.)

In cases of this description, when the draft secured is upon an agent of the drawer to whom he makes the remittance, the agent becomes a trustee for the draft holder. In the case of a single draft, and a remittance appropriated for its particular security, the trust must be executed for the benefit of the draft holder, without reference to the state of accounts between the remitter and his agent on whom it is drawn. (3 Campb. 92 ; 4 Comstock, 501.) The agent who is drawee, when he accepts the draft, "becomes," in the language of this court, "the principal debtor to the holder," but, nevertheless, "the *surety* of the drawer entitled to full indemnity. (Baldw. 538.) Lord Cranworth has also recognized the relation of such an acceptor, as that of a *surety,* who, when he pays the draft, is entitled "to *indemnify himself*" out of the remittance "as far as it will extend." (3 DeG., Macn. & G. 450, 451.) When there is a series of drafts, and a succession of remittances appropriated for their security, and the agent pays, from other sources, the drafts first falling due, he is, to their amounts, as a surety,* substituted for the draft holders whom he has paid. He may, there-

---

* See ante, p. 12, 1st proposition.

fore, without committing a breach of trust, reimburse himself*
out of the proceeds or avails of the remittances, though, in so
doing, he should exhaust the fund, and though he should him-
self continue to be liable, as acceptor, for an unsecured amount.
But, so long as there is, in his hands, a surplus, in amount or
value, beyond the amount of the advances which he may thus
reimburse, he is, as has been stated, a *trustee* for the draft
holders.

The case hitherto considered is that in which there has been
a direct appropriation, express, or symbolical, for the security
of the *drafts*.    This case must be distinguished from the case
of remittances to an agent on whom the drafts are drawn where
the remittances are appropriated in order to secure *him* as the
*intended acceptor,* without any such direct appropriation for
the security of the drafts.    The qualified *interest* of such an
agent in the remittances, under an *appropriation* of them for
his own indemnity, must also be distinguished from his *lien*
for a like purpose, which, if there were no such appropriation,
would attach to them when in his possession.†    The word *lien*
is here used in the sense of a right which, without being at-
tended with any proprietary interest, enables the possessor of
another's property to retain, under certain circumstances, the
possession of it for purposes of self security.

Bankers, or factors, or parties whose agency is compounded,
in any degree, of both characters, have a *general lien* upon their
principal's remittances, and upon all securities and investments
which are their product, or substitute.    This lien, after it has
attached, and so long as it subsists, enables the agents to apply
his funds in their hands to the discharge of their advances on
his account, and hold or apply the surplus for their own indem-
nification against their accrued and accruing liabilities for his
account.    Agents can have no such lien without *actual* posses-
sion.    A *prospective* lien affords them no security.    This was
decided in England, by the House of Lords, in Kinlock *v.*

* See ante, p. 12, 3d proposition.
† See p. 12, 4th and 5th propositions.

Craig, 3 Durnf. & E. 787.   A confusion of the distinct subjects of *lien* and *appropriation* has occasioned a mistake, sometimes made, in saying that agents may, in certain cases, acquire a *constructive possession* of a remittance, or consignment, on its way to them, so that their lien may attach *prospectively* during the transit, or from its commencement.   This confusion is avoided by observing that a *lien* in favor of parties in this relation to a remitter cannot attach until they, or their own agents, have obtained an *actual* possession, but that a *qualified interest* which, though *not a lien,* is more than equivalent as a *security,* may, under an *appropriation* express, or implied, vest in them *before* they acquire possession.

In the leading case of Haile *v.* Smith, in the Exchequer Chamber, 1 Bos. & Pul. 563, bills of lading for merchandise to a shipper's own order, endorsed by him in blank, had been sent by him, with an invoice, to his factors, who were also his bankers.   They were, by agreement, to have received the consignment as a collateral security for their acceptances, and intended acceptances, of a series of his drafts upon them.   The decision was that the consignment, though made to them for sale, as his agents, and under his direction, was made also to enable them to indemnify themselves out of the proceeds, against their advances and acceptances, and, therefore, that the moment the goods were placed on shipboard, and the bill of lading was endorsed and remitted to them, though the vessel, having been detained by an embargo, had not sailed, the property required for the purpose of effectuating the intended security was vested in them.   The rule of decision is the same whether the transportation is by land, or by water, and whether the right of the intended receiver of the property to take possession at the end of the transit is attested by a bill of lading, a carrier's, wharfinger's, or wharehouseman's receipt, or any other proprietary document.   It may be sufficiently attested by an informal paper without a commercial name, or by "correspondence alone." (Gibson *v.* Stevens, 8 Howard, 399; Holl *v.* Griffith, 10 Bingh. 246; Bryans *v.* Nix, 4 Mees. & Welsb. 775, 791; Grosvenor *v.* Phillips, 2 Hill, 147; Holbrook *v.* Wright, 24 Wendell, 173;

Dows *v.* Green, 16 Barbour, 72; Nesmith *v.* Dyeing Co., 1 Curtis, 130.) The mere act of transmission, accompanied with adequate evidence of an intention to pass the qualified interest required for the purpose of securing the intended receiver, suffices to prove the agreement that such an interest shall vest in him for the purpose. This intention has been inferred from the relations alone of the parties where the act of transmission has been an apparent fulfilment of an express or implied obligation to provide such a security for the intended receiver. In the above-cited case of Bainbridge *v.* Wilcox, Baldw. 538, where agents on whom bills of exchange were drawn were "bankers and commission merchants" in a foreign country whose relation to the drawer was defined as "that of agent, factor, and depositary," this court said, it is *"the duty of a person who draws bills on another without funds, to place them in the hands of the acceptor before the bill is due."* (See also 1 Peters, 290; 2 Mylne & Cr. 405.) Between parties in this relation to each other, the mere act of remittance perhaps implies an appropriation for the security of the agent. But, in the present case, the decision of this precise point will not be required.

According to the decisions reported in 1 Bos. & Pul. 563, 1 Pet. 441, 8 How. 400, and 1 Curtis, 130, the absolute or qualified interest, under an appropriation of a remittance in transit, which vests in the intended receiver—whether he is a purchaser from the remitter under an absolute sale,—or is a trustee for other persons who are secured by the remittance,—or is a creditor of the remitter directly secured, but not his agent, or otherwise than for purposes of self security, his bailee,—or is an agent, such as a banker, or a factor, who, though secured in respect of his advances and liabilities, is a bailee for purposes in which the remitter is interested,—is, in its character, a *legal* title. In the last-mentioned case, that of an agent of the remitter, the qualified *legal interest* of the agent, when in possession, partakes to some extent of the character of the *lien* which, if there had not been any such appropriation, would have been incidental to the agency. But it is, in the language of Judge

Curtis, something more than a "lien." The qualified interest of the agent under it vests in him, as we have seen, before his lien could attach. It may, as we will hereafter see, continue to subsist after his lien would expire. Whether he is in possession under it or not, it enables. him to maintain an action in his own name for any wrongful detention or other injury to the subject of the special property. His legal title is, however, only the qualified legal interest required in order to effectuate the purpose of the appropriation. This purpose is, in such a case, that of security only. His title is, in one or more of the reported cases, compared to that of a mortgagee. It is a special trust vested in him to secure his liabilities for, and advances to, the remitter, whose resulting beneficial ownership still subsists for all ulterior purposes. When the agent is an acceptor, or intended acceptor of drafts of the remitter, the comparison of the appropriation for his indemnity to a mortgage must include, in the specific definition of the security, a description of the mortgagee as a *surety* of the mortgagor.

Two cases of remittances to agents of the remitter have thus been described as distinguishable from each other. The first case is that in which the remittances are appropriated for the security of his drafts upon the agents. The second case is that of a mere appropriation of the remittances to secure the agents themselves, as intended acceptors of the drafts. The former case, in effect, includes the latter; that is to say, an appropriation by the remitter to secure the drafts is, in effect, a security which indemnifies the agents as acceptors. But the converse proposition, that the second case includes the first, or, in other words, that a mere appropriation to secure such intended acceptors constitutes or includes a security for the drafts, or implies an intention to create such a security, does not follow as a *consequence*. The next inquiry will be, whether such a proposition can be maintained on independent grounds.

The prevalence of the commercial usage of making, in the modes in which it has been exemplified, express or symbolical appropriations for the direct security of bills of exchange drawn against remittances or consignments, where it is intended that

the bill holders are to be secured in their own right, indicates, by contrast, the effect of the omission of the remitter or consignor to perform any act indicative of such an intention.  The question, what will constitute a *sufficient* appropriation for the security of a bill holder, has often been judicially discussed. Its discussion has usually been based upon a concession that some act of the remitter indicating such an intention is indispensable to the bill holder's acquisition of a cognizable independent interest, legal or equitable, of his own.  Such a concession has, for example, been implied in cases in which it has been assumed that the dishonor of a draft of a remitter upon his agent may so affect the consideration of a security intended for the agent's indemnity as to render an appropriation for the purpose revocable by the remitter.  (4 Mees. & Welsb. 792; 4 Scott, N. R. 52, 53; 3 Mann. & Gr. 619, 620.)  If the holder of the dishonored draft had an interest in the intended security, it could not be thus revocable without his concurrence.

The circumstance that a remitter has *intended* that his draft shall be paid out of the proceeds of a remittance made, or to be made, or that a draft is, in commercial parlance, *drawn against* the remittance, or that the remittance has been made in order to *meet* a draft or intended draft, has not, therefore, been in general understood as imparting to the draft holder an interest of his own in the remittance.  If such an understanding is not implied as to a single draft and remittance, it cannot be implied in the case of a series of drafts and remittances where no draft has been drawn against any particular remittance, but the remitter has intended his drafts to be paid indiscriminately out of the general proceeds of his remittances, as far as their amounts might suffice.  The circumstance that there is, in such a case, an express or implied appropriation by the remitter for the security of the party on whom his drafts are drawn, does not in itself alone create a privity between either this party, or the remitter, and the drawees or endorsees.  Independently of the relation of principal and surety between the remitter and the drawee as intended acceptor, the application of this doctrine would be not less simple in equity than at law.  In 2 Keen, 98,

Lord Langsdale said: "When two persons, for a valuable consideration between themselves, covenant to do some act for the benefit of a mere stranger, that stranger has not a right to enforce the covenant against the two, though each one might against the other." The general truth of this remark was recognized in 2 Younge & Collier Ch. Rep. 462. There is no trust for such a stranger unless one is expressly declared for his benefit, or arises by necessary implication from some act of the original parties equivalent in its effect to the declaration of such a trust.

But when there is an express or implied appropriation for the security of the agent, who is drawee, he stands, as we have seen, on the footing of a *surety* for the remitter. A question has therefore arisen whether the draft holders are not entitled, in equity, to the benefit of such an appropriation. When there is a principal debtor and a surety, the surety's indemnification may sometimes be worked out by giving to the creditor the benefit of securities which the principal has given originally to the surety. This was, probably, the meaning of Sir William Grant, in the first clause of the following passage, in his judgment in Wright *v.* Morley, 11 Vesey, 22: "As *the creditor is entitled to the benefit of all the securities the principal debtor has given to his surety,* the surety has full as good an equity to the benefit of all the securities the principal gives to the creditor." The proposition stated in the latter clause of the passage, that *a surety is entitled to the benefit of all securities received by the creditor from the principal,* is an incontestable rule of equity which was applied by Sir W. Grant, in his judgment in that case. But this rule has been established, and subsists, without any dependence upon the proposition that "the *creditor* is entitled to the benefit of all the securities the *principal debtor* has given to his surety," which Sir W. Grant is reported to have stated in the prior clause. That the whole passage might have been omitted, without altering his judgment or the course of his reasoning, was afterwards clearly shown in an argument of counsel, reported in 2 Glyn & Jameson, 411, 412. The only authority in the books giving any ap-

parent support to the proposition said to have been stated by
Sir William Grant in the prior clause of the passage, was a
case in 1 Eq. Abr. 93, pl. 5, of which the whole report is in
these words: "A bond creditor shall, in this court, have the
benefit of all counter bonds or collateral security given by the
principal to the surety; as, if A. owes B. money, and he and C.
are bound for it, and A. gives C. a mortgage or bond to in-
demnify him, B. shall have the benefit of it to recover his debt.
(Mich. 1692, Maure & Harrison.)    Probably some fact was
omitted which, if stated in the report, would have shown that
the recourse of the creditor to the mortgage was required in
order to work out an equity of the surety.    Of the case, as re-
ported, Lord Eldon said, in 1815, that he had never heard it
relied on as a governing case at this day.  (2 Gl. & Jam. 411;
2 Rose, 184, a.)  · It is in principle, opposed to the decision of
Finney v. Finney, 4 Harris, 380, and repugnant to many
authorities in which subrogation or contribution, unless *in favor*
of a surety, has been held to be contrary to equity.  (1 Ves. Sr.
252; 3 Co. 12, b; 2 Watts, 206, 207; 10 Serg. & Raw. 450;
1 Barr. 273-280; 2 Barr. 217, 218; 5 Watts, 231; 3 Watts,
477; 5 Watts, 208; 5 Raw. 51; 1 Raw. 302; 3 Watts & Serg.
404; 4 Johns. Ch. 546; 5 Johns. Ch. 235; I Paige, 228; 2
Paige, 182; 8 Paige, 277.)

The case in which Lord Eldon made this remark (Exp. War-
ing) arose from two bankruptcies, that of a London banking
house, and that of manufacturers in Lancashire, who had been
their customers.    Their business had been transacted under an
agreement that the manufacturers should deposit such nego-
tiable paper as they should receive in the course of their deal-
ings, with the bankers, and should be at liberty to draw upon
them from time, as their occasions might require, leaving al-
ways a surplus on hand, and paying a commission on accept-
ances.    The manufacturers had also deposited with the bankers
other collateral security for any advances made or to be made.
This arrangement clearly constituted an appropriation for the
security of the bankers.    Holders of their acceptances of the
customer's drafts petitioned in bankruptcy that the securities

thus appropriated should be applied in payment of these acceptances. The prayer of the petition was granted, in order that equities between the two bankrupt estates, which could not otherwise be reached, might be worked out, under a principle which will hereafter be stated and explained. But this, as will be seen in the proper place, could have been done only under a forced or otherwise irrevocable administration of the funds, on the footing of established insolvency. Lord Eldon said: "Supposing a commission not to have issued, I do not see anything in this transaction between persons thus dealing with their bankers, and making a deposit of this sort, which would entitle the creditors to say that they have an equity attaching on these effects; that is to say, that the moment a pledge is put into the hands of the banker, he becomes a surety for them to whom his acceptances are delivered." He was of opinion that the petition could not have been supported on this ground. (2 Gl. & Jam. 415.)

A subsequent observation upon this case, by Sir George Rose, one of the judges of the English court of bankruptcy, might suggest an inquiry whether the draft holders were not equitably substituted for the *drawer,* as *assigns* of such an interest in his remittances as might enable them to compel the same application of the proceeds to the payment of the drafts, that he could have compelled. (4 Deac. & Ch. 602.) This inquiry cannot, however, be prosecuted without a primary resolution of the question whether the appropriation of the remittances was for the security of the drafts, or for the mere indemnification of the drawees, as intended acceptors and sureties. Drafts, not, on their face, orders on any particular fund, but, in form, proper bills of exchange, though as between the drawer and the drawees a particular fund in the hands of the drawees has been appropriated for their payment, neither constitute an equitable assignment of this fund, nor create a trust which attaches to it for the benefit of the draft holders.

The Court of Appeals of New York, in Cowperthwait *v.* Sheffield, 3 Comstock, 251, recognizing this doctrine, said: "A proper bill of exchange does not, of itself, operate as an assign-

ment to the payee of the funds of the drawer, in the hands of the drawee; and, even after an unconditional acceptance, it cannot, in strictness, be held to have that effect, since the drawee becomes bound, by reason of the contract of acceptance, irrespective of the funds in his hands. He may refuse, when he ought to accept, by reason of having funds; and yet, neither he nor the funds would in any way be bound or affected by the bill." The remark of Lord Eldon, in 6 Ves. 450, that "you cannot attach equities upon bills of exchange," was here, in effect, applied *against,* though he had applied it in *favor* of the holders.

Thus, even if the sole relation betwen the remitter and the drawees had been that of principal and *sureties,* the draft holders could not entitle themselves to the benefit of the security by merely showing that it was appropriated for the drawees' indemnification. But, in cases like the present, the sole relation is not that of principal and *sureties.* The superadded relation of principal and *agents* introduces particular considerations, which, if the case were otherwise doubtful, could not, on this point, be disregarded.* This relation could not usefully subsist for commercial purposes, if the principal's remittances were subject, in the hands of his agents, to the control or intermeddling of such unknown parties as might, from time to time, happen to become holders of the drafts. If the funds in question had been the proceeds of effects not remitted by the drawer to the drawees as his agents, but transmitted by him, without their privity or that of the holders, to other persons as his agents, with a direction to pay the proceeds in discharge of the drafts, he could have countermanded this direction at any time before its execution, or, at all events, before it had been properly communicated to parties interested in its execution. (Scott *v.* Porcher, 3 Meriv. 652, 664.) The only difference resulting from the circumstance that the remittances were to the drawees as the agents, with an appropriation for their security, was that *he and they* could, by a *concurrent* act, revoke the appropriation to which the draft holders were not privy.

* See ante, p. 15, 9th proposition.

A rule of equity jurisdiction which would enable the draft holders to require the remittances to be held, or applied for their security, when there has not been a direct appropriation for the purpose, would impede seriously the transaction of commercial business. The consequence of such a rule, as Lord Eldon suggeted in Exp. Waring, 2 Gl. & Jam. 415; 2 Rose, 185; 19 Ves. 349, would be that the remitter and his agent could not, in their own relations of business, make any new arrangements without the consent of the draft holders, "a proposition" which Lord Cranworth afterwards pronounced "utterly untenable." (3 De G., Macn. & G. 448.)

When there has been a direct appropriation for the security of the drafts, its interference with such arrangements is the result of a*greement,* and, *therefore,* is not a subject of any reasonable complaint. But when there has not been any such agreement, though there may have been an appropriation for the security of the agent, commercial convenience requires that the business of the agency may be transacted without any such interference of third persons.

In Cowperthwait *v.* Sheffield, already cited (3 Comstock, 243, 250-253, affirming 1 Sandf. 416, 449-451), this point was decided by the Court of Appeals of the State of New York. A shipment of cotton having been made from Mobile to Glasgow, the consignor drew bills of exchange upon the consignee, and wrote informing him that they had been drawn on account of the shipment. The consignor deposed that the remittance was *intended* to meet the demands of the holders of the bills. But neither this letter of advice nor the bill of lading accompanied them when they were put into the market; and there was no evidence that the bills were negotiated on the faith of an appropriation of the shipment, or of its proceeds, to their payment. The court saying that the remitter "no doubt *expected* that, by reason of this advice," the consignee "would have been induced to honor the bills, upon the prospect thus held out of receiving funds for" his "indemnity," decided, nevertheless, that the remittance was not appropriate for the security of the holders of the bills; adding the remark that, if the letter of

advice "could, by any equitable intendment, be held to amount
to a specific direction to apply the proceeds of the shipment to
the payment of these bills, it could only be in favor of a party
who had notice of the arrangement, and who had purchased
the bills, or become liable upon them, on the faith of it." The
correctness of this decision has been recognized by the Supreme
Court of Pennsylvania. (2 Casey, 89.)

In the present case, therefore, if the relations between S. B.
Ludlow and the defendants were such as they could, by *mutual
consent,* without the concurrence of the draft holders, have
revoked or modified, the draft holders had no cognizable inter-
est of their own in the remittances; and the circumstance that,
between S. B. Ludlow and the defendants, the remittances were
appropriated for the security of the defendants, would not suf-
fice to confer an equitable interest upon the draft holders.*

But, if the remittances were thus appropriated for the se-
curity of the defendants, S. B. Ludlow had no right to take
any part of them away from the defendants against their will,
without first repaying their advances, and exonerating them
from all their outstanding liabilities to the draft holders; nor
could the defendants, without his consent, apply the proceeds
of his remittances remaining after the reimbursement of their
advances to any purpose other than the payment of the drafts.
(See 2 Deacon, 309, 310; 12 Ves. 121, 122.) The relations
between him and the defendants would thus not have been
revocable by either party, without the consent of the other;†
and, unless rescinded, or modified by mutual consent, would
have enured incidentally to the benefit of all, or some of the
draft holders, though not in any right of their own. (See 2
Younge & Coll. Ch. Rep., 460, 461.)

If the original appropriation of the remittances had, under
such circumstances, been for the security, not of the drafts, but
of the defendants as intended acceptors, either they alone, or
S. B. Ludlow alone, could have *afterwards* created an effectual
security for the draft holders by making in their favor an ap-

* See ante, p. 15, 9th proposition.
† See ante, pp. 15, 16, 10th proposition.

propriation of such surplus of the proceeds of the remittances as might remain in the hands of the defendants after the reimbursement of their charges and advances.

Such a subsequent appropriation by S. B. Ludlow would, of course, have the same effect as an original appropriation by him for the purpose. (See Hassall *v.* Smithers, 12 Ves. 119, 122; Burn *v.* Carvalho, 7 Simons, 109.*)

The subsequent appropriation, if made *by the defendants,* would so attach to the proceeds that the defendants would no longer be capable of making, in concurrence with S. B. Ludlow, any different disposition of the fund. He therefore could not prevent their appropriation of it from taking effect unless he paid the drafts from other sources. A suit in equity by the draft holders to compel the application of the *specific* proceeds conformably to such an application by the defendants could not be maintained against them without making S. B. Ludlow also a party. A decree against him would not indeed be necessary. But according to the rules of procedure in equity, an opportunity should be afforded him of contesting the allegations of the complainants in such a suit, and of redeeming his remittances by payment of the drafts, or disclaiming a purpose to pay them from other sources.†

In the absence of appropriation either by S. B. Ludlow or by the defendants for the security of the drafts, if the remittances were, as between him and the defendants, appropriated for the security of the defendants as drawers, a relative impossibility that the draft holders could be deprived of the benefit indirectly incidental to such an appropriation might result from subsequent occurrences. It might thus result from the insolvency of S. B. Ludlow and the defendants, and either the death of one or both of them, or such a judicial or conventional divestiture in their lifetime of the interest of one or both of them as would occasion an administration of the fund on the footing of recognized insolvency. The orginal appropriation would become one of *indefinite continuance* whenever S. B. Ludlow

* See ante, p. 17, 13th proposition.
† This point is fully considered, ante pp. 19-23.

and the defendants might from any cause become thus *incapable of concurring* in any *different* arrangement for the disposition of the remittances or of their proceeds. The draft holders could not then be deprived of the benefit incidental to this appropriation; and it would therefore become cognizable in a court of equity as an indirect security which might be rendered available for their benefit. The jurisdiction of such a court would be exercised as a means of administering in the case, equities, not of the draft holders themselves, but of the original parties to the appropriation, whose rights under it, or those of parties interested in their estates, could not be otherwise enforced without inconvenient circuity of remedy. Their equities in the language of English Chancellors could not be otherwise reached and *worked out*. For special reasons, thus rendering the case an exception from the general rule to the. contrary, the draft holders, notwithstanding their want of direct privity of interest, can assert, in such a case, as creditors of a principal debtor and sureties, a derivative right under an appropriation intended originally for the benefit of the sureties. This derivative right of the draft holders, though previously so contingent or dependent as not to be cognizable, may thus, under such circumstances, become available for their security.*

This equitable jurisdiction somewhat resembles that exercised under compulsory or other irrevocable administration of estates of deceased or living insolvent *partners*. Their joint debts must be paid in full out of their joint effects, before any part of these effects can be made applicable to the payment of a separate debt of one of the partners. If he is indebted to a copartner in an amount of which payment is required in order to equalize their accounts with the firm, this amount must also be. paid out of the joint effects before any part of them can be applied compulsorily in payment of any separate debt. If these two rules were not observed, the interest of one partner in the joint concern might be taken from him and applied in payment

* See ante, p. 15, 10th proposition.

of the other partner's debt. The copartner entitled to receive an amount for the equalization of accounts between the members of the firm has indeed a lien for this amount upon the joint effects. But *other persons who are creditors* of the firm have no such independent equity as gives to *them,* in their own right, a lien for their debts upon the joint effects. These joint creditors are nevertheless entitled, when these effects are administered on the footing of a recognized insolvency, to a priority of payment out of them, because equities existing between the partners, which could not be otherwise reached, may be thus worked out. The foundation of the exercise of the jurisdiction is insolvency of the partners or of one of them, and the divestiture judicial, conventional, or by death of his or their interest in the joint effects.

Draft holders who, under the analogous jurisdiction above defined, proceed in a court of equity to obtain the benefit of an appropriation to which they were not originally privy, made by the drawer to indemnify the drawees as intended acceptors of the drafts, must make apparent the necessity for the court's interposition. The foundation of this necessity is the two-fold insolvency of the remitter who was drawer, and of the agent who, as acceptor, or intended acceptor, was to have been indemnified as a surety. "If either party, the principal or the surety, is solvent," in the language of Lord Cranworth, "no question can arise between the bill holders and those who are liable upon the bills, the bill holder gets paid in full, either by the principal or the surety. If he gets paid in full by the principal, of course he does not apply to the surety. The principal then applies to the depositee, the surety who holds the securities, and says, 'I have paid off all this against which the deposit was made with you by way of indemnity. I have, therefore, put myself in a condition to demand the securities back again.' So also, if the principal is insolvent, and the depositee is solvent, the question does not arise because the bill holder then comes on the depositee. It is no answer for him to say he was only surety. If he is solvent he pays in full, but then he clearly has a right to indemnify himself by means

of the deposit as far as it will extend." (3 De G., Macn. & G. 450, 451.) This is the rule applied in courts of equity to every *creditor's bill* where the complainant can sue at law upon his original demand. He must in every such bill aver the legal debtor's insolvency; and in some cases, though not in a case like the present, must also show that such debtor has been proceeded against at law, or could not be so proceeded against.

The draft holders, having no direct privity of interest, must, in order to sustain the proceeding, show also the *irrevocability* of the appropriation which renders it indirectly available for their security. This irrevocability must not be confounded with such irrevocability by one of two original parties as is inherent in every security. For the purpose in question, the requisite *irrevocability* is that which results from some *relative impossibility, that the original parties to the appropriation can concur in any different disposition* of the proceeds of the remittances. Until Powles *v.* Hargreaves was decided in June, 1853, by Vice Chancellor Stuart, whose decree was afterwards affirmed by the Court of Appeals, (3 De G., Macn. & G. 430,) the decisions upon the subject had all occurred under proceedings in bankruptcy. The first of them, Exp. Waring, was decided by Lord Eldon in 1815. The relations of the parties in that case, and the effect of Lord Eldon's order, have already been stated. (Ante, pp. 64, 65.) This order has recently been published in a note to 3 De G., Macn. & G. 445, 446. The argument in support of the petition for it is reported in 19 Vesey, 346-348. The opposing argument, reported by Mr. Montagu, is in 2 Gl. & Jam. 406-414. The best reports of Lord Eldon's opinion are those in 2 Rose, 184, and 19 Ves. 348, though some passages in the note of it in 2 Gl. & Jam. 415, 416, also merit attention. The cases on the subject which occurred between the years 1815 and 1853, were Exp. Parr, Buck, 196; Exp. Perfect, 1 Mont. 25; Exp. Hobhouse, 2 Deacon, 291, 3 Mont. & A. 269; Exp. Copeland, 3 Deac. & Ch. 199, 2 Mont. & A. 177; Exp. Prescott, 1 Mont. & A. 316, 3 Deac. & Ch. 218, 4 Deac. & Ch. 24.

If the present case had occurred in England, and the defend-

ants and S. B. Ludlow had been declared bankrupt, the respective assignees of their estates would have had no right or power to annul any appropriation of his remittances for the defendants' indemnity that might, *as between him and them,* have been in force at the time of the bankruptcy. The draft holders could not have been deprived of the incidental benefit of this appropriation, as an indirect security for the payment of the drafts. They might, therefore, upon petition, according to these authorities, have obtained an order in bankruptcy for such application of the funds, in discharge of the drafts, as the defendants would, between S. B. Ludlow and themselves, have been *entitled,* not less than *bound,* to make, if no bankruptcy had occurred, and the original appropriation had continued in force.

Until a recent period, it was doubted in England whether this jurisdiction was not confined to cases occurring under commissions of bankruptcy. (See Laycock *v.* Johnson, 6 Hare, 209, 210.) But the decision in Powles *v.* Hargreaves, 3 De G., M. & G. 430, above cited, established the rule of the previous decisions in bankruptcy, as a principle of equitable jurisdiction, exercisable in all cases of the insolvency of the parties to the original appropriation, when their former interests in the fund have been so divested, conventionally, judicially, or by death, that this appropriation of it cannot be rightfully revoked or modified. The facts in Powles *v.* Hargreaves were somewhat complicated; but the decision may be regarded as having determined the application of the rule in England, where the remitter having died insolvent, his personal representative has, by answer, disclaimed all interest, and the agents have by deed assigned all their estate·upon the same trusts for the benefit of their creditors, to which it would there have been subject under an administration in bankruptcy. In answer to a question by Sir Knight Bruce, one of the judges of the Court of Appeal, the counsel for the appellants admitted that if there had been no insolvency and no death, the funds would, *as between the remitter and his agents,* have been clearly applicable to the discharge of the drafts. (3 De G., Macn. & G. 441,

442.)  The counsel contended that in a proceeding not in bank--
ruptcy, the draft holders, as *third persons not privy* to the
appropriation, could not assert under it an equity which the
Court of Chancery would administer.  But Lord Cranworth,
who presided in the Court of Appeal, said that if Lord Eldon,
in Exp. Waring, "did use any expression that could lead to
the inference that there must be two distinct *bankruptcies*
before the *principle* was applicable, it was only because bank-
ruptcy was then in his contemplation, not that he meant it
should be technically bankruptcy."   Lord Cranworth had pre-
viously said : "The question can only arise where there are two
estates, that of the principal and surety, both insolvent, and
coming, therefore, under a forced administration.   But when-
ever that state of things does arise, and whenever two estates
are to be administered by some *vis major,* it is perfectly imma-
terial whether such administration is to be under the jurisdic-
tion of the Court of Chancery or the Courts of Bankruptcy or
Insolvency.   Exactly the same principle becomes applicable.
If it were not so, the strange anomaly would arise that the
property of the depositor, instead of going, as it ought, to pay
his debts, would actually be applied in payment of the debt
of the depositee."  Repeating that "there must be an admin-
istration of two estates, both insolvent, before this *equity of
persons who have no distinct equity of their own, but which
is enforced through the medium of the equity of other parties,*
can by possibility arise," he added: "It appears to me that
state of things did arise here."   He remarked that in the case
of the agents to whom the remittances were made, there was
what must be treated in every respect as a bankruptcy, and
that, in the case of the deceased remitter's estate, there was
virtually the same thing, as his estate was, at the time of his
death, totally insolvent.   Lord Cranworth further said that
"all the equities attaching on it must be carried into effect just
in the same way as if it was an estate administered in the course
of the process of bankruptcy or insolvency, or in *any other
mode of* administering an insolvent estate."   (*Ib.* 451, 452.)
   It was adjudged, in this case, conformably to Lord Eldon's

order in Exp. Waring, that the rule of decision applied whether the remittances in value sufficed or not, for the *full* payment of the drafts. But so cautious were the Court of Appeal in confining their views of the subject within the rule of that precedent, that they hesitated in deciding even this point until after an inspection of Lord Eldon's order.

According to these decisions, mere insolvency of the drawer and the drawees, without an administration of the fund on the recognized footing of such insolvency, will not suffice to entitle the draft holders to the benefit of an appropriation originally made for the security, not of the drafts, but of the drawees as agents and intended acceptors. When, however, the interest of either the drawer or the drawees in the fund is thus administered, such an administration of the interest of the other might possibly be dispensed with, if he is made a party, and is afforded an opportunity of contesting the allegations in support of the suit, including that of his own insolvency, and an opportunity of paying, or disclaiming a purpose to pay, the drafts from other sources.

The doctrine which was applied in Ex parte Waring, and in Powles *v.* Hargreaves, has thus been fully stated, because it elucidates the investigation of questions hereafter to be determined. But neither the interest of the defendants, nor that of S. B. Ludlow, in the remittances, has been so administered on the footing of insolvency, independently of any question of direct appropriation for the security of the drafts, that the doctrine would have been applicable to the present case under any bill that could have been framed. The present bill has been several times amended. Independently of the want of S. B. Ludlow as a party, the complainants have not even averred his insolvency. Though the fact of his insolvency may have been proved, a decree upon the foundation of that doctrine could not have been made under a bill in which it is not averred. (See 3 Barb. Ch. 51; 1 Gallison, 385, 386.)

The case must, therefore, be determined upon the questions; whether there was a direct appropriation by S. B. Ludlow of

his remittances for the security of the drafts; and, if not, whether there was a sufficient appropriation by him for the security of the defendants, and an effectual appropriation by the defendants for the security of the draft holders.

The facts upon which these questions are to be determined present them for consideration in a modified and somewhat complicated form. An occurrence in the proceedings in the cause, of rather an unusual character, has rendered necessary such a statement of these facts by the court as would otherwise have been more properly contained in a master's report. (See ante, p. 51.) In the course of the narrative of the facts which will be thus judicially reported, certain propositions of law and equity requiring incidental investigation will be considered as they may occasionally arise.

Robert M. Ludlow was the father, and Samuel J. and George W. Beebee were the uncles, of R. McKinney Ludlow and S. B. Ludlow. In the years 1846 to 1850, inclusive, Robert M. Ludlow, residing at Philadelphia, and the Messrs. Beebee, who resided at New York, were in partnership as dealers in bullion and exchange, transacting their business under the names, in Philadelphia, of Ludlow, Beebee & Co., and at New York, of Beebee, Ludlow & Co. R. McKinney Ludlow and S. B. Ludlow were, at first, junior partners of the Philadelphia house, but were afterwards recognized only as clerks. In the spring of 1849, S. B. Ludlow left the concern, indebted to them on individual transactions in between $13,000 and $15,000, for which they held some securities whose proceeds, afterwards credited, reduced the debt to about $9,000. He, also, as endorser of a note of another brother, Alexander B. Ludlow, owed them $900. This old indebtment, amounting, with interest, when the bill was filed, to about $11,500, seems never ·to have been paid. But it was never so brought into account, or appropriated, as to become properly connected, in any manner, with any subject of inquiry in this cause.

In 1849 S. B. Ludlow went to California, taking with him

sufficient money for his personal expenses for a few months, and a small credit from his father, but no other capital. In that year he and Alexander B. Ludlow were at the mines in California, where they had a small store. In this business, if nothing was lost, no profit seems to have been made.

In the spring of 1850 S. B. Ludlow received from his father, in the latter's individual name, a letter of credit for a larger amount. He exhibited this credit at San Francisco, to Clinton Winter, a brother of one of the complainants, and proposed that they should establish there "a banking and exchange office." They established such an office accordingly, in partnership, under the firm of S. Beebee Ludlow & Co. The New York and Philadelphia houses were in extensive business, and in high standing and credit. The San Francisco house used Robert M. Ludlow's letter of credit in selling exchange. Their other business consisted in receiving and paying deposits of money, buying and selling gold dust, and lending money on interest, all on a very limited scale. Their business, though thus limited, was of good character and fair credit. This credit was founded upon their supposed connection with the New York and Philadelphia houses. The supposition arose from the similarity to the names of both, of the name under which the business in California was conducted, and from certain operations which induced a belief in a more intimate intercourse in business than really existed. They circulated a card, in which they described themselves as "bullion and exchange bankers," at San Francisco, adding, "Gold and silver and gold dust bought and sold. Advances made and insurance effected on gold dust shipped to the United States. Drafts and bills of exchange on the principal cities, and remittances made to any part of the Union, through

BEEBEE LUDLOW & CO., New York,
and LUDLOW BEEBEE & CO., Philad'a."

The San Francisco house then transacted "almost exclusively an exchange business," remitting through the New York house, to the house at Philadelphia, and drawing against the remit-

tances bills of exchange under the credit given by Robert M. Ludlow. If these bills, or any of them, were drawn upon the *house* at Philadelphia, the partners at New York do not appear to have sanctioned it, or to have known the fact. At the close of the year 1850, S. B. Ludlow & Co., though not gainers, had not been losers by their business.. But S. B. Ludlow individually had lost money in other transactions in which he had engaged on his private account, having, in one such transaction alone, incurred a loss of $8,000.

On 1st January, 1851, Mr. Clinton Winter withdrew from the firm at San Francisco. On the same day, the term of the partnership at New York and Philadelphia expired, according to its original limitation. It was then dissolved by the retirement of the elder Mr. Ludlow from business at New York, and of the Messrs. Beebee from business at Philadelphia. From this date S. B. Ludlow alone transacted business at San Francisco, under the name of his former firm, S. B. Ludlow & Co. Mr. Ludlow, Senior, was in partnership at Philadelphia with R. McKinney Ludlow, under the name of Ludlow & Co.; and the two Messrs. Beebee were in partnership at New York, under the name of Beebee & Co. The business of the respective houses was, for a time, apparently conducted at the three places, as before.

The business of S. B. Ludlow, at San Francisco, was carried on from 1st January, 1851, on its former moderate scale, until after the receipt by him from the defendants, in March, 1851, of an unlimited letter of credit, in the following words:

"PHILADELPHIA, Feb. 10, 1851.
"MESSRS. S. BEEBEE LUDLOW & Co.,
        "San Francisco, California,

"GN.—You are at liberty to draw on us for any amount you may require in the prosecution of your business, and your drafts will be duly honored, and this shall be your letter of credit for that purpose.

                "Yours, sincerely,
                        "LUDLOW & CO."

In the latter part of March he published a copy of this letter
of credit in more than one of the San Francisco newspapers.
Before and after this publication, he exhibited to many persons,
to whom he had sold his bills upon Ludlow & Co., the original
letter of credit, as proof of his authority to draw.

Through the use, in these and other modes, which he made
of this letter of credit, his business in exchange was greatly
expanded. The testimony is concurrent that, without its aid,
he could not have extended the scale of his former operations.
But the notoriety of its existence enabled him to sell his bills
upon the defendants, to a very large amount, at favorable rates
of exchange.

All of his remittances to the Atlantic side of the continent,
made after his publication of this letter of credit, appear to
have been investments of proceeds of his drafts upon the de-
fendants, thus negotiated, and to have been forwarded to the
defendants, as his agents, for the purposes which will hereafter
be defined. These remittances were composed of bills of ex-
change of other persons, upon other drawees, and of shipments
of bullion. His last remittance was by the California mail
of 1st October, 1851.

On the next day the news of the defendants' failure was
received at San Francisco; and, according to the above-men-
tioned expectation, caused an immediate stoppage of S. B.
Ludlow's business there. He had until then continued the
negotiation of his drafts upon them, under their letter of credit.

The bills of exchange which he had remitted to the defend-
ants were *endorsed by him to them*. The bullion which he
remitted to them was intended for coinage at the Mint in Phila-
delphia. There was no assay office then at New York. But
there was no direct intercourse between California and Phila-
delphia. This bullion, therefore, though intended for the de-
fendants, as its ultimate consignees at Philadelphia, was, for
convenience of transmission, forwarded by way of New York,
through the agency of Beebee & Co., to whom, as intermediate
consignees at that place, the bills of lading made it, in the first
instance, deliverable. Beebee & Co. facilitated the transmis-

sion of this portion of his remittances, by insuring, or engaging to insure, the bullion. These insurances were a mere incident of their business as receiving and forwarding agents. The defendants repaid them the premiums of insurance, and the freights, and charged the amounts to S. B. Ludlow. *The bills of lading were accompanied by letters from him to Beebee & Co., ordering him to forward the bullion to the defendants.* Orders to this effect accompanied almost every shipment. If their transmission was, in some instances, neglected, their frequency and the unifority of their purport when sent, sufficiently determined the course of business to regulate it in such omitted instances. There was, moreover, in each case, a *letter of advice from him to the defendants, describing the remittances as made to themselves.*

When S. B. Ludlow, in the latter part of March, 1851, published the defendants' unlimited letter of credit in the San Francisco newspapers, he appended an advertisement, in the following words:

"Exchange on Beebee & Co., New York; Ludlow & Co., Philadelphia, and at their agencies in Boston, Baltimore, Richmond, etc. Gold dust shipped and insured under their policies, at the lowest rates.

"S. BEEBEE LUDLOW & CO.,

m29-tf.                                        *"Bankers."*

Endorsed, moreover, upon each of his bills of lading for gold dust, was a printed memorandum, subscribed by him, or. on his behalf, stating that the shipment was covered by policies of insurance of Beebee & Co. The concluding clause of the advertisement did not import that the gold dust was to be shipped for the security of his exchange, mentioned in the previous clause. The apparent import of the advertisement was, on the contrary, that he proposed to make shipments of gold dust for other parties, as their forwarding agent, holding out as their inducement for employing him in this business the prospect of safe insurance at the lowest rates.

The endorsement on the bills of lading may have been intended for the satisfaction of such parties. It may, however, also have been, and probably was, intended for occasional exhibition to parties whom a knowledge of his arrangement for insurance, might induce to buy his drafts upon the defendants. Certainly, the endorsement was of no use to himself, or to the other parties to this arrangement which it attested. It must, therefore, have been intended for exhibition for some purpose in California. If it had been shown to any of the draft holders interested in the present suit, as an inducement to them to buy their drafts, the circumstance might have had an important bearing in their favor, as evidence of an intended appropriation for *their* security of the proceeds of the bullion shipped under the respective bills of lading thus exhibited. But, though there is proof in the cause that the *letter of credit* was exhibited in aid of his negotiation of his drafts, there is no evidence or allegation, and it is therefore not at all probable, that a *bill of lading* for any one of the remittances in question was ever so exhibited. In the absence of such proof, the negative must be assumed. Consequently, the memorandum on the bills of lading cannot be regarded as having had an independent effect of any kind, in favor of any of the draft holders.

Nothing else in the evidence has any tendency whatever to prove that there was, by S. B. Ludlow, an original appropriation, express or symbolical, of his remittances for the security of the drafts.

The letter of credit under which he negotiated the drafts was not an implied appropriation for their security. It conferred upon him an authority to draw, and contained, on the part of the defendants, a promise to accept his drafts. But their actual acceptance of his drafts thus negotiated could not have affected the question whether his remittances were appropriated for this purpose; and the previous promise to accept them could not, in this respect, have had a more extended operation. Indeed, in a case otherwise doubtful, the circumstance that such a letter of credit existed would, perhaps, weaken rather than strengthen the argument that there had been such an appropriation. If

the letter of credit had not authorized S. B. Ludlow to draw upon the defendants *without limit,* they might, when his remittances did not suffice to cover his drafts, have refused to accept them. In the absence of the letter of credit, these draft holders therefore might have had no expectation that the drafts would be accepted unless they were covered by his remittances. Parties who bought the drafts might then have thought the personal responsibility of the defendants of little importance. But the defendants' letter of credit bound them to such parties, to accept the drafts at all events, however his account might be overdrawn by their payment. Under this letter of credit, therefore, the drafts may have been taken rather upon the credit of the drawees personally than upon that of any remittances, made, or intended. The most favorable view of the case for the complainants, under this head, is, therefore, to dismiss, entirely, the letter of credit from consideration.

There was, consequently, no original appropriation of the remittances in question for the direct security of the drafts.*

But, as between S. B. Ludlow and the defendants, his remittances in bills, and in bullion, were appropriated for the security of the defendants.†

If the appropriation was, in fact, made by him in order to secure their advances and liabilities, the consideration to support it was amply sufficient. Indeed, he was under an obligation to provide, in this respect, adequately for their security. It has been stated that their letter of credit was a promise, on their part, to honor such drafts as might be negotiated under the authority which it conferred. According to the decisions reported in 4 Peters, 121, 122; 1 Story, 28, and 11 Mees. & Welsb. 390, 391, it was not a legal acceptance, by anticipation, of such drafts. But, for any breach of the *promise to accept,* the defendants would be suable by the respective parties who,

---

* See ante, p. 12, 2d proposition.

† See below, and also p. 12, the 4th proposition, and the first paragraph of the 5th.

on the faith of it, bought the drafts. (2 Casey, 87.) So far as *third persons* were concerned, the authority to draw which it conferred was *unlimited*. The defendants were liable, therefore, to the respective parties who bought the drafts from him whether payment of them would overdraw his account or not. As between himself and the defendants, their engagement was not thus absolute and unlimited; but was conditioned only, depending upon his not overdrawing his account. He was not justifiable, under the letter of credit, in drawing upon them unless he kept them *in funds* to meet his drafts at maturity, or, at all events, kept them adequately *secured* by his remittances. In the correspondence, his obligation to cover their liabilities by seasonable remittances was recognized on his part. We have seen already that if the existence of such an obligation had not been thus indicated, it would, under known rules of commercial law, have been implied. (See 1 Peters, 290; Baldw. 538, 2 Mylne & Cr. 405.)

The correspondence which manifested his *obligation* to secure to the defendants their indemnity and reimbursement, showed also his *purpose* to do so. The consideration being sufficient, this manifestation of the purpose would alone have sufficed to create the intended security. But the purpose was also carried into effect, in every instance, by a distinct act sufficient in itself, as an appropriation of each remittance.

It has been stated that the bills of exchange which he remitted were endorsed by him to the defendants. From the time of the transmission of the bills thus endorsed, the defendants alone could control the disposition of them. So soon as the endorsed bills, enclosed in the respective letters remitting them, were on the route by mail, they were effectually appropriated for their intended purpose of securing the defendants. The result was, in this respect, the same, whether the bills thus enclosed were endorsed specially to the defendants, or in blank. The qualified interest in the bills required for their security was in either case vested in the defendants from the commencement of the transit.

The mode in which the bullion was remitted has also been

particularly described, and the character as well as purpose of Beebee & Co.'s interposition by the remitter, as his receiving and forwarding agents at New York, fully stated and explained.    Had the bills of lading made the bullion deliverable to the defendants or to their order, they would have acquired in it, when on shipboard, the qualified property required for the security of their advances and liabilities.    If the bills of lading had been drawn or endorsed in blank, and, in this transferable form, had been transmitted to the defendants, the appropriation would not have been less immediate and effectual. This the above-cited case of Haile v. Smith, 1 Bos. & Pul. 563, sufficiently proves.    On the other hand, the case of Kinlock v. Craig, 3 Durnf. & E. 119, 783, which has also been cited, and Nichols v. Clent, 3 Price, 547, show that if the bullion had, under bills of lading or otherwise, been deliverable to a middleman for any purpose other than that of immediate single transmission to the defendants, they would have acquired no property in it until the fulfilment of the condition, express or implied, of which the middleman's intervention was intended to secure the performance; and also show that if, without any such intervention of a middleman, the bills of lading had made the bullion deliverable to the remitter's own order, and had been transmitted without his endorsement, the defendants would have acquired in the bullion, during the transit, no right or interest which would not have been revocable by the remitter.

But in the case before the court, the effect of the bills of lading, which made his bullion deliverable to Beebee & Co. as intermediate consignees, was determined by his accompanying orders to them to forward it to the defendants.    Without any such accompanying orders to Beebee & Co., a like effect would have been attributable to his letters of advice to the defendants.    The bills of lading, the accompanying orders to Beebee & Co. as forwarding agents, and the letters of advice to the defendants, constituted *in connection* the *proprietary documents* of these remittances.    *The effect of these documents was the same as if the bills of lading had made the bullion deliverable directly to the defendants themselves without any intervention*

*of Beebee & Co.* This is proved by the authorities already cited from 8 Howard, 399; 10 Bingh. 246; 4 Mees. & Welsb. 791; 2 Hill, 147; 24 Wend. 173; I Curtis, 130.

These authorities would at all events have thus disposed of this particular question if the defendants had been able to continue, notwithstanding their failure, to honor the drafts on presentment. Their inability to continue to do so renders an investigation of the state of their accounts with S. B. Ludlow necessary.

The profit or loss of his business in exchange depended upon the avails of his remittances, which, to the extent of their amounts or values, enabled the defendants to pay his drafts upon them, or to reimburse their payments of such drafts. During the nine months of 1851 in which his business was continued at San Francisco, he was a loser to a small amount on his banking operations. On his transactions in exchange during this period, he gained, according to his own estimates, about as much as he lost. His losses in the banking business, added to his heavier losses of the previous year, and his expenses of living in California, occasioned a deficiency in his remittances of which the value was therefore inadequate for the security of his drafts upon the defendants. His account with them was consequently overdrawn at the time of their failure.

At the close of 1850, his former house of S. B. Ludlow & Co. had owed to the former Philadelphia house of Ludlow, Beebee & Co. a balance of $2,834.92. This balance Ludlow & Co., on 1st January, 1851, transferred and charged to him in their new account then opened. The latter account contains also a similar charge under date of 6th January, 1851, of two sums, together $2,570, transferred from a prior account of 27th December. These amounts, in all $5,404.92, resulting from his former business, do not appear to have represented the whole of his losses prior to 1851.

The following transactions of the defendants with S. B. Ludlow, or on his account, from the commencement of 1851 appear upon their books.

In addition to the above-mentioned old items,
together ............................................    $5,404 92
they charged his drafts paid by them to the
amount of ............................................    87,563 59
And their payments of insurances, $1,783.99,
freight, $533.56, a protest, $3, and balances of
interest, $385.67, together ................    2,708 22

Total debits ...................... $95,676 73
They credited, as avails of his remittances, the
following sums:
Received early in 1851, from remittances of the
latter part of 1850.............. $5,657 59
Received from remittances of 1851.. 69,069 47

Total credits ...................... $74,727 06

Leaving to the defendants' credit on 25th August,
1851, the day of their failure, a cash balance of $20,949 67

The correctness of the accounts, resulting in this balance, has
not been disputed.

They had, until then, accepted and punctually paid all of his
drafts upon them. They then ceased so to do, refusing to
pay two, for $2,500 each, held by the complainant Hopkins,
falling due on that day. If the arrival of a remittance had
not been delayed by a casualty mentioned below, the balance
due to them in cash account would have been smaller by several
thousand dollars, and they would probably have been able to
take up these two drafts, and, perhaps, continue their payments
a little longer.

None of the items of charge or discharge, in their account
from the commencement of 1851, which is analyzed above,
are disputed. This account had been twice balanced. At
these rests, and at that of 25th August, it contained no charge
for compensation of any kind. If he had not unauthorizedly

overdrawn it, their course of business with him, therefore, would not have warranted a charge of any commission for the transaction of his business.   But the excess in amount of their payments beyond receipts had been progressively increasing in this year.   Since its commencement, the average balance in which they had been in advance on cash account had been about $13,460, upon an average addition, monthly, of about $1,000 to the sum of the old balances.   On 26th August, 1851, the day after that on which their account was balanced as above, they made a charge against him of $673 for *commission,* without stating the rate, or on. what amount, or amounts.   It was probably intended as a charge of five per cent. on the average amount in which they had been in advance as above, on cash account for eight months, equal to 2½ per cent. on an advance of their acceptances at four months to that amount once renewed.   According to usages in transactions not dissimilar, which will be mentioned hereafter, the charge, though made at this late stage of the business, was, perhaps, under the circumstances of the case, admissible.   *It is the last entry of any kind upon the books of the defendants in account with S. B. Ludlow, or with any other person.*   With its addition, the balance due by him to the defendants on general account, at the time of their failure, was $21,622.67.

The value of his remittances then arrived of which the avails in cash, or its equivalent, had not been credited in this account, will appear upon a comparison of the credits in it with the aggregate of his remittances by such previous mails as had reached their destination.

By the mail of the middle of June, he had forwarded two certificates of deposit, which were credited by the defendants on 6th August, and two bills of lading for gold dust, one by the California for $4,500, which arrived before 28th July, and the other by the Stockton for $4,720, which did not arrive until about 11th August.

By the mail of 1st July, he had remitted a small draft at sight on Philadelphia, and a bill of lading by the Union for $13,308.40 in gold dust.   The draft was credited by the de-

fendants under date of 7th August, at about which time the bill of lading arrived without the gold dust. The Union "was lost in her downward trip," and though the gold dust was saved, it did not arrive at New York until 25th August, 1851, the day of the defendants' failure; and its safety was not known at Philadelphia till the 26th.

By the mail of the middle of July, S. B. Ludlow remitted à draft at three days' sight for $1,200, in coin $207.55, and in gold dust $6,011. The draft was paid at New York on 19th August, and was credited by the defendants at Philadelphia on the 20th. Allowing the days of grace, it must have been presented on the 13th, on which day the coin and gold dust were doubtless at hand.

By these three mails, the remittances in gold dust and coin had thus been in amount, or value, exclusive of the excess of the mint certificates above the California values.. $28,746 95

On account of which the only credits in the defendants' accounts were of the following dates, and amounts, in Mint Certificates:

|  |  |  |
|---|---|---|
| 28th July | $4,825 96 | |
| 21st August | 5,145 21 | |
| 25th " | 4,337 30 | |
| Together | | $14,308 47 |

The difference was an amount in gold dust of $14,438.48 and probably of a value somewhat greater.

This difference included the delayed shipment of $13,308.40 by the Union, which was described in S. B. Ludlow's letters as of that amount, as $13,300, and as $13,000. The excess remaining uncredited may, perhaps, be explained by referring to the circumstance that a note for $1,500, due by parties in California to parties in Philadelphia, had been sent for their account by the defendants to S. B. Ludlow for collection. He had, by the mail of the middle of July, informed them of its receipt; and they were, doubtless, at the time of their failure,

in expectation of intelligence, which actually came by the next mail, that he had collected its amount. After deducting a commission, and the difference in exchange, it would net in Philadelphia about $1,455. An amount about equal, to be paid to the owners here of the note on the receipt of such intelligence, may, perhaps, have been retained by the defendants out of S. B. Ludlow's gold, without being credited to him in general account.

Deducting from the balance of his debit in general
    account with the defendants, which was...... $21,622 67
the value of the bullion arrived, but not credited,
    which was about....................... 14,438 48

    the difference ...................... $7,184 19
represents about the deficiency in his remit-
    tances, estimating this bullion as cash.
The amount payable to the owners of the collected
    note for $1,500, say about................ 1,455 00

    increased the deficiency to about........ $8,639 19
The payment of the two drafts falling due on the
    day of the defendant's failure for together.... 5,000 00

    would have increased it to about........ $13,639 19

This, as we have seen, had been about the average of a progressively increasing deficiency. It had continued to increase, notwithstanding repeated promises in his letters to reduce or discharge it, and to cover adequately his drafts by remittances. Other acceptances were soon to fall due. No remittance was to be expected for ten days, and as fresh drafts always appeared upon the arrival of each California mail, no relief was to be expected on the receipt of a remittance.

This was the condition of the business on the day of the defendant's failure. The amount of his drafts upon them then and afterwards falling due, exceeded, by several thousand dollars, the value of his remittances which afterwards arrived.

The aggregate amount of his drafts upon the defendants in the year 1851 has been stated as $171,305.08.* In this year the defendants paid his drafts to the amount of $87,563.69, leaving, if the above aggregate amount is correctly stated, accepted and unaccepted outstanding drafts to the amount of $83,741.39. The amount cannot be precisely ascertained otherwise than under a future order of reference. But in the present review of the facts, the amount of his drafts upon the defendants which they did not pay may be regarded as about $84,000.

The amounts or values of his remittances which arrived after August, 1851, and the dates of their arrival, were as follows:

| TIMES OF ARRIVAL. | REMITTANCES. | | TOTALS. |
| | In Bullion. | In Bills. | |
| --- | --- | --- | --- |
| About 5th Sept., 1851......... | $15,303 50 | $12,000 00 | $27,303 50 |
| "    20th    "      "    ......... | 6,105 37 | 6,500 00 | 12,605 37 |
| "    5th Octbr.,  "  ......... | 2,632 91 | 20,000 00 | 22,632 91 |
| "   18th    "      "  ......... | 2,559 53 | 6,000 00 | 8,559 53 |
| "    7th Novr.,  "  ......... | ........ | 8,000 00 | 8,000 00 |
| | $26,601 31 | $52,500 00 | $79,101 31 |

The value of the bullion arrived but not credited, $14,438 48
and of the bullion and bills which arrived after-
wards ................................. 79,101 31

were thus, together, about............. $93,539 79
The insurances not charged.......... $982 14
and freights   "       "    .......... 247 80

were, together ...................... 1,229 94

Of the net value, about..................... $92,309 85

* $176,710 00
5,404 92

$171,305 08

the amount required for the payment of the above collection of $1,500 was about..........  1,455 00

leaving about .......................  $90,854 85
Out of which was to be paid the balance due to the defendants in general account...........  21,622 67

so that there was....................  $69,232 18

or thereabouts, to meet the drafts outstanding, of which the amount was about $83,741.39. The deficiency was thus about $14,509.21, increased somewhat by interest and a little reduced by the gain, on a part of the bullion, of the differences in amount between the mint certificates and the California values.

The following is a recapitulation, showing the deduction of this result:

| | | | |
|---|---|---|---|
| Old account........... | $5,404 92 | Proceeds of old remittances .............. | $5,657 59 |
| Drafts paid by defendants ................. | 87,563 59 | Proceeds of remittances of 1851, credited..... | 69,069 57 |
| Charges paid by defendants ................. | 2,708 22 | Remittances arrived but not credited at end of August, 1851......... | 14,438 48 |
| Their charge for commission ............ | 673 00 | | |
| Payment of net collection of $1,500 (about) | 1,455 00 | Remittances which arrived afterwards...... | 79,101 31 |
| Insurances and freights not charged......... | 1,229 94 | Deficiency ........... | 14,509 11 |
| Drafts remaining unpaid ................. | 83,741 39 | | |
| | $182,776 06 | | $182,776 06 |

We may say, with a sufficient approximation to correctness, that there was in value about $69,000 to meet drafts to the amount of about $84,000, and that the deficiency was thus about $15,000.

This having been approximately ascertained, the effect of the defendants' refusal, on and after 25th August, 1851, to honor the drafts, may be considered.*

We have seen that S. B. Ludlow's remittances, though their

* See ante, p. 13, under the 8th head.

nominal amount or value had been received by the defendants
in cash, or its equivalent, without impediment or delay, would
have fallen short by several thousand dollars of the sum re-
quired in order to reimburse their advances and enable them
to continue the punctual payment of his drafts.   His account,
when the first of his bills was dishonored by them, had already
been so overdrawn that the relation of debtor and creditor had
been established between him and the defendants.   This rela-
tion, so far as their intended indemnification was concerned,
had already been substituted for, or superadded to, that of
principal and intended sureties.   Their engagement to honor
his drafts had been made upon the faith of an expectation of
receiving from him remittances of amount or value sufficient,
after payment of any balance due to them in general account,
to indemnify them against their intended liabilities.   As be-
tween him and them, his failure to keep them thus adequately
secured and indemnified is to be deemed the cause of their
not having continued punctually to honor his drafts.   The
dishonor of the drafts involved them, under their letter or
credit, in liability to third persons.   But this was attributable,
as between him and them, to no default on their part.   It was
the result of the inadequacy of his remittances.   He could not
have maintained an action against them for not honoring the
drafts without showing that he had kept them indemnified
against such liability as would have been incurred by them in
so doing.

The effect of the defendants' refusal to honor the later drafts
will first be considered as if the letter of credit under which
they were negotiated had not existed.   The case, thus con-
sidered, was the ordinary one of remittances to agents made,
as well for the remitter's own expected profit, as to secure their
advances, and indemnify them against their accrued and accru-
ing liabilities for his account.   If they had never honored any
of his former drafts, and had neither been in advance to him
nor under pre-existing liabilities for him, the case would have
resembled that of a single remittance to an agent who refuses
to honor the remitter's bills drawn against it.   The case would,

in principle, have been the same, if, when the defendants refused to honor his later drafts, their prior advances and liabilities had been adequately secured by his previous remittances. The relation of sureties entitled to indemnification would not then have arisen in their favor as to the remittances which arrived subsequently. So far as their indemnification was concerned, the purpose of the intended appropriation would have ceased to exist, and the *consideration of its irrevocability* by the remitter would have wholly failed. Had the present case been one of this character, the defendants' refusal to honor his later drafts would, therefore, have rendered the subsequent delivery of his remittances to them countermandable by him. He could have revoked the intended appropriation of the remittances, and have resumed the possession of them, or have changed their destination. Any such resumption by him of possession, or change of destination, would have operated retroactively as an annulment of the appropriation from its date; and its effect would have been the same, in this respect, whether it had preceded or followed the dishonor of the drafts, if they were in fact dishonored.

But in such cases the remitter's interest in the previously intended appropriation may require that, notwithstanding the dishonor of his drafts, the original purpose of the appropriation shall be fulfilled by the application of the proceeds of the remittances to the payment of the drafts. This interest might be defeated, in certain cases, to his great injury, if the acceptance of his drafts by the agent were a condition precedent, on which alone the appropriation of his remittances was dependent. It is not legally such a condition. The appropriation, though revocable, is not annulled without an act of revocation on the part of the remitter.

In the present case, S. B. Ludlow never changed the destination, resumed the possession, or otherwise countermanded the delivery of his remittances. Therefore, if their appropriation *had* been *revocable* by him, it never was *revoked*. Consequently, the right of the defendants to receive the remittances under it could not have been disputed by middlemen, like

Beebee & Co., in possession of them for temporary purposes incidental to their mere transportation. The defendants, though they had refused inexcusably to honor the drafts, could, therefore, in S. B. Ludlow's name, or in their own, have compulsorily taken his remittances out of the hands of any such middlemen by whom they might have been detained. (See Evans *v.* Mitchell, 3 Mann. & G. 619-621; 4 Scott N. R. 52, 53; also, 6 Bingh. 748; remarked upon in 6 Wharton, 427.) The duty of the defendants, as his agents, notwithstanding their dishonor of his drafts, would have required them thus to take his remittances out of the hands of such middlemen into their own possession; and would have required them, not less than if they had honored the drafts, to turn his remittances to account for his profit, and apply the avails, after satisfaction of any balance due to themselves, to the payment of the drafts.

But, though the delivery of the remittances was not countermanded, yet if it had been *countermandable* by S. B. Ludlow, after the dishonor of his drafts, a question would, perhaps, have arisen, whether the remittances would not have been liable to be intercepted at New York, or elsewhere, through seizures of them under adversary proceedings against him by foreign attachment. On behalf of plaintiffs in such proceedings, it might have been contended that their attachments, by substituting them in his place, operated as a countermand of the delivery of the attached remittances to his agents, not less than a voluntary countermand by himself would have thus operated. No such question could, however, arise if S. B. Ludlow was himself incapable of countermanding their delivery to the defendants. The question whether his appropriation of the remittances for their security was revocable by him, in consequence of their dishonoring his later drafts upon them, will, therefore, be considered.

After the more absolute relation of debtor and creditor had, as between these parties, been superadded to that of principal and surety, a particular draft or drafts of the remitter might have been detached by him from others of the series of his drafts, and so connected with a designated remittance as to

prevent any interest in it from vesting in the defendants, until their acceptance of such draft or drafts.  Such a draft of a remitter upon an agent who is in advance has been sometimes pinned, or otherwise annexed to a carrier's, wharfinger's, or warehouseman's receipt, or to a more formal proprietary document, such as a bill of lading, so as to indicate an intended particular connection of the draft and remittance with each other.  The cases of Barrow *v.* Coles, 3 Campb. 92, and The Bank of Rochester *v.* Jones, 4 Comstock, 501, reversing 4 Denio, 489, show that an agent who, under such circumstances, detaches the proprietary document, and, keeping it, refuses to accept the draft, cannot retain the remittance against the will of the remitter, however he may stand indebted to the agent on general account.

But, in the present case, the evidence proves, and the defendants in their answer state, that the remittances were made in order that their proceeds or avails might be credited to the remitter in general account, and without any special appropriation to any particular draft or drafts.  Under such circumstances, an agent already under advances and liabilities, which remittances received by him will not more than suffice to secure, may take them, and retain them, notwithstanding a refusal by him to permit the remitter's account to be still further overdrawn by bills presented before or after the arrival of the remittance.  This point, if it could have been doubted, was decided in Anderson *v.* Clark, 2 Bingh. 20.  In that case, Orr, a merchant at Newry, in Ireland, was in the habit of making consignments of butter, from Newry to the plaintiffs at Liverpool, to be sold *on Orr's account;* and in the habit of thereupon drawing bills of exchange on the plaintiff.  During the continuance of these dealings, Orr frequently drew upon the plaintiff, in anticipation of future consignments.  There was a balance of £1,659 15 *s.* 1*d.* due to the plaintiff on account of such transactions, when Orr shipped a consignment of butter to him, invoiced at £592, and at the same time drew upon him a bill for £500, which he *refused* to accept.  The butter was thereupon relanded at Newry, and delivered to Orr by the master of the vessel, against

whom the action was brought for its non-delivery to the plain-
tiff. The defence was that the plaintiff, by refusing to accept
the bill for £500, had refused the shipment, and that as the con-
signment was to have been sold on Orr's account, the property
in the butter had never passed out of him, and he might coun-
termand its delivery. This defence would have prevailed if the
consignment and the draft had composed an isolated transac-
tion. But the plaintiff recovered. The court were of opinion
that though he "might not have an absolute property in the
goods * * * he had a sufficient qualified interest in them, in
the way of security, to entitle him to sue on a breach of contract
for non-delivery." Parke, B., afterwards referring to the
"principle upon which he knew" that this case "was decided,"
said that the "bill of lading, making the goods deliverable to
a factor, was, upon proof from correspondence of the intention
of the principal to vest the property in the factor as a security
for antecedent advances, held to give him a special property
the instant the goods were delivered on board" of the ship. (4
Mees. & Welsb. 792.) The authority of Anderson v. Clark is.
also recognized in Grosvenor v. Phillips, 2 Hill, 152.

Unless a condition that the property in such remittances.
shall not vest until the acceptance of a draft or drafts is im-
posed, or their acceptance constitutes the *whole* consideration
of the right of the intended receiver of the remittance to
security, the dishonor of the drafts does not prevent such a
property from thus vesting.

In the present case, the question has hitherto been considered
independently of any particular effect attributable to the letter
of credit under which the drafts were negotiated. We have
seen that the dishonor of the later drafts by the defendants was,
when it occurred, excusable, and even justifiable, as between
them and the drawer, who, therefore, could not have revoked
his appropriation of the remittances for their security. The
effect of the letter of credit, under this head, will next be
considered.

Its effect, perhaps, was that, although the defendants had
even been adequately secured by seasonable remittances, and.

the dishonor by them of the remitter's drafts had, consequently, been inexcusable, the appropriation of the remittances would, nevertheless, have been irrevocable by him.   When he negotiated the drafts, he obtained value for them on the Pacific side of the continent, through the use of the defendants' credit. The defendants, at the same time, incurred a liability under their promise to honor the drafts, contained in their letter of credit.   Their failure to incur, according to this promise, an additional or modified liability, as acceptors of the drafts, did not, therefore, it would seem, affect the *whole* consideration of the intended security.   Their liability to suit for breach of this promise continued, and was, in itself, a subsisting part of the consideration.   If so, the appropriation of the remittances for their security would, perhaps, not have been revocable. The precise case may not have been adjudicated; but there have been decisions approaching, in principle, the determination of the point very nearly.   The ownership of goods delivered, under a contract of sale, to a carrier for transportation to the purchaser vests immediately in the purchaser, subject only to the seller's right of stoppage in transitu.   Though the purchaser becomes insolvent, or even bankrupt, before their delivery, and refuses to accept a bill drawn for the price, in pursuance of the contract, or has failed to remit, according to its requirement, a banker's bill for the price, the seller, who has not been able to stop them in transitu, cannot resume the possession.   The suggestions of a contrary tendency by Lord Kenyon, and Ashurst, J., in Tooke *v.* Hollingsworth, 5 Durnf. & E. 226, 228, were certainly rejected in the Exchequer Chamber, where that case was finally decided (2 H. Bl. 502), and have been overruled in Wilmhurst *v.* Bowsher, (7 Mann. & Gr. 882,) and Heinekey *v.* Earle, (8 El. & Bl. 410, 422,) both in the Exchequer Chamber, and the intervening cases of Key *v.* Cotesworth, (7 Exch. 595,) and Gurney v. Behrend, (3 El. & Bl. 633.)*

In these cases, the insolvent buyer was liable to an action upon

---

* See also Browne *v.* Hare, 3 Hurlst. & Norm. 484, 497.

his promise to remit in the one case, and to accept in the other case; and the property in the goods vested in him, in consideration of this *promise*.

The only difference between some of the cases thus decided and the present case is, that the property which was there vested was an absolute ownership, while here it was a qualified interest for the particular purpose of the intended security. The principle appears, however, to be applicable alike, if its foundation is that the consideration of the act of appropriation does not *wholly* fail.

The present case may, however, for the reasons already stated, be determined under this head on the more simple ground that the remittances were intended as a security for *past advances* and for liabilities *already incurred,* as well as for accruing liabilities. On this point the case of Anderson *v.* Clark* is a sufficient authority for the determination of the question.

Consequently, notwithstanding the dishonor of the later drafts, the remittances were appropriated for the security of the defendants in such a manner that S. B. Ludlow could not, after the commencement of their transit from California, have countermanded their delivery to the defendants, or have otherwise annulled their appropriation without the consent of the defendants, unles he paid the drafts from other sources. He and the defendants, by any *concurrent* act not voidable on the ground of covin and fraud, could have made a different disposition of the remittances which would have been effectual against the draft holders. But an appropriation of any one or more of the remittances for the security of the drafts made at any time after the commencement of the transit, by him alone, or by the defendants alone, would, as has already been stated, have constituted an effectual security for the draft holders. If made by the defendants alone, S. B. Ludlow could not, as has also been stated, have annulled it without paying the drafts himself.

* 2 Bing. 20, and 4 M. & W. 792, cited ante, pp. 95, 96.

If any of the drafts had been given directly for the price of any bullion remitted by him to the defendants, it might, upon their insolvency, have been stopped in transitu by, or for the benefit of, the payees or endorsees, at any time before its delivery to the defendants.   But this right of stoppage in transitu could not in that case have been exercised at any time after its receipt by the defendants or their agents.   If the right was not seasonably exercised, the circumstance that it *might* have been so exercised would have *afterwards* been immaterial. His remittances having, however, been bought, as has been stated, with proceeds of sales of the drafts, cannot have been paid for by the drafts themselves.   Therefore, no question of stoppage in transitu could have arisen out of these transactions *even as to such of the remittances as did not arrive until after the bill in this case was filed.*

The sole recourse of the complainants, therefore, was in such appropriation, if any, of the remittances for the security of the drafts, as might have been effectually made while the remittances were in transit, or after their arrival.*

The delay which occurred in the arrival of the bullion invoiced at $13,308.40, shipped by the wrecked steamer Union, has already been mentioned as having prevented the receipt of this remittance by the defendants before their failure.   Under the arrangement between S. B. Ludlow and Beebee & Co., as to insurance, this amount, if the bullion had been lost, would have been covered by Beebee & Co.'s insurances, or Beebee & Co. would have been liable to him for neglecting to effect insurance.   While its fate was, perhaps, yet uncertain, an arrangement for its appropriation was made by the defendants with Beebee & Co., to whom they were indebted in a much larger amount.

This arrangement was of the effect stated in the following letter:

* See ante, p. 16, the concluding paragraph under the 10th head.

"PHILADELPHIA, Aug. 16th, 1851.
"MESSRS BEEBEE & Co.,
          "New York.

"You will please receive and place the proceeds of the bill of lading for thirteen thousand dollars in gold dust, which bill of lading you held, to the credit of our account for moneys advanced S. Beebee Ludlow & Co.

                              "LUDLOW & CO."

The meaning of this was that Beebee & Co. should credit the amount of these proceeds to their debtors, Ludlow & Co., by whom the same amount should be thereupon credited to S. B. Ludlow in reduction of his debt to them in general account. But, if the gold dust should come to hand, the liquidation of the credit was to be made by the mint certificates. Consequently, no entries of the transaction had been made in the books of the parties at the time of the defendants' failure.

After the arrival at New York of the $13,308.40, described in this letter as $13,000, another appropriation was made by the defendants, in the form of an order on Beebee & Co., in the following words:

                    "PHILADELPHIA, August 29th, 1851.
"MESSRS. BEEBEE & Co.,
          "New York.

"Please to pay over to the order of Messrs. Willis & Co., of Boston, out of any proceeds of gold dust you may receive from S. Beebee Ludlow & Co., of San Francisco, for our account to the amount of eight thousand three hundred and two dollars and sixty-three cents.

"$8,302.63.                    LUDLOW & CO."

This order was handed to Willis & Co., as the defendants, on the day of its date, by letter, informed Beebee & Co. The order, endorsed by Willis & Co., was, on the 30th of August, endorsed by them to Beebee & Co., with a request that its amount might be credited to them on account.

The two appropriations by the defendants for $13,308.40 in favor of Beebee & Co., and $8,302.63 in favor of Willis & Co.,

were on account of debts of their own to these respective par-ties. S. B. Ludlow was not privy to these debts, or, in any manner, interested in their discharge. But this was apparently immaterial, as both appropriations were apparently covered by the balance of $21,622.67 to the credit of the defendants in general account with him.

The bullion on hand at Philadelphia at the time of their failure did not more than suffice for the payment of the collec-tion of $1,500. The mint receipts for the bullion by the Union, invoiced as $13,308.40, show that it produced in coin $14,115.66. This amount was credited by Beebee & Co. to the defendants on 5th September, 1851. The defendants were not immediately advised of this credit. A corresponding credit on their books to S. B. Ludlow was never made. Such a credit would have reduced the balance due by him to the defendants in general cash account to between $7,500 and $7,600.*

The order of 29th August, 1851, in favor of Willis & Co. for $8,302.63, was, on its face, payable out of the expected remit-tances in bullion that might arrive after its date at New York. There was, at its date, no fund on hand at New York or Phila-delphia for its payment. When the first of the remittances which afterwards arrived reached New York no more than between $7,500 and $7,600, was properly payable on account of this order, because no more was covered by the reduced balance then due to the defendants. But, for the present, the small difference in amount may be disregarded. According to the aspect of the accounts at the close of August, 1851, bullion to the value of $8,302.63 was to be retained at New York, by Beebee & Co. for Willis & Co. out of the first remittance that might afterwards arrive; and the residue of the remittances, on their arrival at New York, should have been immediately forwarded by Beebee & Co. to the defendants at Philadelphia.

This was the state of things when, on 1st September, 1851, the defendant, Robert M. Ludlow, subscribed the name of his firm to a writing of the following effect:

* See ante, p. 89, about $8,639.19, less $807.56.

"We hereby assign over to William Taylor, of Philadelphia, any gold dust, coin, or drafts, that S. Beebee Ludlow & Co., of San Francisco, California, may send to us for their account. First, for the purpose of paying their balance due us, and our acceptances of their drafts on us; and second, for the payment of their sight-drafts and time-drafts on us: which you will please collect and hold, for the purpose of making a pro rata dividend to the different parties as above holding said drafts. And you will also take possession of any gold dust shipped by S. B. Ludlow & Co. to our care for other parties, and deliver the same to them, as our agent.

"Philadelphia, Sept. 1st, 1851:

"LUDLOW & CO."

The defendants took immediate measures to procure S. B. Ludlow's ratification of this act; but we have, unfortunately, a small part only of their correspondence of September, 1851. The bill interrogated the defendants what correspondence they had had with S. B. Ludlow, and with Beebee & Co., respectively, concerning the drafts and the remittances, and concerning the provision to be made for the payment of the drafts out of the remittances, and what correspondence they had had with S. B. Ludlow "touching the reception, *disposal,* and present custody or possession of the" remittances; requesting the defendants to append copies of the respective corespondences to their answer. They did not append any copies of letters, alleging, as a reason, that their correspondence with neither of the parties indicated or referred to any *special* appropriation of the remittances. After mentioning their letter of credit, authorizing S. B. Ludlow to draw on them, they stated that there had not been any correspondence between him and them respecting the drafts and remittances, other than that they were usually advised by him of his drafts upon them, and of the amounts of his shipments to them, "except certain letters, containing, *besides,* family matters unconnected with said drafts or shipments." They added that their letters to him were not copied, as they were *"generally* on family matters," and that

"the corespondence with Beebee & Co." was "of the same general character, except where connected with other subjects." The answer was entirely silent on the subject of any correspondence concerning the paper of 1st September, 1851. A sufficient length of time for the receipt from S. B. Ludlow of a reply to any letter from them upon the subject had not elapsed when their answer was filed. But their duty had required them to apprise him promptly of any act of such importance in the business of their agency; and the evidence is very distinct that they had not neglected the performance of this duty.

This evidence discloses the fact that all of their letters to him, written before the 24th of September, 1851, have, at their suggestion, been destroyed by him, under circumstances of great culpability, which will hereafter be stated. The correspondence of a commercial agency forms a part of the muniments of the title, so to speak, of the property to which it refers. The wilful destruction of such a correspondence brings a case in which it occurs within rules of evidence as to the *spoliation of papers,* which justify, against parties guilty of it, and in favor of other parties interested, "the utmost latitude of presumption" from such secondary and otherwise inferior evidence as may be accessible. The decisions of courts of equity upon the subject were collected and reviewed by this court in 1 Baldwin, 388-391. The suppressions and evasions of the answer in the present case make it a peculiarly strong one, in this respect, against the defendants, as parties whose relation to the subject was fiduciary.*

The defendants' letters to S. B. Ludlow, written in September, 1851, which have been destroyed, were dated on or about the 1st, 9th, 11th, and 12th of that month. Of some of them, duplicates—also destroyed—were sent. The contents of the first of these letters are proved in part by Clinton Winter, who, after deposing that "intelligence of the failure of Ludlow & Co. was received at San Francisco on the 2d of October, 1851," i. e., by the mail of the beginning of September, testified that "S. B.

---

* See ante, p. 17, last paragraph under 11th head.

Ludlow received, simultaneously with receipt of intelligence of the failure of Ludlow & Co., a letter from Robert M. Ludlow, dated Philadelphia, September, 1851, stating that Ludlow & Co. had made an especial assignment of his remittances to one William Taylor for the benefit of his creditors, and that he had better confirm it; that his interests were fully protected, and that he might assure his creditors" in California "that they need be under no uneasiness, as all his drafts would be paid to within, perhaps, ten or fifteen cents on the dollar." That this letter or another of the destroyed letters, communicated to him the contents of the assignment with more fullness and precision than this witness, from recollection, states them, is indicated in a letter of S. B. Ludlow, written after his receipt of the intelligence communicated. This letter, which is an important paper in the cause, was in these words:

"SAN FRANCISCO, Oct. 14th, 1851.
"MESSRS. LUDLOW & Co.

"GENTLEMEN :—The funds sent on to you by us, and what we have remitted you since your failure, will, of course, be taken by you, or your assignee, to pay off what the house here, S. Beebee Ludlow & Co., may owe you, together with what acceptances you may be under for us before our other liabilities may come in, or rather *after your claim against us, is satisfied,* then we *presume* and *wish that all acceptances of ours against you will come in.* And after that, all drafts that may appear subsequent to your failure to be paid pro rata out of the balance of the funds to our credit.

"We are in hopes at least you have taken care of our friends Winter and Latimer first above all. Also that *in case funds may be laying to our credit, and that you have not paid these drafts, then let this be your order to do so,* or to what part of the amount of funds may be due them.

"We are very respectfully your ob't servants,
"S. BEEBEE LUDLOW & CO."

If the complainants, Winter, Latimer & Co., were not secured, in common with other holders of the drafts, in the man-

ner set forth in the previous part of this letter, the concluding part of it had the effect of creating a *particular* security for the benefit of *these* complainants.  But the proper effect of the letter was not so restricted as to render it thus operative for their benefit alone.

The coincidence between the general appropriation of the remittances which it assumed to have been made, conformably to the writer's own wishes and sense of justice, and the appropriation of them by the paper of 1st September, 1851, was complete.  The letter, if interpretable without reference to the proof that the existence of that paper had already been made known to the writer, was an unequivocal admission by him that the defendants had been authorized to execute precisely such a paper.  This recognition by him of such a pre-existing authority would then be evidence that the authority had in fact existed.  But if he was mistaken, and it had not existed, his admission that it had, was either a ratification, or such a dispensation with one as was of equivalent effect.  When an act, already performed, is of such a character as to be voidable by a party who does not know whether it has been performed or not, his recognition of it as valid, if performed, must have one or the other effect.

But the letter, interpreted, as it should be, with reference to the fact that, when it was written, the existence of the assignment had already been made known to the writer, shows that he knew also the precise contents, or precise intended effect, of the assignment.  The letter, thus interpreted, was a direct ratification by its writer of the assignment.  If he knew its intended operation, as his letter then shows that he did, the form of the language of the letter is immaterial.  That the letter stated no objection to the act sufficed, then, to render it an effectual adoption.  As between a principal and his agent, who has performed an unauthorized act, if the principal, when informed of it, makes no objection, his mere silence is a ratification.

Every ratification, whether tacit or express, operates, between the parties to it, and *in favor* of other persons, retrospectively,

so as to take effect from the date of the act ratified.    This letter of 14th October, 1851, had, therefore, *in favor of the draft holders* mentioned in the appropriation of 1st September, 1851, the same effect *against the defendants and S. B. Ludlow* as if he had subscribed this appropriation on the day of its date.

But this letter of ratification was not written in California until six days after the filing of the original bill in this cause. It was not, by due course of mail, receivable in Philadelphia until about the 20th of November, 1851, which was nearly a fortnight after the arrival of the last of the remittances at New York.   Though the ratification was, *between the parties,* retroactive, the paper of 1st September, 1851, was *against other persons,* inoperative *as an act of S. B. Ludlow* until his ratification.   This paper was, in the meantime, for practical purposes, effectual only as the creation *by the defendants* of a trust for the security of the drafts.   This trust, independently of the subsequent ratification, took effect in favor of the draft holders no further than it could be executed through rights exercisable by, or interests vested in, the defendants themselves.

The defendants, as agents of S. B. Ludlow, could not, without his authority, lawfully delegate the performance of any other than ministerial duties of their agency to another person. (11 Howard, 223, 224.)   They could much less, without his authority, substitute for their own agency under him such a trust as to his remittances, permanently vested in another person, as this paper purported to vest in William Taylor as assignee.   S. B. Ludlow's ratification of the paper was, therefore, indispensable to its *complete* validity as an *assignment.**

But the paper, *so far as the defendants themselves were concerned,* was not imperfect or incomplete.†   It required on their part no act in order to render it effectual for its intended purpose.   So far as *they* were concerned, it was, therefore, a valid act *from its date.*   Upon the question whether it might not, as

---

\* See ante, p. 17, the 12th proposition.
† See ante, pp. 17, 18, the 13th head.

a valid *assignment,* have taken complete effect without S. B. Ludlow's ratification, three propositions have been assumed, rather than discussed in the course of the arguments of counsel. These propositions are: the first, that when the ultimate avails of the remittances in cash, or its equivalent, had been duly credited by the defendants in account, if the balance of the account had at any time been in their favor, they would, while his debtors for such balance, have had a right of using its amount as their own; the second, that this right continued to exist, as between him and them, after they had ceased to honor his drafts; and the third, that while it subsisted, they had, in consequence of its existence, an absolute property in the remittances even before the avails in cash or its equivalent were credited.

The third proposition would not follow as a consequence from the establishment of either or both of the others. Unless it should be established, the others are of little importance.

The second proposition is not a necessary consequence of the establishment of the first. After these remarks, the three propositions will be considered in succession.

The first proposition, disconnected from the others, is resolved in the answer to the question whether, when the ultimate avails of the remittances had been duly credited by the defendants in account, if the balance had, at any time, been in S. B. Ludlow's favor, they would, while his debtors for such balance, have had a right of using its amount as their own, so long as they continued to accept his drafts with an intention of paying them at maturity, and fulfilling all essential duties of their agency. The determination of this question depends in part upon an ascertainment of the legal denomination or character of the defendants' agency.

The defendants, if not S. B. Ludlow's general agents on this side of the continent, were his agents to turn his remittances to account for his profit, pay his drafts negotiated under their letter of credit, and attend, for some other purposes, to his interests. The remittances were of a determinable value, and readily convertible into money. He wrote to the defendants

that, in their occasional estimates of the balances of his account, they should take into consideration the gold dust that they might "have on hand not coined," which was "the same as cash." Within two or three days of the times of depositing this bullion for coinage, the mint certificates for the respective *precise* values, differing very little from the California values in the invoices, were always receivable. His remitted bills had usually a few days only to run. The defendants' accounts for 1851 contained only one charge for a protest, which was more than four months before their failure.

As far as third persons were concerned, the character of these remittances defined the authority of the agents, without reference to the mode in which the business was to have been conducted between them and the remitter. Persons who knew that the defendants were his agents, and that particular bills remitted by him were subjects of their agency, might receive them from the defendants without inquiring whether they had been discounted, or what was the state of the defendants' account with him, or whether the disposition of the bills was, between him and the defendants, proper. If the persons receiving the bills were not privy to some actual wrong, such persons would acquire the same title to them as if the defendants were owners of them instead of mere agents. Though, as between the defendants and S. B. Ludlow, their transfer bills might be a malappropriation, the rule as to transfers by bankers laid down in 1 Bos. & Pul. 648; 1 Rose, 238; 19 Ves. 38, would apply. The remitter could not follow them, or their proceeds, into the hands of parties not actually privy to the malappropriation, as the owner of merchandise consigned to a factor can, in certain cases, follow it or its proceeds.

Even as between S. B. Ludlow and the defendants, though they were not simply his bankers, but in part his factors, the rule of their conduct as to his remittances might, in some respects, depend upon their determinable value and ready exchangeability for money. His remittances to them, like those to bankers, might have been appropriated by them directly, without a previous conversion into cash, or discount by them-

selves, for any necessary purpose of their agency for which payments by them in money could have been rightly charged against him in account, if such appropriation could be made without an improper sacrifice of his interests. If a transfer to other persons of his remitted bills before their maturity had been thus made for any such purpose of their agency, the transfer might have been made with a deduction of a discount if not of an unreasonable rate. The value of bullion thus appropriated might be ascertained by weight, at the market rate per ounce, or, it might be delivered at the mint, and the liquidation abide the receipt of the official certificate. At the maturity of his drafts upon them, if they were not in cash to a sufficient amount from his remittances, they might thus have discharged from time to time the amounts falling due, so far as the draft holders might be willing to receive his remitted bills, or his bullion, in payment. So when the cash balance of the defendants' general account with him was in their favor, they might thus appropriate his bullion or his remitted bills, to an amount or value *not exceeding such balance,* to purposes of *their own,*— such, for example, as the payment of their own debts to which he was not privy, and in the discharge of which he was not interested. This was the course adopted by them in the two appropriations of 16th August and 29th August, 1851, in favor of Beebee & Co., and Willis & Co., respectively, both covered by the balance in which his account was then overdrawn. In those instances, however, when the mint certificates had been received, and the respective amounts liquidated and credited to the defendants, they should of course have credited him with equivalent amounts.

But, as between the principal and his agent, the convertibility in such cases of the remittances into money, though they even consist altogether of negotiable securities, does not alone suffice to render the agency that of a banker. In the present case, if, as between the defendants and S. B. Ludlow, the sole regular criterion of the value of his remittances in account had been the prices of intended sales of the bills or bullion, which their duty required them, if possible, to effect, they would have been his

mere *factors.*   In Exp. Pauli, 3 Deacon, 169, 174, dealers in
bullion and foreign exchange, who were also bill and money
agents, were in the habit of receiving from a banker in another
country, foreign bills of exchange *for sale,* with instructions as
to the mode in which they were to be disposed of, and the pro-
ceeds to be applied.   They do not appear to have had relations,
with him of any other kind.   Though they were in the habit of
endorsing the bills when sold, and giving him credit for the
price, for which he was then at liberty to draw upon them, they
were judicially designated as his factors.   Ch. Baron Pollock,
when at the bar, said, in an argument upon the relation between
a banker and his customer, that "a banker is a factor for
money."   (2 Barnw. & Cr. 425.)   If any authorities apparently
suported his observation they were cases in which, under spe-
cial circumstances, the rights or liabilities of a banker had been
judicially described as, for certain purposes, *like* those of a
factor.   *Resemblance,* however, does not here constitute *iden-
tity.*   This observation in so unqualified a form cannot be
safely adopted.   But a professional banker's agency may, from
the purposes for which he receives a remittance, become that
of a factor.

The purpose for which a factor has received a remittance may
also render him in a specific relative sense, a banker.   (Buck,
364.)   But here, again, the agency may strongly *resemble* that
of a banker, without becoming one of this character.   The
danger of confounding the two descriptions of agency may be
exemplified in the case of remittances in bills to a factor by a
principal whose consignments of merchandise would not suffice
to secure his drafts upon the factor.   When there is to be *no
sale* of such bills on the remitter's account, and they are only
to be collected at maturity, or discounted by the deduction of
a fixed rate of interest for the time that they have to run, the
agency respecting them has a strong external resemblance to a
banker's.   But his right of retaining their avails in money as a
security for his accruing liabilities not as yet matured, is de-
terminable by the same rules which would apply to the proceeds
of sales by him of his principal's merchandise.   If he was a

simple banker only in respect of such bills, his right of retain-ing the cash avails for this purpose, would not always be deter-minable by the same rules.

In the present case the mails to and from California were semi-monthly. The average time of communication, either way, was about five weeks; and the time for the receipt of an answer to a letter, usually, between eleven and twelve weeks. This remoteness of the parties from each other, and unfre-quency of their intercourse, the mode in which the remittances in bullion were forwarded by shipments, and certain incidents of their transportation and primary custody on arrival, gave to the defendants' agency an external resemblance to that of the factors of a foreign consignor.

This *resemblance* alone did not suffice to render them in any respect S. B. Ludlow's factors. But, independently of certain evidence in the cause, that they were his *general* agents, a neces-sary result of some of the above-mentioned incidents of their agency was, that they must have had a discretionary authority to *sell* his bullion, or his remitted bills, in the money market, for his account, whenever such sales would, in their opinion, have been conducive to the promotion of his interests. As they were not legally his brokers, they would, if they had made any such sales, have been his factors as to the subjects of sale. (See 2 Barnw. & Alders. 143, 148; 7 Mann. Gr. & Sc. 693, 694; 3 Deacon, 169, 174.) Therefore, if the defendants were the bankers of S. B. Ludlow, they were his bankers with a power enabling them to act as factors. The existence of such a power to sell, though it may never have been exercised, can-not properly be disregarded in defining the character of their agency. It prevented them from being the *simple* bankers of their principal.

If the avails of his remittances were to have been credited to him, *without any sale* of them to other persons, the defend-ants would have been simply his *bankers*. A *purchase* by a banker from his customer, of the kind known as a *discount,* is distinguishable, in this respect, from a *sale* to other persons. The *discount* is effected by crediting to the principal a price

ascertained by some stipulated or uniform rate of deduction from a standard value.   Bullion may be thus, under certain circumstances, discounted by a credit at a fixed rate of deduction below its nominal value.  The banker who credits the amount thus ascertained, in becoming a purchaser of the bullion, ceases to be an agent.   (2 H. Bl. 502, 503.)   A banker who discounts undue bills or notes received from his customer, by crediting to him their amounts, less interest for the respective times between their maturity and the dates of the credits, becomes, in like manner, as to the paper thus discounted, a purchaser, and ceases to be an agent from these respective dates. (2 Barnw. & Cress. 432, 433; 2 Mylne & Cr. 404.)   His *agency*, therefore, can only subsist as to such securities of his customer as have not been discounted.   In the present case, there does not appear to have been a discount by the defendants of any security received from S. B. Ludlow.

A commercial agency may be of such a compound character as to render the agent at all times, in some degree, a factor as well as a banker, as to the same subjects of his agency.   It may also be of such an alternating character as renders the agent, by turns, a banker or a factor, as to subjects of his agency, otherwise of the same class.   (2 H. Bl. 502, 503.)   In England, before the recoinage which was effected in the last century, the weight of the current coins of the realm had varied in such degrees that they were dealt in as bullion by goldsmiths, who, like the parties in the present case, were also dealers in exchange.   The business of private banking was formerly transacted principally by such goldsmiths.   (1 Ld. Ray. 733, 734; 7 Serg. & Raw. 465.)   After the recoinage, the light coins were still dealt in, to a greater or less extent, as bullion, by the goldsmiths, until the suspension of specie payments, near the close of the century.   (See 5 Durnf. & E. 215, 217 (n) ; 2 H. Bl. 502, 503; the statutes 13 G. 3, c. 71, and 14 G. 3, c. 70; the acts of the Executive Government in 1773 and 1774, in Ruding's Annals of the Coinage, Lord Liverpool's Letter on the Coins, ed. 1805, pp. 3, 4, 143, 175 to 179; Huskisson on the Currency, A. D. 1810, pp. 25, 26; Eckfeldt and Dubois' Manual,

pp. 34, 35.)   In the meantime, however, goldsmiths were gradually confined to their legitimate avocations, and the general business of private banking passed into the hands of other persons, as professional bankers.   Before this change in the character of the business, the twofold relation of the goldsmiths to a remitter of bullion and bills, probably, was often that of both factors and bankers.

The present practice of the London bankers, or that which prevailed in the last, and at the commencement of the present, century, was to enter the amounts of discounted bills, after deducting the interest, in the outer column of a customer's account, where his deposits of cash were credited.   Their practice as to bills *not discounted* was to *enter them short,* as it was called.   This consisted in making a note, in an inner column of the customer's account, of the receipt of such bills, their amounts, and the times when they would be payable.   When their amounts were afterwards paid, they were carried forward into the cash column of credits.

The practice of English bankers in other cities and towns, called *country bankers,* differed from that of the *London bankers* as to bills *not* discounted.   A portion of this *undiscounted* paper consisted of what were called *approved* bills. When such approved bills, which had not a long time to run, were brought by a customer to the country bankers, they were in the habit of entering them to his credit at once, in the column in which cash received from him was credited, and paying him their amounts, or letting them draw for them as cash.   No *deduction* of interest in the form of a discount was made as these credits were thus entered.   But interest was charged on both sides of the account, including these transactions; and when the balance of interest was against the customer, the bankers charged a commission.   These running bills were *always endorsed* by the customer.   The country bankers, as it suited their convenience, paid them away to their customers, or transmitted them to their own correspondents in London.   (9 East. 12; 2 Barn. & Cress. 422; 1 Rose, 232 to 257.)   Decisions hereafter cited have established the law in England, that such

8

running bills did not become, like discounted bills, the property of the country bankers; but, like the bills entered short by London bankers, continued to be the property of the customer. Thus, the bills *entered short,* and the undiscounted bills *carried out* in the cash column of credits, were the subjects alike of a continuing *agency* on the part of the bankers.

A simpler mode of conducting the business of bankers, as to undiscounted securities, is, to omit crediting them to the customers until the actual receipt of the avails in cash or its equivalent. The accounts of the defendants with S. B. Ludlow indicate that they adopted this course in the transaction of the business in question. The full amounts of the bills which he remitted, as collected at their maturities, were credited. The product in coin of his remittances in bullion was always represented by credits for the mint certificates when received.

We have seen that if the defendants' advances and intended acceptances had been properly secured by S. B. Ludlow's remittances, they were to have transacted his business without any charge for compensation. This arrangement may perhaps be referable to the consideration of their consanguinity, or that of their former connection in business. But, the course of their business, in this respect, whatever may have been the motive, resembled that between a banker and his customer. It is true that the transaction of banking business for a distant customer is very often attended with a charge of a commission upon acceptances, or upon advances. (See 15 Ves. 120; 17 Ves. 332; 1 Rose, 238; 1 Madd. 112; 3 Durnf. & E. 52 (c); 1 Bos. & Pul. 144; 9 East. 13; 3 Campb. 491, 492; 16 Johns. 375.) But the charge is not as universal as it is in the case of a factor. The practice of some bankers is to charge a customer with a commission on such sum only as the balance of their interest account against him shows, by computation, to have been the average amount of their cash advances. (9 East. 13.) This appears to have been the rule adopted by the defendants in making the above mentioned charge of commission at the close of their general account.*

* Ante, pp. 86, 87.

If the character of the defendants' agency had been determinable by the mode in which its business was uniformly conducted, from the commencement of 1851 to their failure, they would, therefore, have been simply S. B. Ludlow's bankers. Had the distance between the parties been less great than it was, and their intercourse less restricted, their agency as to his remittances might, therefore, have been denominated that of simple bankers. If they were, in any degree, his factors, it was because the exigencies of their agency required that a discretionary authority to sell should be one of its incidents. It has been stated that this power, if it existed, was never exercised.

The first proposition will, therefore, be considered as the question would be presented if the defendants had been simple bankers of S. B. Ludlow, and also as it would be presented if they were his mere factors.

When a banker who has in hand a security belonging to his customer credits him with an amount collected from it, the case is, in effect, the same, as to the amount credited, as when the banker credits an amount originally received from the customer in money. In the latter case, the sum credited is popularly called a deposit. But this is legally a misnomer. The amount credited becomes at once, in either case, the banker's, though the course of his business may be to allow no interest. The credit, in either case, represents merely an amount for which the party credited may draw upon the bankers. In 3 Meriv. 568, 569, Sir W. Grant, who had previously decided the point, (ib. 541, (n)) said: "There is a fallacy in likening the dealings of a banker to the case of a deposit, to which, in legal effect, they have no sort of resemblance. Money paid into a banker's becomes immediately a part of his general assets; and he is merely a debtor for the amount." Sir W. Grant added that the money ceases to belong to the party paying it "the moment he has parted with it, and he has only to trust, for the return of it, to the solvency of the persons into whose hands it passes." Lord Langdale used similar language in Watts *v.* Christie, 13 Jurist, 845, 846; (S. C. 11 Beavan, 551-2,) and

the case of Jackson *v.* Bank United States, 10 Barr, 61, was decided under a similar view of the subject: See also Sims *v.* Bond, 5 Barnw. & Adolph. 392, and Lloyd *v.* The West Branch Bank, 3 Harris, 175.

Between a factor and his principal who does not receive interest upon the credits from their date, the case is ordinarily different. The factor, in such a case, cannot justify mixing proceeds of sales of the principal's consignments with his own funds, or otherwise using them for his own purposes, without proof of an understanding express, or implied, with his principal, that the relation between them shall, in this respect, resemble that of a customer with his banker. But, when the consignor who, from time to time, draws upon his factor, has, without objection, received accounts in which the factor has, in all cases, allowed him interest on such credits, from their dates, the right of the factor to use the proceeds thus credited, as his own, is unquestionable.

In the present case, the correspondence and accounts prove, and the answer, in effect, states, that the defendants had not been at liberty to dispose of his remittances without passing the avails to his credit in the same general account in which they charged the payment of his drafts. Thus, the avails of the remittances, as far as they sufficed, would always, after the repayment of the defendants' charges and advances have been applicable to the payment of his drafts negotiated under their letter of credit. As this letter of credit obliged the defendants, as between themselves and the draft holders, to honor the drafts, whether in funds for the purpose or not, the reciprocal right of using, in their own business, occasional cash balances to his credit on which they allowed him interest, would not have been unreasonable.

As the defendants' accounts with him were stated, and balanced, at three successive rests, in the year 1851, interest was allowed him on every credit from its date, while interest was charged on the other side from the date of each payment. The balance of interest, at each rest, was added to the balance of principal, so as to form part of the principal in the new account.

By acquiescence, and otherwise, S. B. Ludlow admitted the correctness of these accounts. This mode of accounting, as to interest, is not unusual between a banker and his customer, or between a factor and a consignor who draws against his consignments, or otherwise obtains regular, or occasional advances. (Baldw. 536; 2 Anstr. 495; 9 East, 13; 2 Barnw. & Cress. 422; 19 Ves. 26, 39, 41; 1 Rose, 239; 17 Barbour, 385; 1 Ball & B. 421.) In the present case, no credit turned the balance of the account at any time, in S. B. Ludlow's favor. The account of interest, therefore, was, in effect, less that of agents with a principal than of creditors with a debtor. The accounts, for this reason, are not quite as decisive as they might otherwise have been, of the defendants' right to use, as their own, the amount of any such balance as might have, afterwards, at any time, appeared to his credit. But, their caption, "S. B. Ludlow & Co., in account current with Ludlow & Co., *and interest six per cent. to"* the respective dates at foot, and their general similarity to those of private bankers, leave no room for any reasonable doubt that if the balance had ever been in his favor, he would still have received interest on each credit from its date. If so, the mutual understanding, like that which always exists between a banker and his customer, and frequently between a factor and his consignor, must have been that they had, until the suspension of their payments, the right of using, in their own business, occasional cash balances appearing on their books to his credit.

The right of a banker, while he honors his customer's drafts or checks, thus to use, in his own business, the funds which he duly credits to the customer, is usually attended with a right on the part of the customer to draw out at pleasure the occasional balances to his credit in the banker's account, though, in so doing, he leaves liabilities under outstanding engagements to the banker unsecured. (See Beckwith *v.* Union Bank, 4 Sandf. 604.) Brandao *v.* Barnett, in the House of Lords (3 Mann. Gr. & Sc. 531, 532, 535,) recognizes the doctrine of previous decisions that a banker has a general lien upon all *securities* in his hands belonging to his customers received in the regular

course of his business. But, in a subsequent case, already cited, in which there had been an "argument that bankers had a lien on *balances* in their hands," Lord Langdale said that "there was no authority for it"; and added that "customers were entitled to have their balance paid immediately upon their order for it, otherwise a business of this sort could not be carried on." (Watts *v.* Christie, 13 Jurist, 846, S. C.; 11 Beavan, 555.) According to the dicta of Lord Ellenborough in Madden *v.* Kempster, (1 Campb. 13,) and of Lord Eldon in Exp. Metcalfe, (11 Ves. 408,) the tendency of Sir James Eyre's language in Hollingsworth *v.* Tooke, (2 H. Bl. 502, 504,) and the decision of the Court of Bankruptcy in Exp. Pauli, (3 Deacon, 169,) the rule stated by Lord Langdale must be confined in its application to *simple* banking business, and is inapplicable to cases in which a banker's functions are analogous, in any degree, to those of a factor. Even where the course of business, in such cases, authorizes the use by the factor, like a banker, in his own business, of the amount of any cash balance in his hands, his lien extends to such a balance. In the present case, however, the defendants were secured, not under a mere *lien,* but, as has been shown, under an *appropriation* of the remittances. If they were simple bankers of S. B. Ludlow, the credits for the proceeds and avails, though not covered by their *lien,* were not less included in the *appropriation* for their security than if the amounts credited had been money then lodged with the defendants *for that purpose.* (See Morse *v.* Williams, 3 Campb. 418.) A *balance* of cash in their hands would, as the product and ultimate substitute of the remittances, have represented them for this purpose. In Beckwith *v.* Union Bank, (4 Sandf. 604, 610,) a bank charged a customer's account with a dishonored bill of which he was endorser. He had, before its maturity, made a general assignment for the benefit of his creditors, of which, however, the bank was ignorant when the bill was thus charged. His assignees recovered from the bank the cash balance to his credit at the date of his assignment without any deduction on account of the bill. The reason of the decision was that the bank had not, in respect of the bill, any

*lien* upon this balance. But, the Court said that the bank, if it had *made advances, or incurred liabilities for him in respect of the sum of his credit,* would have been protected against the assignees.

The cash balance of the defendants' account never was in favor of S. B. Ludlow; and, had it been, he was not at hand to draw its occasional amount, and had at hand no agent authorized to draw it out. Nevertheless, the point was one of great practical importance. The defendants might after their failure have been made garnishees in foreign attachments prosecuted against S. B. Ludlow in Pennsylvania. As their payments of his drafts had ceased, cash balances of their account would from time to time have been accruing to his credit. The attachments might have intercepted such prospective cash balances unless they were included, as we have seen that they were, in the general appropriation for the security of the defendants' accruing liabilities.

Thus, if the defendants had been in debt on cash account to S. B. Ludlow, but under accruing liabilities for him, he could not, without exonerating them from such liabilities, have taken the balance of cash out of their hands; but they could use its amount *as their own* until their liabilities became payable.

The second proposition* depends upon the question whether the defendants would have been justifiable in using the amount of such a balance *as their own* after they had ceased to honor his drafts. The question must be answered negatively. The *punctuality* with which the drafts were to be honored by the defendants was the sole foundation of their original right of using the avails of the remittances as their own. The right ceased when they ceased to honor the drafts. (See McCrelish *v.* Churchman, 4 Rawle, 26, 37, 38.) Though the dishonor of the drafts was caused by no fault of their own, but by his failure to make adequate remittances for their security, the right was then terminated. They could still *retain* the *specific* proceeds

---

* See this proposition stated, p. 107.

for their own security, keeping them apart from their own funds. But their duty then required them, as his agents, to apply the *specific* surplus, remaining after payment of the balance due to themselves, to the discharge of his drafts negotiated. under their letter of credit. Their former exemption from this duty ceased when they no longer applied *other* funds to this purpose. The duty was not less binding upon them because they had coincident rights and co-extensive interests of their own. Exp. Waring, 19 Ves. 350, and many of the cases above quoted as having been determined upon the authority of that decision* are adjudications in point.

A broken bank holding undue notes deposited by a customer for collection, will, therefore, be restrained by a court of equity from using in its own embarrassed business the proceeds of its collections which it might have thus used if it had continued the regular payment of his checks. If, under a credit opened by the bank, before its failure, in favor of the customer, his account has been overdrawn, and the notes have been deposited in order to secure the balance to his debt, the broken bank will be restrained from using as its own the surplus of the proceeds *above* such balance. If the bank is, moreover, under the credit, involved in liabilities for his drafts which are outstanding, an injunction would nevertheless be granted prohibiting the application of the surplus to any purpose other than the payment of such drafts. Therefore, if the present bill had been at the suit of S. B. Ludlow containing an averment that the defendants were insolvent and did not *intend* to apply the surplus proceeds of his remittances remaining after the payment of the balance due to themselves,—or to apply any other funds which were at their command,—to the payment of the drafts in question, an injunction would, in like manner, be awarded, if the averment appeared by their answer or otherwise to be true.

If, under such a proceeding at the suit of S. B. Ludlow, it appeared that the defendants intending to dishonor his drafts,

* See the cases ante, p. 72.

intended also to apply the amount of such surplus, when col-
lected, in payment of other debts of their own in the discharge
of which he was not interested, the court would not hesitate a
moment in ordering the funds into court, or placing them in
custody of a receiver.    To refuse to extend its protective in-
terposition for the purpose would be to sanction a fraud.    A
banker who credits the proceeds of securities in his hands *in-
tending,* at the time of doing so, to use them as his own, but
*not* pay the checks or drafts of his customer, is guilty of a
fraudulent abstraction of the funds in crediting and using them
with such an intent.    Persons not privy to the fraud may in-
deed be able to retain the funds thus abstracted and misapplied
by him which they have innocently received.    But, the party
defrauded can recover their amount or value from receivers
of them who colluded with him, or were privy to his guilt.
The circumstance that, in the absence of such a guilty inten-
tion, he might have used the funds as his own, would not
enable him or participants in his fraud, to avoid its conse-
quences.    A seller of goods on credit, after their delivery has
been so completed that the right of stoppage in transitu is
ended, cannot, on account of the buyer's insolvency, resume the
possession of them unless he can prove that they were bought
with a preconceived intention of not paying the price.    But if
he can prove that they were thus fraudulently bought, he can
retake them from the possession of the buyer, or of any party
privy to the fraud, or may recover their value from a party
thus privy who has converted them to his own use.    (See 9
Barnw. & Cress. 60; 1 Barnw. & Cress. 514; 7 Bingh. 543, 552,
553; 3 Taunton, 274; 2 Brod. & Bingh. 371; 2 Marshall, 370;
7 Taunton, 59; 3 Wharton, 396, 397; 4 Whart. 500, 506; 2
Mason, 238 to 240; 3 Johns. 235.)*    Proof of the buyer's

* Some decisions in New York have, since the case in 3 Johnson, ap-
parently sanctioned the application of this doctrine in cases where the
proof of the fraud would, elsewhere, not be thought sufficient.    The re-
cent criticism on these later New York decisions by Woodward, J., in
7 Casey, 326, 327, interpreted with reference to the question of *evidence,*
does not impugn the general doctrine which had been established in

irretrievable insolvency, and of his knowledge of it, accompanied by evidence that the goods were not used in any regular course of legitimate business, but were at once passed over to a particularly favored creditor, or thrown at once into the wreck of the insolvency, suffices, in such a case, to prove the fraud. Evidence that the buyer, when he purchased, knew himself to be insolvent, will not, alone, suffice to prove such a preconceived intent not to pay the price. The reason that, in this case of a purchase on credit, mere knowledge of insolvency does not alone prove the fraud, is two-fold. The buyer, though insolvent, may be engaged in a profitable business, carried on with a hope of paying his former debts, or with an expectation of meeting, at all events, his new engagements. He, moreover, acquires, in the goods bought, a new capital, so to speak, for the term of the credit. He may, before its expiration, have sold them, worked them up, or otherwise turned them to account, so as to be able to pay the price at the end of the time. A presumption of innocence cannot, for like reasons, apply in favor of an insolvent banker or factor, who applies to his own use the proceeds of his principal's property, particularly of that received by him after the suspension of his payments. A banker who, knowing himself to be insolvent, and unable to continue to honor his customers' drafts or checks as presented, uses their funds in the payment of his own debts, voluntarily deprives himself of the only means through which he can reasonably expect to be able to fulfill the duties of his agency, or sincerely intend so to do. He cannot pretend that he thus used their funds with an intention to honor their checks or drafts with punctuality. In the absence of such an intention, this use of their funds is a malappropriation without a legal or a moral excuse.

The defendants appear to have known that if they applied the proceeds of S. B. Ludlow's remittances, which arrived after their failure, to any purposes other than those of their agency,

Pennsylvania as well as in England by the decisions mentioned in the text.

they would not have at their command any means of restoring the amounts thus used, or of applying moneys derivable from other sources to its purposes. That they had, in fact, no other means at their command available for such purposes is fully proved. If they did not know this to be the case on the 25th of August, 1851, when they ceased to honor his drafts, they certainly were convinced of it before the arrival, some days afterwards, of the first of these remittances. They therefore could not, without a breach of good faith, have applied their proceeds to any different purpose.

The resolution of the third proposition* is arrived at in the simplest mode through an ascertainment of the *right of owner-ship* which continued to subsist in S. B. Ludlow, the *remitter* and *principal*.

So long as the defendants' advances were unpaid, and they were not exonerated from their liabilities on his account, he could not, against their will, even by revoking their agency, have divested their qualified interest in his remittances, or in the proceeds or avails required for their intended security. But subject only to such right or interest as was vested in them for this purpose, the ownership of the remittances was in himself alone.† His right of revoking their agency was limited only by this right or interest, and by such incidental privileges as were necessary for effectuating their security. This right of revocation, so far as it could be exercised without depriving them of such security, was exercisable by him notwithstanding their lien, and notwithstanding their interest under the appropriation. Had he, at any time, paid or tendered to the defendants the amount of their general balance and outstanding charges, and taken up his drafts upon them, and exonerated them from their liabilities under the letter of credit, his right of revocation of their agency would have become absolute and unlimited. He could, in that case, by exercising this right,

* This proposition is stated on p. 107.
† See ante, pp. 12, 13.

have taken his remittances, if undisposed of, out of the defendants' possession into his own. The principal, where third persons have acquired no valid interest, may not only thus resume possession of the subject of an agency in the original form of such subject, but may also take possession of all securities or investments which are its product or substitute in the hands of the agent, and may follow its proceeds after its rightful or its wrongful conversion into money, so long as the funds can be traced and identified. When an English banker, who is under outstanding acceptances for a customer, and has in hand negotiable securities belonging to the customer, becomes bankrupt, the Court of Bankruptcy will make an order for the restoration of the securities to the customer on his giving approved security to indemnify the bankrupt and his estate against the outstanding liabilities. (2 Rose, 162; 1 Rose, 280.) In this, as in other cases of trust or authority, the existence of the agency has prevented the subjects of it from passing, under the English bankrupt acts, as effects in the reputed ownership, or at the order and disposition, of the bankrupt. That the principal may, at pleasure, exercise the right of thus revoking the agency and resuming possession of the remittances, when the agent is a factor, appears from numerous cases. (2 Ves. Sen. 582; 1 Atk. 232; 1 Younge & Jerv. 216; 5 Clarke & Fin. 522, 523; 11 Howard, 224, 225; 1 Deacon, 681; 3 Deacon, 169; Walsh's case, 4 Taunton, 268, also 3 Maule & Selw. 574, 575, where other cases in point are cited.) The exercise of the right has also been sustained where the agent was a banker, whose relation to a portion of his principal's remittances, consisting of bullion and endorsed bills, was, in a special and limited sense, that of a factor. (Hollingsworth v. Tooke, in the Exchequer Chamber, 2 H. Bl. 501; see 1 Bos. & Pul. 549; 1 Rose, 241.) A like decision had previously been made, where the agent was a London banker, and the securities of which the value was recovered by the customer were bills endorsed by him, which had been received by the banker and *credited short*. (Zinck. v. Walker, 2 W., B. C. 1154.) In both cases, the resumption of possession at the time

of the respective bankruptcies was impossible, as the bank-
rupt was then, in each case, under acceptances for the principal
to an amount greater than the value of the securities.    But the
principal, having afterwards in each case taken up the drafts,
recovered the value of the securities from the bankrupt's
assignees.

In Giles *v.* Perkins, (9 East. 12,) the principle on which
these decisions depend was applied where the securities were
bills to the credit of a customer with his country banker, *not
entered short, but credited before maturity in the cash column,*
without the deduction of a discount.    According to the course
of business above explained,* the customer might have drawn
for their amounts before their maturity.    The bankers, before
their maturity, became bankrupt.    Their assignees refused to
return the bills to the customer; and, as they fell due, received
the amounts from the acceptors.    In an action by the customer
against the assignees, the question was, whether the bills ought
to have been returned to him, or he was only entitled to prove
their amounts, as a creditor, under the commission, for his
dividend.    He recovered their whole amount from the as-
signees, Lord Ellenborough saying that "every man who pays
bills not then due into the hands of his banker places them there
as in the hands of his agent, to obtain payment of them when
due.    If the banker discount the bill, or advance money upon
the credit of it, that alters the case.    He then acquires the
entire property in it, or has a lien on it, pro tanto, for his ad-
vance."    The obvious meaning of this was, that the agent,
when he *discounts* the bill, acquires the entire or *absolute*
property; but when he makes an *advance,* acquires only a lien,
or *qualified* property in the bill.

When a man parts with possession of a bill which he has
*endorsed,* the presumption, in general, is, that he intends to
transfer it absolutely, and to be liable, as endorser, to whomso-
ever may be the holder.    The question has been, whether, when
the party to whom he transmits it is his agent, and does *not*

* Ante, p. 113.

discount it, this presumption is rebutted, as between the agent and himself, by the mere fact of agency. The case of Giles *v.* Perkins was an authority that the presumption is thus rebutted when the agency is of such a character that, as in the case of a banker, the endorsement may facilitate the transmission of the bill, or its collection from parties primarily liable. The decision was, in effect, that all undue or unpaid bills, *endorsed* by a customer, and received from him by his banker, continue, while in the banker's hands, to be the customer's property, unless they are discounted by the banker. It negatived the distinction, in this respect, as to bills credited before maturity, between a bill entered short and one entered in the cash column, without the deduction of a discount.

This case of Giles *v.* Perkins, decided in the year 1807, was not easily reconcilable with Bent *v.* Puller, (5 Durnf. & E. 494,) decided in 1794. Lord Cranworth, when Solicitor General, referring, as counsel, in argument, to Bent *v.* Puller, said that it had been determined before the law on the subject had been much considered or well settled, and that its authority was extremely doubtful. (2 Mylne & Cr. 402.) But Lord Eldon, for many years after the decision of Giles *v.* Perkins, hesitated in rejecting the authority of Bent *v.* Puller; and, in one case, at least, (Exp. Sargeant, 1 Rose, 154,) his reasoning is, with difficulty, reconcilable with Giles *v.* Perkins. In several cases he directed an inquiry whether the endorsement was intended to enable the agent to proceed upon the bill against all parties whose names were upon it, including the customer himself, or was intended *merely* to facilitate its transmission, or the enforcement of remedies upon it against parties other than the customer. The banker, he thought, would acquire, in the latter case, only a *qualified,* but in the former an *absolute,* property in the bill. (See Exp. Toogood, 19 Ves. 231, 232; Exp. Sargeant, above cited, and the cases under Boldero's Bankruptcy, 19 Ves. 25 to 61; 1 Rose, 232 to 257.)

The doubt in England upon the subject was resolved in Thompson *v.* Giles, (2 Barnw. & Cress. 422,) decided in 1824.

In this case, all approved bills received by a country bank from its customer, "whether made specially payable to the customer or not, were endorsed by him, or if, for any private reasons, he did not wish his name to appear on the bills, a letter was given to the bank, acknowledging himself to be equally liable as if he had endorsed." It was decided that a credit of such bills by the bank, in the cash column of the customer's account, if an entry of them *as cash,* "was not, of itself, sufficient to convert the property." There was a local custom of bankers to *use* the bills received from their customers. But this, the court thought, did not mean "that they so used them, *as their own,* without reference to the customer's account." The case was, in principle, the same as Giles *v.* Perkins. It was decided to be within "a general rule," which Holroyd, J., stated to be, "that if a customer pay bills into a banker's hands, although it gives him a right to expect that his drafts will be honored to the amount of the bills paid in, yet *the property in the bills is not altered; they still remain the property of the customer,* though the banker may have a lien to the extent of his advances."

The subsequent case of Exp. Thompson, (1 Mont. & Mac. 102,) decided by Vice Chancellor Shadwell, according to the tendency of Lord Eldon's reasoning in Exp. Sargeant, was, afterwards, upon the authority of Giles *v.* Thompson, over-ruled by Lord Brougham in Exp. Benson, (1 Mont. & Bligh, 120). Giles *v.* Thompson had, in the meantime, been approved and followed by Lord Lyndhurst, in Exp. Armistead, (2 Glyn. & Jam. 379, 380). In language afterwards used by Lord Cottenham, the law on the subject is, "that, unless there be a contract to the contrary, if a person, having an agent elsewhere, remits to him, for a particular purpose, bills not due, and that purpose is not answered, and then the agent carries them to account, and becomes a bankrupt, *the property in the bills is not altered, but remains in the party making the remittance.* That, of course, may be regulated by usage; but, prima facie, without special contract, the presumption is that the bills are received by the agent for the purpose of in-

demnifying him against any eventual loss, and are not to be dealt with as his own," etc.

The case in which Lord Cottenham used this language was that of Jombart v. Woollett, (2 Mylne & Cr. 389, 402,) where the bills had been remitted by a foreign merchant to his London agent, to keep him in cash to meet his acceptances for the remitter when due. The correspondence showed that they were, *so soon as received* by the agent, to be passed to the remitter's credit. But, as the correspondence was interpreted, the credits were to be for their whole respective amounts, without a *deduction* of the discount. It was therefore held that they continued to be the property of the remitter, to whom, on the bankruptcy of the agent, those which then remained in his hands were restored.

The present case is free from even such former doubts as the decisions above reviewed have resolved. The bills remitted by S. B. Ludlow to the defendants were not credited by them until they had collected the amounts in money; nor was the value of his remitted bullion credited until the mint certificates were in their hands. It is, therefore, quite clear that until the respective amounts were thus duly credited, the resulting ownership of both bullion and bills, and of their avails, including the mint certificates, was in S. B. Ludlow, notwithstanding the defendants' lien, and notwithstanding the qualified interest vested in them, for their security under the appropriation of which the character and effect, *as between him and them,* have been defined. The remitted bills were not credited until, by their payment, they became extinct securities. But, the mint certificates, when credited, were not thus extinct. If, after they were credited, they remained in the defendants' hands, and no right of any third person had intervened, S. B. Ludlow might, perhaps, have reclaimed them as his own, exonerating the defendants from all their outstanding liabilities on his account. But, the decision of this precise point is not necessary.

Until the remittances were finally converted into cash, or its

equivalent, and the avails were actually *credited,* the defendants therefore, even while they continued punctually to honor his drafts, with an intention of continuing so to do, had no right or interest of their own in the subjects of their agency, except the right of lien vested in them as agents, and their qualified interest under the original appropriation for their security. As between themselves and S. B. Ludlow they were, consequently, not at liberty to use his bills, or bullion, or the mint certificates, or any other product of, or substitute for his remittances, to an amount or value *exceeding* that of the balance at any time due to themselves, for any purpose of *their own* in which he was *not interested,* or for any other purpose *foreign to duties of their agency.*

Returning from the consideration of the three propositions assumed, as above, by counsel in argument,* we may repeat that the defendants were incapable of delegating their agency to William Taylor, or vesting in him a trust such as was declared in the paper of 1st September, 1851. This paper was, therefore, invalid as an *assignment* for the purpose thus declared, until S. B. Ludlow's ratification of it, which did not occur until after the bill in this case was filed.

But, the defendants had, as we have also seen, a qualified *interest of their own* in his remittances, which was co-extensive and coincident with the purposes expressed in this paper. They were capable, as to this interest, *of declaring a trust,* which, so far as the interest extended, would attach to the ultimate proceeds or avails of the remittances. Whether S. B. Ludlow had confirmed the paper or not, it was, from its date, effectual against the defendants, as their *declaration of such a trust* as to their interest in the proceeds or avails. A court of equity would give to it this effect from its date, though it might, until confirmed, be incapable of taking effect as an *assignment.*

An act purporting to be a present transfer, by a party who

* See ante, p. 107.

has no present right of making it, operates against him as a declaration of trust, attaching to any modified interest in the subject of it, or to any substitute for, or product of, such subject, which may be so vested in him at the date of the act, or so acquired by him after its date, that its purpose can, in whole or in part, be substantially executed without an infraction of other person's rights.    To this rule there is a single exception only.    This exception is where such an act is entirely without consideration, and has not, so far as the party himself is concerned, been completely executed.    When it is thus *both unexecuted by him and voluntary,* courts of equity do not lend their aid in order to give to it a compulsory effect.    In every other case they recognize the existence of a trust, and carry it into effect.

In particular cases the preceding act will take effect, even *at law,* so as to vest the new or modified interest.    The doctrine under which the preceding act thus takes effect in certain cases, as to real estate, through the implication of a leading use, originated in equity.    Cases under this particular head would not now be cognizable at law without the aid of the statute of uses.    Independently, however, of this or of any other statute, the doctrine of estoppel has, in some cases, been extended *at law* upon equitable principles with a like result as to both real and personal estate.    But, in general, as to both personal and real property, effect cannot be given at law to a preceding act purporting to be a conveyance or transfer which was inoperative when made, without some *new* act of the party by whom it was made.    In equity the general rule is different.    When there has been a *sufficient consideration* to support the original act, it is *always* recognized in courts of equity as the declaration of a trust.    It is afterwards carried into effect under the universal doctrine of such courts, that a trust, so far as it can be executed, shall not fail for want of a trustee.

In the present case, the draft holders, without some such aid as a paper like that of 1st September, 1851, would afford, could not, for want of original privity, have asserted a cog-

nizable interest in the remittances, or in their proceeds. But, their derivative interest, acquired through this paper, in the proceeds or avails which it appropriated for their ultimate security, was cognizable in a court of equity.

William Taylor, named in it as assignee, was a clerk in the employment of the defendants. His acts under it were probably performed in implicit subordination to their direction. For twelve days at least after its date, he, and the defendants, appear to have acted upon it as in force. During this period, William Taylor paid the above-mentioned collection of $1,500 in coined gold. But this gold may have been coined from bullion received before their failure, of which an amount sufficient, or nearly sufficient, was, as we have seen, on hand. Whether the payment was made under the provision in the paper that he should take possession of gold dust shipped by S. B. Ludlow to their care for other parties is, therefore, uncertain. But, on and after the first arrival, after the defendants' failure, of a mail from California, acts of an unequivocal character on the part of both William Taylor and the defendants were performed under other provisions of the paper.

The steamer which brought this mail arrived at New York on the 5th, and her letters reached Philadelphia on the 6th of September, 1851. The remittance by her from S. B. Ludlow to the defendants was of the value of $27,303.50, composed, as has been stated, of $12,000 in bills and $15,303.50 in bullion. Of the bills, two for, together, $6,000, were drawn by Tallant & Wilde on Hoge & Co., of New York, payable at ――― days' sight, and two for, together, $6,000, by Burgoyne & Co. on Beebee & Co., payable at five days' sight. The bills on Hoge & Co., endorsed, as usual, to the defendants, were endorsed by them and delivered to William Taylor, who, on the 6th September, 1851, enclosed them to correspondents of his own at New York, that they might be presented for acceptance. They were accepted, and were afterwards returned to him and handed to the defendants. The bills on Beebee & Co., also endorsed to the defendants, were in two parts. The first were

enclosed by S. B. Ludlow to the drawees, in a letter describing them, and adding, "which please accept and *send to Messrs. Ludlow & Co.,* Philadelphia. If not accepted, please protest and *send to same parties."* The seconds of these bills he sent directly to the defendants themselves, who seem to have awaited the receipt of the firsts from Beebee & Co., with their acceptances upon them. The bullion was in two boxes, and was accompanied by a letter from S. B. Ludlow to Bebee & Co., containing the usual order to forward it to the defendants at Philadelphia. There was also the usual letter of advice from him to the defendants, informing them that it was sent *to them.*

The mint certificate for the delayed remittance by the Union had in the meantime been received. After the deduction from the remittances which arrived on the 5th of September, of a sum sufficient, with the amount of this certificate, to pay the balance of $21,622.67 to the credit of the defendants in general account, there should have been about $19,000 remaining from this remittance to be applied to the payment of S. B. Ludlow's drafts upon them, according to the provisions of the paper of 1st September, 1851.

That the defendants intended and expected to make this application of the avails of the remittance, appears from the following communication, which on the day of the arrival of their letters from California by this mail, they addressed to the complainants, Winter, Latimer & Co.:

"PHILADELPHIA, Sept. 6, 1851.
"MESSRS. WINTER, LATIMER & Co.,
                    "Baltimore, Md.

"Gs.—You will please take notice that we have made an assignment of all remittances that may be received from S. Beebee Ludlow & Co., of San Francisco, California, for the payment, first, of the balance of their indebtedness to us, and second, of our acceptances of their drafts, and for such sight and time drafts as they may have drawn on us, to be divided pro rata.          "Yours, sincerely,
                    "LUDLOW & CO."

But whatever may have been intended or expected at this date, *no portion* of the avails of this, or of any subsequent remittance, *was ever applied for the benefit of the draft holders.*

Some of the remittances were levied upon, it has been alleged, at New York and elsewhere, under foreign attachments against S. B. Ludlow, at the suit of holders of his dishonored drafts upon the defendants.   Portions of the bullion would seem to have been temporarily attached, but not to have been detained under the attachments.   Other portions are said to have been attached and never to have been restored.   The *character* of the proceedings by way of attachment, however, has not, nor has even their *occurrence,* been properly proved. Draft holders who instituted such proceedings have, of course, precluded themselves from holding the defendants accountable in respect of the funds attached and detained.   Whether the defendants are accountable to *other* draft holders for not having reclaimed remittances thus attached, is a question which will not require particular consideration, unless these other draft holders ask a reference in order that the subject may be investigated.   But no plaintiff in any such attachment will be permitted to participate in the benefit of any distribution under a decree in the cause without accounting for the amount attached and detained at this suit, as an addition to the fund for distribution.

The invoiced value of such portions of the bullion as are alleged to have been attached and detained was not, in the whole, more than about $10,692.44, which was, as we have seen, less than the amount in which the entire value of all the remittances fell short of the aggregate amount of his drafts. The attached portions of the remittances, therefore, will probably not be taken into account in future stages of the cause, except so far as may be necessary for the adjustment of equities among the draft holders in the distribution of amounts *not* attached.   The amounts of the ultimate avails of the remittances *not* attached are known with exact precision, as will hereafter appear.

The narrative of the occurrences through which the security intended for the benefit of the draft holders was frustrated as to these amounts, must be preceded by some account of the relations between the defendants and their former partners, who composed the New York house of Beebee & Co.

The Messrs. Beebee had been the capitalists of the former houses at New York and Philadelphia. Mr. Ludlow, at the dissolution, was largely indebted to them, principally from having, with partnership moneys, paid his own losses in private speculations, and from having applied such moneys in payment of the above-mentioned private losses of S. B. Ludlow, and of similar losses of R. McKinney Ludlow, and also of another clerk of the former Philadelphia house. This clerk, and R. McKinney Ludlow, united with him in a joint and several note for the whole debt, payable in 12 months from 1st January, 1851, with interest. A payment on account was made by this clerk soon after its date, and Mr. Ludlow was not long afterwards credited upon the note with his share of profits of the former New York house, leaving due upon it about $88,000. In the following year, $90,000 was received on account of it from securities which had, from its date, been in the hands or control of Messrs. Beebee. In consequence of interest accrued in the meantime, a small amount appears to have remained unpaid, whether secured or not, the evidence does not show distinctly.

Beebee & Co., at New York, and the defendants, Ludlow & Co., in Philadelphia, appear to have been agents of each other in these respective cities. The failure of the defendants does not appear to have affected the standing or credit of Beebee & Co., who, for a long time afterwards, continued their business upon its former footing. In the course of the new business of the year 1851, between these houses, a debt appears to have been incurred by the defendants to Beebee & Co. Some of the proper materials for the ascertainment of its true magnitude at the time of the defendants' failure have not been exhibited. If its amount were a point of importance in the cause, as, however,

it is not, the testimony as to the alleged amount would require a closer scrutiny than could be made without a special reference to a master. That a debt of considerable amount existed, there can be no reasonable doubt. Its amount, after the proceeds of the bullion by the Union had been credited, may, for the purposes of the present investigation, be assumed to have been as great as the value of all the remittances of S. B. Ludlow, which arrived after the defendants' failure.

The mode in which Beebee & Co. facilitated the transmission of bullion from S. B. Ludlow to the defendants, by insuring, or engaging to insure, this portion of his remittances, has been sufficiently described. The necessity for a receiving and forwarding agency at New York has also been explained. The legal and equitable relations between S. B. Ludlow and the defendants were, in all respects, the same as if no such middlemen as Beebee & Co. had intervened. Beebee & Co. seem to have always avoided, and, indeed, to have expressly disclaimed, all other connection with S. B. Ludlow than that of simple receiving and forwarding agents. Some loose testimony that he was their agent at San Francisco is entirely contradicted by depositions and letters of which the effect cannot be mistaken. They had other correspondents in California, with whom they transacted there an extensive business in which he was not a participant. If he, and they, sometimes, executed reciprocally, small commissions for each other, the occasional transaction of such business was not connected with any subject of consideration in the cause.

On 6th September, 1851, the day on which the defendants wrote their above-mentioned letter to Winter, Latimer & Co., Beebee & Co. wrote, from New York, a letter to the defendants, which is one of those that the defendants have suppressed. It is, moreover, not in the letter book of Beebee & Co., as one of the members of that firm deposes. It was, doubtless, therefore, intended as a communication out of the regular course of business. From the subsequent correspondence, we may infer that it requested the defendants to send to Beebee & Co. such an order for the bullion just arrived as they had pre-

viously received from the defendants for the shipment by the Union. This letter seems to have excited the defendants' fears lest Beebee & Co. should keep the firsts of the two bills of exchange on themselves which composed a part of the remittance just arrived, and credit the amounts to the defendants on account of their debt, instead of accepting these bills and sending them to the defendants for the business of their agency. Perhaps the letter of Beebee & Co. may have intimated that they had such a purpose. On Monday, 8th September, the seconds of these two bills, endorsed by the defendants "to the order of Wm. Taylor, *assignee*," and by William Taylor describing himself as *assignee*, were enclosed by him in a letter to the same correspondents at New York, to whom he had already sent the bills on Hoge & Co. He deposes that the bills were handed to him "by Ludlow & Co., *under the paper of 1st September, 1851*." His letter of 8th September instructed his correspondents to present the bills on Beebee & Co. for acceptance, and, if they should not be accepted, to have them protested, and return them. On the next day, the defendants answered Beebee & Co.'s letter of the 6th, as follows:

"PHILADELPHIA, Sept. 9, 1851.

"MESSRS. BEEBEE & Co.

"GENTS.—We have yours of the 6th inst, asking for an order for the gold dust that may come from S. Beebee Ludlow & Co., of San Francisco, to us, under your policy.

"This we cannot admit, as we have no right to use their property except for the legitimate purpose for which it is intended, viz.: for paying their indebtednes to us, and the drafts for which the shipments are made. We have already given you an order for the $13m. per Union, and Willis & Co. an order for $8m. and odd—the balance between this and the amount they owe us will scarcely pay our indebtedness to our correspondents.

"*We some days since made an assignment of all remittances*

*to come from S. B. L. & Co. for the payment as above
stated.*

"Yours respectfully,

(Signed)                            "LUDLOW & CO.

"If the gold per Union is coined, please give us the amt. of
proceeds."

The member of the firm of Beebee & Co., who testified that
*their* letter of the 6th was not in their letter book, deposed that
*he* had no knowledge of receiving any such letter as this of the
9th, and that if *they* had received such a letter, *he* would have
recollected it. He said: "I have *caused* an examination to be
made by the *clerk having charge of the letters,* and can find
none," meaning none of the date. If the clerk had himself
been examined, and proved the search, it would have amounted
to nothing, because a reply to a letter purposely out of the letter
book would not probably have been in the file of *regular* letters
in his charge. There is, in the evidence, therefore, nothing
tending to negative the receipt of the letter of the 9th by the
other member of their firm. A letter from them of the 10th,
which will be mentioned presently, without acknowledging for-
mally its receipt, appears to have been written with a reference
to its contents.

There is thus no reasonable doubt that the letter of the 9th
of September was received by Beebee & Co. It is, at all events,
quite certain that it was written by the defendants. A machine
copy of it is in their press letter book, which is, against them,
the best possible secondary evidence of its contents. It shows,
on their part, a proper sense of their duty to S. B. Ludlow
under their agency, and to the draft holders under their ap-
propriation of the 1st of that month. But, probably from care-
lessness in the use of language, they seem, unintentionally, to
have intimated in it, contrary to the truth, that after the pay-
ment of the two orders for, together, $21,611.03, a balance
would still remain due to them on general account by S. B.
Ludlow. This, perhaps, gave to Beebee & Co., an apparent

reason for urging the defendants to give to them an order to retain an additional portion of his remittances. But it afforded no pretext of an excuse for the retention of any portion of them by Beebee & Co. without some such appropriation.

Of the bullion invoiced at $15,303.50, included in this remittance, a portion, in value rather more than a third of it, is said to have been seized and detained under attachments. The residue of the bullion was received by Beebee & Co., who, on the 8th of September, handed it over to Willis & Co. By a writing of this date, Willis & Co. engaged to return any surplus which this bullion might produce above the $8,302.63.

Beebee & Co. refused to accept the seconds of the two bills on themselves, which were protested and returned, with the protests, to William Taylor, by his correspondent. Beebee & Co., on the 10th, credited their amount, $6,000, to the defendants; and, on the same day, wrote a letter to them, inviting one or both of them to New York, and saying: "The drafts" (meaning these two bills) "we have passed to your credit, believing we have the best right to them, and you have used our funds to pay Sam's drafts," meaning S. B. Ludlow's drafts paid by the defendants before their failure. This letter, so far as intelligible, indicates that Beebee & Co. may then have thought S. B. Ludlow still indebted to the defendants in a balance equal to this amount of $6,000 or more. Beebee & Co., if they then thought so, cannot long have entertained such a belief. But nothing in the correspondence indicates that the defendants corrected, at the time, or even perceived the mistake, in this respect, into which their letter of the 9th may have temporarily led the New York house.

The defendants, on the 12th of September, 1851, in one of the destroyed letters, advised S. B. Ludlow, if he shipped gold, to consign it to William Taylor. This proves that they had not, at this date, abandoned their purpose of carrying their appropriation of 1st September, 1851, into effect for the benefit of the draft holders. It also indicates that they had then detected, in Beebee & Co., a purpose to detain, if they could, S. B. Ludlow's remittances in order to defeat this appro-

priation, of which they had been apprised by the letter of the 9th.

If, at this crisis, the defendants had, with a firm persistence, maintained this appropriation, Beebee & Co. must have yielded. They had not, as yet, ventured further than to make a show of detaining the $6,000 in bills on themselves. But the letter of instructions under which they had received the firsts of these bills had left them no discretion between the alternatives either of accepting them and sending them to the defendants, or of returning them protested to California with notice to the drawers. Their act of passing them to the defendants' credit in an account in which the remitter had no interest whatever was a palpable fraud and legal nullity. Thus, the seconds of exchange, which had been duly protested, were in full force. Notice of their dishonor could have been sent by William Taylor or by the defendants to the drawers; and, as the first mail since the arrival of the bills was not to leave until the 15th, ample time was left for sending such notice. This return of the paper with notice of its dishonor would, probably, have ruined the drawers. They were the friends and agents of Beebee & Co., who probably *could* not have permitted such a destruction of their credit. That they *would* not have permitted it was tested on a subsequent occasion which will be mentioned hereafter. As to the bullion, Beebee & Co. would not have ventured to appropriate it to their own use, or have pretended that they had a right so to do, unless they had been able to procure from the defendants a writing purporting to sanction such a diversion of it from its destination. George W. Beebee was afterwards cautious on this point when he was examined as a witness. To the question, "What remittances for Ludlow & Co. have been received by you since the 25th August, 1851?" he answered, "We received consignments from S. B. Ludlow & Co.; when asked to remit Ludlow & Co. we did so, *unless we were advised by Ludlow & Co. to make other disposition.*" A change of the intended disposition of the remittances by the defendants, after the notice which Beebee & Co. had received in the letter of 9th September, 1851, could

not vest in Beebee & Co. a valid interest.   But it might serve
to screen the motive of the intended malappropriation of the
bullion as the subject of a bailment to them as transporting
agents; and might thus relieve them of a serious hazard which
they appear to have been unwilling to encounter.

Until after the 12th of September, 1851, nothing culpable
appears to have been done by the defendants as to the remit-
tance which had arrived, or as to those which were expected.
But before the 15th of that month some evil influence, which
the evidence has not disclosed, seems to have intervened.
When the bills on Hoge & Co., accepted by these drawees, had
been returned from New York to William Taylor, he had
handed them to the defendants.   From their hands, they
passed, on the 15th or earlier, into the possession of Beebee &
Co., by whom they were, on that day, credited to the defend-
ants in account, with a discount of seventeen days' interest.
George W. Beebee deposes that Beebee & Co. "received from
Ludlow & Co., under date of 15th September, two acceptances
of Wm. Hoge & Co. for $3,000 each, together making $6,000,
less interest seventeen days, $19.83, making the amount to
the credit of Ludlow & Co. $5,980.17 as per their order."
The account of Ludlow & Co. on the books of Beebee & Co.
contains a credit corresponding precisely with this testimony.
The seconds of exchange, in this case, appear to have been
received by Beebee & Co. from the defendants, who retained
the firsts of these two bills.

The bad influence of which this was the first result that is
known must have begun to have a determinate effect upon the
defendants' conduct a day or two before this date of the 15th
of September, as it prevented notice of the dishonor of the bills
on Beebee & Co. from being mailed for transmission to the
drawers by the steamer which was to sail on that day for
California.

From this period, the defendants appear to have blindly sur-
rendered their will and freedom of agency to the direction of
Beebee & Co.

On the 17th September, 1851, the defendants wrote to Bee-

bee & Co., "We sent you last night the paper executed for the gold dust," etc.   The paper thus mentioned appears to have been without any date until its arrival at New York, where a date was inserted.   It must have been one or the other of the two following papers, both of which were, at about this time, subscribed by the defendants.   That which bears the date of the 12th is unquestionably antedated.   If it was not the one transmitted on the night of the 16th, it probably was not executed until after they had executed that of the 18th, which, perhaps, may have been executed on the day of its date. The testimony on the subject is confused and obscure, the only point certain appearing to be that the paper purporting to be prior of the two in date is antedated.

The two papers are of the following purport:

"PHILADA., Sept. 12th, 1851.
"MESSRS. BEEBEE & Co.,
          "New York.

"GENTS.—In consideration of our indebtedness to you, we hereby transfer to you all gold dust, coin, bills of exchange, credits, or other moneys which have been consigned to us by Messrs. S. Beebee Ludlow & Co., of San Francisco, and which are in your possession, you having received the same under your policies of insurance, and otherwise growing out of our business relations with you.

          "Yours, very truly,
                    "LUDLOW & CO."

"In consideration of our indebtedness to Messrs. Beebee & Co., of New York, we hereby authorize and empower them to receive and apply to our credit of their claim against us, all gold dust, gold in bars or coined, consigned to them, or to be consigned to them, for our account, and bills of exchange and drafts made payable to our order.

                    "LUDLOW & CO.
"PHILADELPHIA, Sept. 18, 1851."

If the date of the paper which now bears that of the 12th of September, was not inserted until after it had left the defend-

:ants' possession, there is, unfortunately, no reason to doubt that
the purpose of the parties at New York to antedate it was
known to the defendants.    The defendant, Robert M. Ludlow,
seems to have been unable to devise any pretence of self-excuse
for their conduct at this period.    On 24th September he wrote
to S. B. Ludlow as follows: "We wrote you and sent dupli-
cates on the 9th, 11th, and 12th Sept. * * * *In my last I
advised you, if you shipped gold, to consign it to W. Taylor,
But that will not answer.    Send, as before, to Beebee & Co.*
* * * You will consign everything, as heretofore, to Beebee
& Co., for safety. * * * I sometimes feel. as if I should
lose my senses, and go crazy.    Come home and do not wait
for trouble in California.    *Nothing can be done here till you
return in paying drafts*—hope before this reaches California
you will be on your way back.    *Destroy all the letters I have
sent you.*"    S. B. Ludlow's deposition states that he "burned up
or destroyed" his correspondence with Ludlow & Co. before
he left California, except one letter—probably this one.    He
avoids assigning the direction in this letter as his motive for
destroying the previous correspondence.    But his destruction
of it is not reasonably attributable to any other cause.    The
act, as has already been said, was one of extreme culpability.
The suggestion of it on their part was more culpable, as he
was not then fully informed of their misappropriation of his
funds.

The letter of the 24th of September shows on its face that it
was the defendants' first intimation to him of a purpose to
annul the appropriation of the remittances for the security of
the draft holders made on the 1st of that month.    This letter
of the 24th of September did not reach him until some time
after his letter of 14th October, 1851, in which he ratified that
appropriation, had been written and was on its way.    Their
previous communication to him of the existence, and contents
or intended effect, of the paper of 1st September, 1851, had
vested in him an optional right of adopting the appropriation
retrospectively to its date, as his and their concurrent act.
This option was finally determined by his letter of ratification

of 14th October.* If the defendants, as between themselves and him, could have revoked the appropriation by a letter of countermand received by him before his option was thus determined, they could not revoke it by a countermand not received by him until afterwards. The letter of 24th September, therefore, had no effect as a revocation or countermand.

The draft holders had, as we have seen, under the paper of 1st September, 1851, an equitable interest in the proceeds or avails of the remittances, which, independently of any potential ratification of it by S. B. Ludlow, were appropriated by it for their security. The precise time of the defendants' attempted annulment of this appropriation is not material as between them and the draft holders. Though the subsequent paper which bears the date of 12th September, 1851, was not antedated, it could not operate as an effectual revocation of the security which the previous paper had created. For the benefit of the draft holders, the security created by the paper of 1st September, 1851, had taken effect from its date and had, in the meantime, been acted upon, so as to be vested irrevocably.

On this point there is no analogy in the cases which have been cited in argument of revoked, cancelled, or abandoned papers, which had never been delivered, or published, or acted upon. There is, moreover, no analogy to the cases also cited of English composition deeds which require creditors to become parties, or otherwise assent before the deeds are to take effect in their favor, or to such assignments for the benefit of creditors as require the release of their debts, or surrender of their securities, or the fulfilment of other onerous conditions. Upon the authority of Thompson *v*. Leach, decided in England by the House of Lords, 2 Ventr. 208; 3 Lev. 285; Show P. C. 151; 3 Mod. 296, 331, the rule of decision in Pennsylvania has been to presume an absent party's acceptance of a security beneficial to his interests, from the time of its creation, though he may then have been ignorant of its existence. In the well-known case of Wilt *v*. Franklin, 1 Binney, 518, 519, 520, this

* Ante, p. 106.

rule was applied to the case of an assignment for the benefit of creditors ignorant of its existence to a trustee who lived at a distance and was. also ignorant of its existence. The property transferred remained in the possession of the assignor, on whose behalf the assignment had been prepared under the direction of a member of his family, who, or the assignor, had possession of the paper from the time of its execution on the night of Saturday until the evening of Tuesday, when it was handed to a messenger to be taken to the assignee, who did not receive it or know of its existence until the next day, Wednesday, when he gave to it his assent. An execution at the suit of a creditor of the assignor, having been levied on the intervening Monday, the question was whether, as against the sheriff, the property levied on had passed by the assignment. The decision was that it had passed by the assignment, which *had taken effect on the Saturday night*. Chief Justice Tilghman, after saying it was rightly conceded that where a deed is for the benefit of the grantee, it is reasonable that his assent should be presumed, said: "I think it reasonable to make the same presumption where the grantee is required by the deed to do an act useful to his neighbor, and not injurious to himself. This presumption is liable to be rebutted by showing an express dissent. A man cannot be forced to accept a conveyance against his will. But, in the present instance, the presumption is confirmed by the assent of the grantee, the moment he was informed of the consequence." This rule of presumption of acceptance has been followed in the very recent case of Henderson's Appeal, 7 Casey, 504. If any doubt of the correctness of the decision in Wilt *v.* Franklin has ever arisen from the fact that an adversary proceeding had intervened before anything whatever had been done under the assignment by anybody, there can be no doubt of the existence of such a rule of presumption, or of its applicability to cases like the present between parties and privies to the intended security, or to cases between parties or privies, and creditors proceeding adversarily *after* the security has been acted upon by the party who created it. The presumption, or implica-

tion, of the assent or acceptance of an absent party whom a
security benefits, has been made by the Supreme Court of the
United States, in the cases reported in 11 Wheaton, 96, 97,
and 16 Peters, 118, 119, decided on the same principle as Wilt
*v.* Franklin.   These cases were cited with approbation in 8
Howard, 440.   The older English authorities on the subject
at law, and in equity, had been reviewed by Chancellor Kent
in 1 Johns. ch. 255 to 258, and by Bayley, J., in 5 Barnw. &
Cress. 671.   See also 11 East. 623; 5 Serg. & R: 320.*

Under this doctrine, the circumstance that the paper of 1st
September, 1851, was an *unsealed* writing, was unimportant.†
If it would have been effectual with a seal, the debts and lia-
bilities which it secured were a sufficient consideration to sup-
port it without one.   (8 Howard, 429, 440; 16 Peters, 16 to
22; 9 Mees. & Welsb. 419 to 422.)   In Grove *v.* Brien, 8
Howard, 423, a manufacturer of nails, at a place in Maryland,
near Harper's Ferry, was indebted to Gilmor, of Baltimore,
to Grove, of Alexandria, and to Fowle, of the same place.
To Fowle he had been in the habit of consigning nails for sale
on commission.   On 14th March, 1843, he made a shipment
of nails to Fowle by a canal boat, the master of which gave
him a receipt for them to be delivered to Fowle, of Alex-
andria, for the use of Gilmor.   This manufacturer, on the
same day, wrote to Fowle that they had been thus consigned
to him for the use of Gilmor.   There was no privity between
Fowle and Gilmor, who was not even informed that the con-
signment had been made.   On the arrival of the boat at Alex-
andria a few days after, the nails were attached as the prop-
erty of the manufacturer, under a proceeding at the suit of
Grove.   It was decided that the attachment could not be sup-
ported, because the property had been transferred for the use
of Gilmor from the time of the delivery to the master of the
boat.   As to the objection that Gilmor had not assented to
the transfer of the property to him as security for his demand

* See ante, p. 18, the 15th proposition.
† Ib. the 14th proposition.

against the shipper until after the levy of the attachment, the court said that *in the case of an absolute assignment of property by a debtor to his creditor for the purpose of securing a pre-existing debt, an assent will, in the absence of all evidence to the contrary, be presumed on account of the benefit that he is to derive from it.* In Mellon's Appeal, 1 Grant, 212, the Supreme Court of Pennsylvania, notwithstanding the law of the State concerning preferences in assignments, sustained a particular assignment appropriating a judgment for the special security of a creditor of the plaintiff in the judgment, made by this plaintiff when he was about executing a general assignment for the benefit of his creditors. This particular appropriation of the judgment, made directly to the creditor to be specially secured, but without this creditor's knowledge, took effect from a mere delivery of it to the person who was assignee under the general assignment.

Even a *voluntary* deed of trust may take effect in favor of beneficiaries ignorant of its existence. As to both real and personal estate, such a deed, though the grantor has, from the time of its delivery, retained it in his own possession, binds parties and privies; and, as to personal estate, which is not within the statute of 27 Eliz. c. 4, is valid even against purchasers. (1 Vern. 100; 2 Vern. 473; Pr. Ch. 235; 7 Br. P. C. 410; 3 Meriv. 256, 270, 271; 3 Swanst. 411, (n); 1 Eq. Ab. 168; 6 Ves. 656; 3 Hare, 532; 18 Ves. 84; 2 Younge & Coll. Ch. 451; 4 Hare, 67; 2 Myl. & K. 496, 503; 1 Sim. & St. 315; 1 Johns. Ch. 336 to 338, 256 to 258.) A sealed or unsealed assignment in trust for the security of an existing debt, ought, much more, from the character of the consideration, to be deemed irrevocable. The consideration, according to the preponderance of authorities, is *valuable.* This preponderance is determined here by the weight of opinions of the Supreme Court of the United States. Effect would, therefore, be given to the security in equity, though it were, in form, so incomplete or imperfect that a court of equity would not, if it were a mere *voluntary* transfer, carry it into effect.

In England, the subject has, however, been somewhat per-
plexed by a class of cases originating in two decisions of
Lord Eldon, one of them in direct opposition to the decision
of the Supreme Court of the United States in Grove *v.* Brien
(8 How. 429), above cited, the other in as direct opposition to
Wilt *v.* Franklin (1 Bin. 502), and Henderson's Appeal (7
Casey, 504), decided by the Supreme Court of Pennsylvania,
and the several coinciding opinions of the Supreme Court of
the United States which have been mentioned. (Ante, p. 144.)

The decision in opposition to Grove *v.* Brien, has, after
some fluctuation of opinion, been overruled in England. The
case was Exp. Heywood (2 Rose, 355), where A. was a
member of the firm of A. & B., and also of the firm of A. &
C., the latter of which firms, being indebted to the former,
consigned a shipment of merchandise to a factor, with direc-
tions to pay, out of the proceeds, to the former firm, a given
sum on account of this debt. A. & B. were at the same time
advised by A. & C. that this direction had been thus given to
the factor. The question, stated as having been presented
under proceedings in bankruptcy, was, whether A. & B. had
any *lien* on the proceeds of the consignment. Lord Eldon
expressed his opinion that there was none, but ordered an
issue upon the question stated *in this form.* The trial of the
issue before Lord Ellenborough resulted in a non-suit. He
"was of opinion that there was no *lien,* which in its legal
sense meant a right to *possess* or to *retain.*" According to
the report, he added that the direction as to the proceeds
"gave no specific interest in them to" A. & B. The former
part of the opinion that there was, in a technical sense, no
lien, is clear law. But the proposition that A. & B. had no
specific interest in the proceeds, whatever apparent counten-
ance it afterwards received in Garrard *v.* Lauderdale (3 Sim.
1, 2 Russ. & M. 451), and more particularly in Malcolm *v.*
Scott (3 Hare, 46), could not now be supported in England.
The circumstance that A. & B. were advised of the direction
to the factor, in the execution of which they were interested,
converted his agency into a trust for their security. The

dicta in Acton v. Woodgate (2 Mylne & K. 495), and Brown v. Cavendish (1 Jones & Latouche, 635), and the decisions in Wilding v. Richards (1 Collier, 661, 664, 665), and Walker v. Rostron (9 Mees. & W. 411, 421), show that the direction to the factor and its communication to the creditors constituted an *appropriation* for their security, which was not revocable except by the consent of all parties. Had not the direction been communicated, it would, as a simple order from the debtors to their own agent, have been revocable by them except so far as a difference might perhaps have arisen from the fact that one of them was a member of both firms.

The case in opposition to Wilt v. Franklin was Walwyn v. Coutts (3 Meriv. 707, 3 Sim. 14), decided by Lord Eldon in 1815, a short time before his decision in Exp. Heywood. In Walwyn v. Coutts, an assignment was made by deed, in trust for the benefit of creditors, none of whom were parties to it, or to any agreement under which it had been made, and from whom no release or other consideration, in the language of the report, had moved. Lord Eldon decided that the trust might be revoked or varied by the party who had created it. The reason of the decision stated in the report is, that the *trust* was *voluntary*. When the question was reconsidered in Garrard v. Lauderdale (3 Simons, 1, affirmed in 2 Russ. & M. 451), Lord Brougham concurred with Vice-Chancellor Shadwell in opinion that though the conveyance was to be deemed voluntary, the decision of Lord Eldon could not be supported on this general ground. It was followed by them on the distinct ground that such an assignment by a debtor of his property for the payment of his debts may be understood as a mere imperfect executory disposition which he has directed for his own benefit, under a trust of which, if it is to be regarded as merely voluntary, the creditors to be paid cannot, when they afterwards discover its existence, compel the execution. According to Sir Knight Bruce, this doctrine is, that the writing, which is, in form, a *deed of trust*, is thus revocable when it appears to have been intended, as, in effect, an *instrument of agency*, but is not revocable when it appears

to have been intended as, in effect, the creation of a trust. (1 Collier, 663 to 665.)   Lord Brougham, in tracing the doctrine to former indications of its undeveloped existence, admitted the distinction in which he thought that it had originated to be somewhat obscure.   (2 Russ. & M. 451.)   Lord Cottenham, intending, perhaps, to refer to this review of the subject by Lord Brougham, afterwards observed that the doctrine, though not new law, probably had its foundation in Walwyn *v.* Coutts.   (See 2 Drury & Walsh, 437, where the report is fuller than in 7 Cl. & Fin. 792.)   Lord Cottenham, when Master of the Rolls, had said that the distinction was somewhat refined.   While he professed a wish not to have it supposed that he entertained any doubt of the propriety of the doctrine, he avoided expressing an opinion whether the views of the relations of the creditors and the trustees, on which it had been founded, were correct.   (2 Myl. & K. 510, 511.)   Sir Knight Bruce, when Vice-Chancellor, intimated an unwillingness to act upon the authorities on the subject further than they might possibly compel him to act contrary to the opinion that, in their absence, he would have entertained.   (1 Collier, 659, 660, 664.)   From the deference due to Lord Eldon's opinion, his decision has, under these restrictions, been followed in England, so far as to induce the Privy Council to reverse a decision of the Supreme Court of a British Colony in which the doctrine had been disregarded (3 Mo. 445, 450, 451), and the House of Lords to reverse a decree of the Chancellor of Ireland, by whom its application had been overlooked. (7 Cl. & Fin. 772.)   But Lord St. Leonards, when Chancellor of Ireland, afterwards thought that the doctrine of this class of cases had been carried beyond the intention of those who, he said, had originally introduced it, and manifested very clearly his purpose to extend it no further than a proper deference to the precedents might require.   (4 Drury and Warren, 406, 408; 1 Jones and Lat. 635.) ·

These definitions of the doctrine, and the opinions as to its proper limitation, could not be reconciled with a similar deference to the authority of Exp. Heywood.   With reference

to the doctrine of this case, as partially recognized in Garrard
v. Lauderdale, the Master of the Rolls, in Acton v. Woodgate,
(2 Myl. & K. 495), said: "it seems to have been considered
that a communication by the trustees to creditors, of the fact
of such a trust would not defeat the power of revocation by
the debtors. It appears to me, however, that this doctrine is
questionable, because the creditors, being aware of such a
trust, might be thereby induced to a forbearance in respect of
their claims, which they would not otherwise have exercised."
This opinion, followed by Sir Knight Bruce, in Wilding v.
Richards (1 Collier, 656, 665), and approved by Lord St.
Leonards when Chancellor of Ireland in Brown v. Cavendish
(1 Jones & Lat. 635), has been sustained by the decision of the
Court of Exchequer in Walker v. Rostron (9 M. & W. 411),
all of which cases have been cited. But such a trust would
not now be sustained in England, in favor of a creditor, upon
a bare communication to him of its existence, followed by its
immediate revocation, or upon a communication of its exist-
ence to him under any other circumstances indicating that it
could not have been, or was not, relied on by him as a security.

In Pennsylvania, before the decision of Walwyn v. Coutts,
the subject had been relieved from liability to the embarrass-
ment attendant upon such refined, if not over nice, distinc-
tions, by the adoption of the rule of *presuming acceptance of
a beneficial act.* The subsequent sanction of this rule of pre-
sumption by the Supreme Court of the United States, deter-
mines, of course, its application by this court in the present
case. Under it, the distinction between a creditor who is a
party, and one who is not a party, to an instrument creating
a trust of this description, becomes unimportant. So far as
Walwyn v. Coutts is followed in England, it rests entirely
on this distinction. In Exton v. Scott (6 Simons, 31), a per-
son accountable to parties *already* trustees for other persons,
executed a mortgage to the trustees to secure the amount.
The mortgage was privately prepared by himself, was in his
own handwriting, and was executed in his private office, when
no one was present except himself and his clerk, who, as a

subscribing witness, attested its execution. Twelve years afterwards he died insolvent. The mortgage was found, after his death, in a chest containing his title deeds. There was an affidavit of one of the mortgagees that the debtor had orally promised to execute such a security; but its actual existence had not been known to either of them, or to any person interested in it as a security. Nevertheless, it was held that the security had taken effect from the time of its execution; and its validity was sustained against the general creditors of the mortgagor. (See, also, 3 Hare, 532; 4 Hare, 67.)

The paper of 1st September, 1851, was, however, not such an instrument as is denominated in books of reports, and in statutes of Pennsylvania, and of other States, an assignment, or partial assignment, for the benefit of creditors;* nor was it, like the letter of advice in Grove *v.* Brien, an original security for a debt. The funds appropriated could not, without the *mutual consent* of S. B. Ludlow and the defendants, have been applied in any manner *less* beneficial to the draft holders than was provided in this paper. Had no such paper existed, the remittances might, as we have seen, have been disposed of differently by the *concurrent* act of S. B. Ludlow and the defendants. As *between them and him,* however, the funds had *already* been appropriated, conformably to the provisions of the paper. This original appropriation, unless revoked or modified by their *mutual consent,* would, therefore, have inured incidentally to the benefit of the draft holders. The only effect of the paper of 1st September, 1851, was to prevent this incidental effect of the original appropriation from being any longer liable to revocation or change by a concurrent act of the original parties. In Powles *v.* Hargreaves (3 De G. Macn. & G. 430), already cited, this effect was the *indirect* result of a general assignment for the benefit of creditors, which declared no such trust as to the particular fund there in question.

In the present case, the direct result is produced by a paper

---

* See ante, p. 19, the 18th head.

of which it was the *intended* effect.   So far as the intended
security could be derived through rights or interests of the de-
fendants, who executed the paper, the reason that the appro-
priation should *immediately* take effect for the benefit of the
draft holders, was, therefore, much stronger than in the case
of an original appropriation for the security of a debt, or in
that of an assignment for the benefit of creditors.   (See 2
Brockenb. 277; 21 How. 78.)

But, the facts in evidence present such a case that this paper,
if its effect were determinable according to the doctrine estab-
lished in England, by Walwyn *v.* Coutts, as explained by Gar-
rard *v.* Lauderdale, and subsequent English decisions, would
have been irrevocable.   We have seen that immediately upon
the execution of the paper, on the 1st of September, 1851, the
defendants informed S. B. Ludlow of its existence, and on the
12th of that month, advised him by letter to send his remit-
tances directly to the party named in it as assignee, that they
and this party had, in the meantime, so indorsed bills of ex-
change, which were a *portion of the remittances described in it,*
as to recognize its existence, and had caused the dishonor of
these bills, with such indorsements, to be registered in a no-
tarial protest—that the defendants wrote on the 9th of that
month to Beebee & Co., the forwarding agents of the remitter,
notifying them of the existence of the paper, and that the de-
fendants had on the 6th, in a letter to complainants in this
cause, held the paper forth as an instrument in actual and pros-
pective operation.   No court of equity could, upon such facts
decide that the draft holders had not, on the faith of the exist-
ence of such a security, forborne to adopt adversary measures.
No court of equity would sanction under such circumstances,
the revocation or annulment of the security.*

We will hereafter see that, by the bill in the present case, the
complainants, who received the letter of the 6th, did actually,
on behalf of other draft holders, as well as themselves, adopt
the security mentioned in that letter as one in which they had

* See ante, p. 18, the 16th proposition.

a common interest. But, independently of any effect of this adoption of it, enough had, even according to these English decisions, been done before the 12th of September to render the paper irrevocable on or after that day, without the consent of the draft holders.

That the remittances which were the intended subject of the paper of 1st September, 1851, were not in the defendants' possession at its date, and that a portion of them had not even been shipped from California, were, in equity, circumstances immaterial to the validity of the security. (See The Warre, 8 Price, 269 (n); Bunbury *v.* Winter, 1 Jac. & Walk. 262; Langton *v.* Horton, 1 Hare, 556, 557; Douglas *v.* Russell, 1 Mylne & K. 488, affirming 4 Simons, 524.)

The history of the remittances, from the misappropriation of the two drafts upon Hoge & Co. on the 15th of September, to the filing of the bill in this case on the 8th of October, may be briefly told.

The bullion which had been received by Willis & Co. on the 8th of September, having been coined, its proceeds were accounted for by them to Beebee & Co., who credited the amount, $10,471.43, to the defendants on the 19th of that month, charging them with $8,302.63 as paid, by their order, to Willis & Co.

Of the remittance which arrived on the 20th of September, 1851, the bullion invoiced at $6,105.37 was immediately sold by Beebee & Co. They received the price in two payments, and credited the respective amounts to the defendants, $5,000 on the 20th, and $1,370.10 on the 29th of September, 1851. The residue of the remittance was in a bill of Burgoyne & Co., at five days' sight, on Beebee & Co., for $6,500. *This bill was transmitted by the defendants in a letter of the 22d to Beebee & Co.,* who, on the 23d, credited the defendants with $6,491.33 as its amount, less the discount of eight days interest; and, on the same day, by mail, informed them that this had been done.

Of the remaining remittances, the portions which were in

bullion are said to have been attached at New York, and to have remained under attachment.

Of the remittance which arrived on the 5th of October, 1851, $20,000 was in bills of Burgoyne & Company on Beebee & Company, at twenty days' sight. These bills must have been received by the defendants at Philadelphia on the 6th of October, and must have been transmitted by them on that day to Beebee & Company, who, on the 8th, acknowledged the receipt of them, stating that they were credited to the defendants less the discount. They had been thus discounted and credited by Beebee & Company to the defendants on the 7th, which was the day before the bill in the present case was filed. The net amount of this credit of the 7th of October was $19,966.45.

If these could have been deemed regular credits by Beebee & Company to the defendants, the respective amounts would, of course, have been credited by the defendants to S. B. Ludlow. But the defendants, as their answer states, and as their books of account show, made no entries in these books after their failure. This proves their own consciousness of the impropriety of their conduct.

In excuse for it their counsel has, in argument, suggested that, possibly, the defendants might not have been able to get the remittances out of the hands of Beebee & Company. The suggestion would not have been available in law if it could have been sustained upon the facts of the case. Agents or bailees who, not having prevented the commission of a wrong injurious to the interests of an owner of property confided to their care, endeavor to excuse their default on the ground that the perpetration of the wrong could not have been prevented, cannot sustain the defence if they themselves have done anything to bring about, or facilitate, the perpetration of the wrong. In such a case, at all events, they cannot excuse themselves by merely alleging that the wrong *might* have happened notwithstanding any efforts that could have been made for its prevention. Nothing short of proof that it *must* have happened will avail for their excuse. An allegation to the latter effect is not often entertained. A navigator who deviates from the course

of his voyage, cannot, when sued by the owner of a cargo lost, after the deviation, in a storm, sustain a defence upon the ground that if the deviation had not occurred, the same storm would have caused a like loss in the regular track of the vessel. Chief Justice Tindal answered such a defence when attempted by the owner of a vessel by saying "that no wrongdoer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened, while his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up, as an answer to the action, the bare possibility of a loss if his wrongful act had never been done." (6 Bingh. 724.) Here the defendants themselves perpetrated a series of wrongful breaches of their duty. On or before the 15th of September, they handed Hoge & Company's acceptances to Beebee & Company to be misappropriated. Afterwards they subscribed the two transfers which are dated respectively the 12th and 18th of that month, in order to facilitate Beebee & Company's intended malappropriations. The letter to Beebee & Company of the 22d of September, enclosed the bill for $6,500 on Beebe & Company themselves, that it might be misappropriated; and they sent, on or about the 6th of October, the bills for together $20,000, to Beebee & Company for a like evil purpose. Consequently, the defendants were actual participants in the fraudulent conversion of the remittances to Beebee & Company's use. But, had this been otherwise, the suggestion that they could not by the adoption of proper measures, in S. B. Ludlow's name, or in their own, have prevented the fraud, would not have been sustainable upon the facts in evidence. The suggestion, though made on their behalf by counsel, does not appear to have ever been made by themselves.

An allegation by themselves, as well as by counsel, has been that they made the transfers to Beebe & Company under the influence of an apprehension that the remittances might be intercepted at New York, by processes of attachment. We have seen that such attachments could not have been so prosecuted as to prevent the execution of the trusts of the paper of 1st Sep-

tember, 1851. But there cannot have been an apprehension of attachments at the suit of parties other than particular draft holders interested in these trusts. These draft holders could, at the worst, have obtained under the attachments, only a very small amount more than their dividend under those trusts. If attachments at their suit had been maintainable with such a result, it would have been far less disastrous and unjust than the transfer of the remittances to Beebee & Company in order that their proceeds might be credited by them to the defendants in an account in which neither the draft holders, nor the remitter, had a particle of interest. This allegation, therefore, furnishes no pretext for an excuse of the defendants' conduct.

Their actuating motive appears to have been the corrupt influence of an expectation that, if they would make this misapplication of these remittances, which Beebee & Company solicited, Beebee & Company would assist them with money to conduct their future business. There can be little, if any, doubt that Beebee & Company held out the inducement of a promise of such assistance. In the course of an examination of the elder Mr. Ludlow, hereafter mentioned, we find the following questions and answers, which, if not thus explained, are not easily intelligible:

"*Question.* These funds of S. B. Ludlow & Co., which have been remitted to meet exchange—did you, or did you not, hand them over to Beebee & Co., to be appropriated to the payment of your debts to them?

*Answer.* I did so; both for the security of S. B. Ludlow & Co., and ourselves, to prevent attachments, as we were largely indebted to Beebee & Co., *hoping that they would assist us as they have heretofore done.*

*Question.* How should that secure S. B. Ludlow & Co? I mean handing over these funds to a third person?

*Answer.* When we pay off our indebtedness to them (Beebee & Co.), these funds of S. Beebee Ludlow & Co. would be their property, i. e., S. B. Ludlow & Co.'s.

*Question.* Handed over to them by Beebee & Co.?

*Answer.* Either to them or us.

*Question.* To you, for S. B. Ludlow & Co.?

*Answer.* For their account."

The want of an account in the books of the defendants from August, 1851, to 8th October, 1851, when the bill in this case was filed, has been fully supplied by their account in the books of Beebee & Co., of which a transcript is in evidence. The correspondence, and George W. Beebee's deposition as to each item entering into the account, would also supply the deficiency. He deposes that their books do *not* contain entries of amounts which, in consequence of attachments, they did not receive. His words are: "There have been consignments to us that we have not received at all. They have been attached by various parties. *The books do not show these.*" The amount of the funds which have *not* been detained under attachments is, therefore, ascertainable from these books.

The credits which enter into the account have already been stated, but will be restated.

The credits of avails of *bullion* since the defendants' account of August, 1851, may be thus recapitulated:

Proceeds of the delayed remittances by the Union credited on the 5th September,............... $14,115.66

Proceeds of the unattached portion of the bullion included in the remittance which arrived on 5th September, 1851, credited on 18th September, 1851, .................................... 10,471.43

Proceeds of the bullion included in the remittance which arrived on 20th September, 1851, credited on that day, .......................... $5,000.00
And on 29th September, 1851,..... 1,370.10
                                  ———— $6,370.10

Gross proceeds of bullion credited,........... $30,957.19

Brought forward .................... $30,957.19

From which the deductions to be al-
    lowed, were, insurances paid,.... $982.14

                    freights paid, ...... 247.40

Eight oz. gold dust delivered under an
    order, ........................ 141.20

A forged draft credited in the old ac-
    count, ........................ 100.00

A draft paid 25th August, 1851,.... 50.00

                                    $1,520.74

Less credit 23d October, 1851, freight
    and insurance, ................ 50.00

                                    ——    1,470.74

Net proceeds of bullion credited,............. $29,486.45

The following is the recapitulation of credits of the pro-
ceeds of the remitted *bills:*

Of the $12,000 included in the remittances which
    arrived on the 5th of September, 1851, the
    bills on Beebee & Co. were credited on 10th
    September, ............................ $6,000.00

And Hoge & Co.'s acceptances, less the discount,
    on the 15th of September, ................ 5,980.17

The bill included in the remittance which arrived
    on 20th September, 1851, less the discount,
    was credited on the 23d of September,........ 6,491.33

And the bills included in the remittance which
    arrived on 5th October, 1851, less the discount,
    were credited on 7th October, 1851,.......... 19,966.45

Proceeds of remitted bills credited,........... $38,437.95

From the net proceeds of the bullion credited,.... $29,486.45

The orders of 16th August, 1851, in favor of Beebee & Co., and 29th August, 1851, in favor of Willis & Co., both for bullion, and both covered by the balance due to the defendants on 26th August, 1851, in general account, rendered it proper that this balance should be deducted, ................................  21,622.67

The credit remaining from the bullion, was...... $7,863.78
The credits for the proceeds of the bills, were.... 38,437.95

$46.301.73

Thus on 7th October, 1851, the day before the bill was filed, $46,301.73, with interest, which, if its account were averaged, would run from a prior day, was applicable to the payment of the draft holders in the manner set forth in the paper of 1st September, 1851.

The bill averred, and the answer admitted, that the complainants, Winter, Latimer & Co., to whom the defendants had written their letter of 6th September, 1851, stating that they had made an assignment of the remittances, and stating its effect, had, after the receipt of the letter, called upon the defendants for information *to whom* their assignment, or transfer of the remittances had been made, and that they had *refused,* or *omitted* to give such information. The date of this refusal or omission has not been shown. But a letter of Beebee & Co. to the defendants, dated on the 6th of October, two days before the bill was filed, indicates that Beebee & Co. were probably then devising means to prevent a discovery of the truth by these complainants, or other parties interested who might make inquiries on the subject of the remittances. This letter was in these words:

"MESSRS. LUDLOW & Co.          *"New York, Oct, 6th,* 1851.

"GENTLEMEN :—The box of eight thousand dollars of gold dust by Illinois, was attached in Norfolk, and the box by this

steamer Ohio also attached on board the ship and sheriff brought it off. This for your government.

"Very respectfully yours,

"BEEBEE & CO.

"We shall have to take steps to get them and quash attachments."

The steamer Illinois mentioned in this letter, due at New York on 20th September, 1851, arrived there on that day, having touched at Norfolk. No box of bullion containing $8,000 had been shipped in her by S. B. Ludlow. This appears negatively from his correspondence. The bullion included in his remittance by her, was invoiced, as has been stated at $6,105.37, and was disposed of, on her arrival, by Beebee & Co. for $6,370.10. *It was on board when she arrived at New York on the 20th of September.* George W. Beebee two months afterwards, deposed on the subject as follows: "On 20th September, 1851, we received a box gold dust consigned to us for Ludlow & Co.'s account, or to be forwarded by us to Ludlow & Co., which was attached at Norfolk. *On the receipt* of *that* gold dust, we sold the same, and received an advance of five thousand dollars. On the 29th of September we received the balance of proceeds thirteen hundred, seventy dollars and ten cents placed on our books to the credit of Ludlow & Co. as per his order." The $5,000 on their books is credited on the 20th, and the $1,370.10 on the 29th of September. If this bullion had been attached at Norfolk, it had been restored before the steamer resumed her voyage for New York. It is impossible, therefore, to read the letter of 6th October, 1851, without a very painful impression as to the motive under which it was written. The defendants, in their letter in answer, dated 10th October, said that it was "the first intimation that any gold dust was attached in Norfolk." The bill had in the meantime been filed.

When the bill was filed, three mails had arrived from California since the date of the paper of 1st September, 1851, without any payment having been made, or statement rendered, by

the defendants to the draft holders. The freight lists at New York would not show the amounts of S. B. Ludlow's remittances in bullion, as they came in the name of Beebee & Co., with large quantities which they were in the habit of receiving from other persons. As the remittances in bills came by mail, information concerning them was to be sought only from the defendants, who were disposed to give none. There was every reason to believe, as was in fact the case, that two other remittances dispatched before S. B. Ludlow's receipt of information of their failure, were then on their way from California.

This was the state of things when the bill was filed. It averred that the defendants' letter of 6th September, 1851, was the complainants' only information of the existence, contents, or effect, of the assignment mentioned in it, and that they did not know to whom it had been made. On these points they prayed a full discovery. They insisted that the draft holders, including themselves, were secured by an alleged independent primary appropriation of the remittances, entitling them to payment before the proceeds could be applied in discharge of any balance that might be due by the remitter to the defendants, and that, consequently, the draft holders' equitable rights could not be more than partially and inadequately secured by any such assignment as the letter described. But, the bill was framed so as to entitle the draft holders to the benefit of the security described in the letter as an assignment, if they could not obtain the relief which they prayed under the alleged previous appropriation.

The defendants, in their answer, filed on 14th October, 1851, denied that there had ever been any special appropriation by S. B. Ludlow of his remittances to secure the payment of his drafts upon them. The answer negatived every fact from which an inference that he had, in any manner, appropriated them generally, or specially, for the purpose, could have been deducible, unless his mere acts of remittance to agents on whom the series of his drafts was drawn implied such an appropriation. The respondents annexed a copy of the "instrument or paper purporting to be an assignment" of 1st September, 1851,

II

mentioned in their letter of 6th September. A copy of it has already been given at length. They described it as an instrument "without seal and not witnessed," and as having been "drawn without consultation of counsel" by one of them, Robert M. Ludlow, and signed by him in the name of their firm. They stated that "having learned a few days after that it was utterly worthless for the purpose intended, and invalid, the name of Ludlow & Co. was simply erased from it by the said Robert M. Ludlow." They said that they did "not consider the said instrument or paper purporting to be an assignment *of any force whatever*, the same having been cancelled, and having been otherwise informal, void, and useless for the purposes intended."

The defendants annexed to their answer their general account with S. B. Ludlow from 13th March, 1851, showing the above-mentioned balance of $21,622.67 to their credit at the time of their failure. The answer stated, in reply to interrogatories of the complainants, that, from about the dates of the particular drafts in their favor in respect of which their suit was brought, and since, the amount of gold, and gold dust, remitted by S. B. Ludlow to the defendants which had been received, and come to their hands, was about $50,183.10, as nearly as they could get at the sum in the short time allowed to make up the account; but that *several* invoices, the amount of which was *unknown*, had, since their failure, been seized upon and appropriated by creditors by attachment, *or otherwise;* and that they were *not advised* that there was any gold or gold dust on its way from San Francisco. This was all that the answer contained in the way of account or discovery. The sum of $50,183.10, appears to have been intended as an aggregate of certain items credited in the same cash accounts which resulted in the above-mentioned balance of $21,622.67, and, therefore, to have included nothing subsequent or extrinsic to that account. The answer thus contained no account, or statement, of uncoined or uncredited bullion on hand at the time of the defendants' failure, or of remittances in *bills* which had been *subsequently* received. As to remittances in *bullion* by

the three mails which had arrived since their failure, composing, as they said, *several* invoices of *amounts unknown,* all that they disclosed was contained in the vague reference to undefined *appropriations* by creditors under attachments, *or otherwise.* As to remittances by expected arrivals, one of which was about due, the statement that they had not been *advised* of such remittances, imported nothing, because usually the letters of advice came by the mail steamers which brought the remittances. The suppressions and evasions of the answer as to the correspondence with S. B. Ludlow and with Beebee & Co. have already been particularly mentioned (Ante, pp. 102, 103).

On 15th October, 1851, the day after the filing of this answer, there was an interlocutory hearing on an application for the appointment of a receiver. The question to be determined before the insufficiencies of the answer could be considered, was whether, as the case was then presented, upon bill and answer, the draft holders had any *interest* in the remittances.

We have seen that if the paper of 1st September, 1851, was in force, the draft holders had under it, independently of S. B. Ludlow's potential ratification of it, an equitable derivative interest of their own in the remittances. Its cancellation, if it had previously taken effect in interest, did not annul or impair its legal or equitable operation.*

The cases at law on this point are cited in 2 H. Bl. 262 to 264; 4 Barn. & Alders. 677; 4 Watts, 199. In Clavering *v.* Clavering, the House of Lords affirmed a decree in Chancery in a case in which a father had conveyed an estate in trust to raise two annuities in favor of his children, to commence after his death. He retained the conveyance in his own custody till his death, having in the mean time, by a subsequent deed, settled the estate in a different manner. In support of the latter settlement, it was argued in the House of Lords that, as the former settlement might have been cancelled by the father, he could annul it by the execution of a new one, but the prior settlement was sustained, (1 Br. P. C. 124; Toml. Ed. vol. 7,

---

* See ante, pp. 18, 19, the 17th proposition.

p. 410.)    At the hearing in Chancery, Lord Keeper Wright
had cited Lady Hudson's case, where a father, on a quarrel
with his eldest son, settled an annuity on his wife in augmenta-
tion of her jointure, and afterwards, being reconciled to his
son, cancelled the settlement which was found cancelled at his
death.   On a trial at law, the deed being proved to have been
executed, was adjudged good, though cancelled.    The son
brought a bill in Chancery, which was dismissed by Lord Som-
ers, (Pr. Ch. 235.)    Sear v. Ashwell, (3 Swanst. 411,) is
an authority to the same effect.*

Numerous facts above related, proving that the paper of 1st
September, 1851, was in force when its attempted cancellation
occurred, were not mentioned in the answer, or known at the
interlocutory hearing on 15th October, 1851.   But the answer
showed that the paper had been acted upon for some days after
its date, and that its existence as a security had, in this period,
been communicated to complainants in the cause, as parties in-
terested in its provisions.    Therefore, if it had not originally
been ineffectual for its intended purpose, it was apparently not
annulled by the cancellation.

The answer did not state for what reasons the paper had
been supposed *ineffectual,* unless they were included in the
description of it as the act of one member only of the defend-
ants' firm, and as unattested and unsealed.   The general agency
of partners for each other extends to acts of this description.
(See 5 Cranch, 289; 13 Peters, 423, 433; 5 Watts, 24; 6
Watts & Serg. 310, 311; 1 Brockenb. 456; 4 Barnw. & Cress.
867, 879.)   Such an act, performed by one of them in their
partnership name, was, therefore, in law, their joint act.   The
want of an attestation in the case of a sealed instrument proved
to have been delivered, or of an unsealed instrument shown to
have taken effect, is immaterial.   In the case of an unsealed
writing, it is not even an informality.   The remaining objec-
tion, of the want of a seal, has been disposed of under a former
head, where other questions concerning this paper, more im-

* See ante, p. 146.

portant than those which the answer suggested, have been considered.

The complainants appeared, therefore, at the interlocutory hearing, to have an *interest in the subject* of controversy. When this conclusion was reached, the suppressions and evasions of the defendants' answer became the proper subject of consideration. That it had been studiously framed so as if possible to conceal some important facts, was apparent. Insolvency was admitted in the answer. As the relation of the respondents to the subject of controversy was fiduciary, the manifestation of such a purpose of concealment, or even the want of a proper and full disclosure of the truth, rendered the case one for the appointment of a receiver. But these evasions and suppressions had so concealed the subjects of a receiver's intended custody, that his appointment, without a compulsory discovery in aid of its object would probably have been useless.

The question was, how such a discovery should be obtained. The ordinary mode of obtaining, through exceptions to the answer, an adjudication of its insufficiency, and thus compelling the defendants to make a better answer, would have been attended with such delay as to frustrate the remedial purpose of the receivership. This is not the only mode of obtaining a better answer from a defendant whose accountable relation to the subject of controversy is *fiduciary.*

There have been two modes known in chancery practice of compelling a discovery by such a defendant, without a previous adjudication, or hearing, upon exceptions to his answer. One has been the summary method of examining a *defendant* upon interrogatories by a master. Under the other method, complainants, as well as defendants, are examinable by a master to whom the cause has been *referred* for some *purpose defined in an order* of the court, so that the investigation is limited strictly to this purpose. These two modes of *examining parties* appear to have been somewhat confounded by counsel in this cause, in argument.

The former method of examination, unless the defendant has been adjudged contumacious for a refusal to answer, or for

persistence in answering insufficiently, is now, in practice, almost, if not quite, obsolete. But, anciently every defendant served with a writ of subpœna was compelled, according to its literal mandate, to appear *in person* at the return day in chancery, and there submit himself to a personal examination which the chancellor conducted through an official delegate, who was usually one of the masters. The return by the master of such a personal examination was then the defendant's *answer in chancery*. Whether such a proceeding as is now called a cross bill was a necessary preliminary to a counter interrogation of the complainant, is, perhaps, doubtful. But with, or without, such a preliminary, the complainant was also examinable by a master at the instance of a defendant who could suggest a sufficient cause for such interrogation. In those days, the subpœna was not regularly issuable, under the original bill, until after the chancellor had, through a master, or other delegate, examined and approved the bill. Where a demurrer is now interposed on behalf of a defendant, an argument on the sufficiency of the bill might then precede the decision whether a subpœna should issue. The master, instead of deciding this preliminary question, sometimes reported it, in a case of doubt, to the chancellor, for his consideration. In order that the bills might not be prepared unadvisedly, the rule was, that none should be presented without the signature of a *counsellor,* as distinguished from a mere solicitor or attorney. Though the bill was thus exhibited under the sanction of counsel by whom it was, in most cases, probably, prepared, it was revised by the master who, probably, always regulated the form of the interrogative part. Afterwards, however, the preliminary scrutiny in chancery of the original *bill* was altogether dispensed with, by a rule that the subpœna should issue upon the mere presentment of a bill "subscribed with the hand of a counsellor at law." This change in the practice occurred more than three centuries ago. It occasioned a great increase in the number of suits in chancery. But, for some time afterwards, defendants, in original and cross bills, were, according to the former practice, examined, in person, by the masters. The consequence of the

changes which have been mentioned was, however, that, in the course of time, the defendant's answer was prepared and completed by his legal adviser, so that both parties, in this respect, stood on the same footing, and there was no longer any *judicial* intervention in the *primary* stages of chancery pleadings on either side. As demurrers to bills had, in the meantime, become frequent, so exceptions to answers followed, as of course, the latter change. These changes were not established until after cross bills had become the only proceeding under which a defendant could, before an interlocutory decree, interrogate a complainant. There was, in such respects, a reciprocation under cross bills of the practice established under original bills. The ancient practice of personal examinations of defendants by masters in chancery was restrained, therefore, within limits which the 70th of Lord Bacon's ordinances defined in the following words: "The defendant is not to be examined upon interrogatories except it be *in very special cases by express order of the court, to sift out some fraud, or practice pregnantly appearing to the court,* or otherwise upon offer of the plaintiff to be concluded by the answer of the defendant, without any liberty to disprove such answer, or to impeach him after of perjury." In the present case, the *fraud and artifice apparent* in the answer would, perhaps, have justified an order for the summary examination of the defendants according to the ancient practice. (See the cases in 1 Merivale cited in 2 Johns. Ch. 518.)

But, before the time of Lord Bacon, the practice of making orders of reference for defined purposes, with power to examine parties concerning the matters referred, had become frequent. This practice has been since matured into a distinct system. Under the 74th, 77th, 79th and 81st rules of equity practice prescribed by the Supreme Court, "whenever any reference of any matter is made to a master to examine and report thereon," he is authorized to "regulate all the proceedings in every hearing before him," and "examine the parties in the cause upon oath, touching all matters contained in the reference," and to examine accounting parties viva voce, or upon

interrogatories in his office, or by deposition, as he may direct. It is stated in Daniel's Chancery Practice, that such "an *examination* is in the nature of an *answer*, and not of a deposition, and is governed by nearly the same rules as answers." In the language of Chancellor Kent, "Every defendant, notwithstanding his interest, is bound to answer, in the first instance, under oath, to the charges in the bill; and, having thus answered *as a party*, it is said that he shall not be examined in chief, in the character of a mere *witness*. But when a reference is ordered *upon hearing*, then the inquiry becomes necessarily minute, and a new and more detailed investigation is opened, to which the general inquiries in the bill were not adapted. Here, the same policy and principles of the court which required an answer to the bill, apply, and call again upon the conscience of the party, *as party*, for a further disclosure adapted to the minutiæ of the inquiry. The same reasons which required an answer, in the first instance, require an examination in the second * * * * * *. The bill could not have been framed and adapted to meet the fulness and minuteness of the inquiries under the reference, and it is the fundamental doctrine of this court, that the party is bound to answer *on oath* to every fact material to the right of the plaintiff. The disclosure must be made, either by the answer to the bill, or by examination before the master. In one way or the other, the truth is to be sifted out, and the conscience of a defendant probed to its deepest recesses. The *usual* subject of a reference is the taking, and stating an account; but I apprehend, there is *no case* which *confines* the power of the court, as to the examination of parties, to that kind of reference; and the reason of the rule, and, no doubt the practice, applies to references in general." After citing precedents of orders for examining parties, and compelling the production of books and papers in different stages of equity causes, and giving an extract from the above ordinance of Lord Bacon, Chancellor Kent instanced the case before him, which was that of a party fiduciary accountable as "one of the strongest that could be imagined to illustrate the necessity of such a jurisdiction, and the wisdom of the rule," adding the

remark that "a reference, in such cases, under the usual order, has the effect of a supplemental bill of discovery." (2 Johns. Ch. 516 to 518.)

In England, the order of reference usually contains a provision that the master may examine the parties on oath concerning the matters referred, upon *interrogations as he shall direct,* and may order and compel the production of books and papers, etc. There, the master cannot examine parties without an express authority conferred by the court. But such an authority is almost always inserted in the order, as a provision of course. In cases of accountability, and other cases in which rights incidental to, or arising from, fiduciary relations are to be ascertained, or enforced, the omission of such a provision has been corrected by the allowance of an amendment on almost the same footing as if the omission had been a mere clerical mistake in drafting the order. Under the rules of the Supreme Court of the United States, the authority is, as we have seen, implied, though not inserted in the order.

Under an order of reference made by a Circuit Court of the United States, in an equity suit, the examination of a party should be conducted before the master by interrogatories in writing, if such a course is insisted upon by any of the parties interested in its result. But the interrogatories may then, according to the practice in this, and perhaps in other, circuits, be written down by the master, or for him, before each answer, as the examination proceeds. Though the examination is, in form, and in effect, a series of answers to successive interrogatories by the master, the interrogatories are, from necessity, or for convenience, proposed, and are often, without objection, directly put, by parties, through their counsel, under, of course, the master's direction and regulation. The formality of writing down the questions is often, by express agreement, or tacit acquiescence, dispensed with, except on points upon which the master or his clerk is requested specially to reduce them to writing. The relaxations in some of the States, of the rules of the English practice, in these respects, in the master's office, originated in taking the depositions of *witnesses,* and were

afterwards extended, perhaps rather incautiously, to examinations of *parties*, where an adherence to strict rule is obviously more important. But, if no objection is taken in the course of the proceedings, the question, under each head, is considered one of mere convenience involving no principle of policy or of right. (See Livingston *v.* Story, 13 Peters, 367, 368; Remsen *v.* Remsen, 2 Johns. Ch. 499.) When an authority to examine parties is conferred by an order of this Court, the direction that it shall take place *upon interrogatories,* therefore is usually omitted, in order that the parties may dispense with written interrogatories if they prefer this informal mode of proceeding. But where such interrogatories are thus waived, the character of the proceeding before the master under which a party is examined still is that of an *answer* as distinguished from a deposition.

In Smith's Chancery Practice, it is, without the citation of an authority, said of "the examination of a party in the cause sworn in answer to interrogatories settled by the master" that "such examination is only evidence against the examinant, and can neither be used in his favor, nor against another party." That it cannot be used against another party is, undoubtedly correct if the examination is considered not as a deposition, but as an answer. The other proposition that it cannot be used in the examinant's own favor, may be true when the interrogatories have not been framed or suggested by an opposing litigant. But when they have been prepared and submitted on behalf of such an opponent, the circumstances that the master has allowed them to be put, as framed, ought not, according to what seems to be the meaning of the Practical Register (Wyatt, 198,) to prevent the examinant's answers, when responsive to them, from being evidence in his own favor. The same inference is deducible from the 70th of Lord Bacon's ordinances which has already been cited. The safer and more just rule would seem to be to receive his answers as evidence in his own favor under the same limitations which apply to his answer to the original bill. It is true that in cases of accountability, where such examinations occur more frequently than in

other cases, an allegation by which the accountable party, in response to an interrogatory or adverse allegation, charges himself with an item, cannot in general be so framed that the context shall operate in avoidance of the charge, or by way of discharge. But this rule applies not less to his answer to the original bill than to his answers when under examination by a master who is taking an account in pursuance of a decree. (See 2 Johns. Ch. pp. 87 to 94; 11 Howard, 140, 141.) The rule depends upon the particular proposition that the matter stated in discharge or avoidance, when it is not otherwise responsive to the allegation, or question of accountability, cannot be made so by a mere form of words connecting it, in a single sentence, with the admission of the truth of this allegation. The general analogy of the examination to an answer is, therefore, here maintained.

There is no particular state of a suit in equity, after answer, in which such an order of reference with a power to examine parties may not be made. When, before the replication, a cause is heard on bill and answer, upon motion or otherwise, an interlocutory decree may always direct such investigations as justice and equity may require. The investigation is usually directed, because points have been discerned upon which fuller information than the answer has disclosed is required. The necessity for a reference may arise, as in the present case, from the fact that an answer has been evasive or suppressive, in particulars as to which the relations of the parties had required from the respondent a full disclosure. The summary examination by the master may then be the principal purpose of the reference.

A proceeding under which a receiver is appointed, is usually of a summary character. It would often be an idle form, if the disclosure of such material facts concerning the subjects of his intended custody as the answer may have suppressed, were not summarily compellable through such an examination. The necessity for it could not be stronger in any case than it was in the present, where the obscurity of the defendants' answer, as to their conduct and intentions, afforded sufficient reason

for taking the funds out of their hands and placing them in less insecure custody. Discovery, not less than security, was the purpose to be attained.

That these purposes might, as far as possible, be attained, the following interlocutory decree was made:

"15th October, 1851. This cause having been heard on the motion of the complainants for a receiver, it is ordered that it be referred to Thomas I. Wharton, Esq., as a master, to take an account of what gold dust, gold, and other securities, have been shipped from time to time, whether already received, or yet in course of transportation, by the said S. Beebee Ludlow and Company, of San Francisco, or by their authorized agents, to the said defendants, or to their authorized agents, or to any other person or persons, for the object and purpose set forth in the bill, of providing for the drafts drawn by the said S. Beebee Ludlow and Company upon the said defendants, and by them accepted, and of which said drafts, certain are held by the complainants, and upon certain others of which the said complainants, or some of them, are liable as endorsers.

"And that he report to the court the disposal which has been made by the said defendants, or on their behalf, or for or in their name, or otherwise howsoever or by whomsoever, of the gold dust, and gold and other securities; and particularly when, and into whose hands, the various alleged remittances of the said gold dust, gold, and other securities, already arrived, did come. And if any part or portion of the same has been seized or appropriated by creditors by attachment, or by any other persons by attachment, or otherwise, to report all pertinent facts relating to such seizures and appropriations of the said securities; and more especially to report who such alleged creditors or other persons are, and what the amount of their claims or rights in the said securities may be; and what the amounts are of the said securities which have been so seized or appropriated by them respectively; and what the existing condition may be of such attachments, seizures, and appropriations, of the said securities.

"And for the better taking the said accounts, and discovery

of the said matters, the master is authorized to take testimony, and to examine the said parties touching the said matters, and to compel the production of books, papers and vouchers.

"And it is further ordered that the master do appoint a proper person to be receiver of the said gold dust, gold, and other securities, such person first giving security, to be allowed by the master, faithfully to perform his duties as such receiver."

Under this order, the master, on 22d October, 1851, appointed a receiver, who gave the required security, and whose appointment was approved by the court. The bill of exchange for $6,000, which composed a part of the remittance that arrived on the 18th of October, had in the meantime been accepted. The receiver obtained it from the defendants, and collected its amount at maturity. It was paid on the 22d of November.

He also received from them a bill, at 30 days' sight, for $8,000, which constituted the remittance that arrived on the 7th of November. This was a bill of Burgoyne & Co., on Beebee & Co., in favor of S. B. Ludlow, endorsed by him to the defendants, and by them endorsed in blank. The receiver deposited this bill with a bank in Philadelphia for collection. It was presented at New York to Beebee & Co., by whom it was accepted. This acceptance was a virtual admission by Beebee & Co. of the invalidity of the transfers by the defendants, under which Beebee & Co. had appropriated the three previous remittances to their own use. Their acceptance of the bill was doubtless to prevent its return, under protest, to the drawers in California.

Had Beebee & Co. been unable to prevent such a return to the same drawers, by the mail of 15th September, of their bills for $6,000, then under protest, those bills would probably have been taken up, and their bills for $20,000, which arrived in the beginning of October, would probably have been accepted and paid.*

* See p. 139.

The bill for $8,000 was paid at its maturity to the receiver.

This completes the history of S. B. Ludlow's remittances to the defendants. Besides the remittances whose proceeds had been credited in the general account, ending in the balance due to them of $21,622.67, and besides the $10,692.44, said to have remained under attachment, his remittances had produced the net amount of $81,924.40, which was an excess of $60,301.73 above the balance due to them in general account. This excess was composed of the net amount of $46,301.73, which had remained in the hands of Beebee & Co., bearing interest from a day not later than that on which the bill was filed,* and the $14,000 which, with its increase, remains in the custody of the receiver.

If the present proceeding had been at the suit of S. B. Ludlow, he could not have compelled the payment of these amounts to himself, without first exonerating the defendants from liability for his drafts upon them, by discharging the drafts from other sources. But, the defendants would, in such a proceeding, have been compellable to pay to holders of these drafts, an amount equal to the $46,301.73, with its interest; and the $14,000, with its increase, would have also been distributable, under the direction of the court, among these draft holders. Payment of the $46,301.73, with interest, into the registry of the court, or to the receiver, would probably have been ordered, that it might, with the $14,000 and its increase already in court, form a common fund for distribution. In the distribution of this fund, cognizance would have been taken of such equities as, from the detention of other portions of the remittances under attachments at the suit of particular draft holders, might have arisen in favor of draft holders not privy to the attachments. Cognizance might also have been taken of the question of the defendants' liability for the deficiency, if any, of the fund for distribution, to equalize the receipts of non-attaching and attaching draft holders.

* See p. 159.

The principal question for the consideration of the Court has been, whether, in the present proceeding, at the. suit of the draft holders themselves, they can obtain the like relief, under any independent equity of their own, or under any derivative right acquired through equities of the defendants and S. B. Ludlow. Another question has been, whether, against. the draft holders, the defendants had the same right which they would have had against S. B. Ludlow, of retaining or disposing, for their own use, of his remittances to the value of the $21,622.67, due to themselves.

The manner in which these questions have been presented will appear from the following history of the litigation since the appointment of the master on 15th October, 1851.

Besides the documentary evidence produced before him, and reported by him to the court, he examined the defendant, Robert M. Ludlow, and took the deposition of William Taylor as a witness. A commission to New York was issued, in pursuance of which, depositions of the two Messrs. Beebee, severally taken, were forwarded to the master "to be received by" him "and by the court when reported to the court by" him, "as part of the proceedings in" his "office." These two depositions, and the documents returned with them, are the most important evidence in the cause, except the accounts between the defendants and S. B. Ludlow, and his letters to the defendants and to Beebee & Co. which accompanied his remittances.

S. B. Ludlow, at the request of parties on both sides, left California on or about the 1st of November, 1851, and came to Philadelphia, where he arrived in the beginning of December, and remained nearly, if not quite, five months, during which time he was more than once examined before the master as a witness on the part of the complainants. In some letters written by him from Philadelphia, he expressed his disapproval of the transfer by the defendants of his funds to Beebee & Co. There is no proof that he ever, in any manner, signified, in writing, or by word of mouth, any disapproval

of the appropriation of his remittances for the security of the draft holders by the writing of 1st September, 1851, or signified a desire to recall anything in his letter of 14th October, 1851, by which it was ratified.

In the early part of February, 1852, many of the draft holders by whom and on whose behalf the present suit is prosecuted, instituted several actions by foreign attachment against Beebee & Co., the New York house in whose hands the misapplied funds remained. These were actions of indebtitatus assumpsit for money had and received, with other common counts. They were brought for a recovery, by the respective plaintiffs, from Beebee & Co., of a dividend, in each case, of the proceeds of the remittances in question which had remained in their hands. Other actions of the same kind by foreign attachment were instituted simultaneously, for the same purpose, at the suit of S. B. Ludlow, as nominal plaintiff, to the use of some of the respective draft holders who also brought suit as above in their own respective names. His letter of 14th October, 1851, was a sufficient authority to use his name in a proceeding for their use if he could himself have maintained the proceeding. Beebee & Co. contested the respective suits of both descriptions, either by entering bail to dissolve the attachments, or by otherwise appearing for the purpose of contestation, according to the provisions of the law of the State.

In one of the cases in which suit was thus brought in the State Courts, in the name of draft holders as plaintiffs, a commission to take the testimony of witnesses at San Francisco was issued. By a memorandum appended to the commission, it was agreed that the return to it, "subject to all legal exception," should "be used and read in evidence" in each of the other cases in the State Courts, *and also in this cause,* "as if the commission had been issued and the depositions had been taken" therein, so that no objection which would not have been available to the party making it, had the commission been issued and executed therein, should be admitted. Under this commission, the complainant Gabriel Winter, his brother Clinton Winter, Robert H. Bennett, and Benjamin F. Hillard an

endorser of some of the notes held by the complainant Hopkins, were examined as witnesses. The depositions of the first and last named of these four witnesses were properly rejected, and those of Clinton Winter and R. H. Bennett rightly received by the master.

While the reference was pending, the complainants, on 31st May, 1853, in consequence of a proceeding on the part of the defendants under the 66th rule of equity practice, filed the general replication.

In September, 1853, the reference being still pending, counsel on behalf of the defendants were heard in support of an application that the court would determine whether the testimony taken before the master, and his report, were "to be considered evidence to be used upon the final hearing of the cause, or" merely testimony under "an interlocutory order relating to the action of the receiver, or what other effect" should be given to the proceedings under the reference. The court refused to determine the question upon this application.

It was afterwards, before the master, "agreed by the counsel on both sides that he should report to the court the testimony taken merely, and *without making any other report.*" He reported this agreement, and the testimony which had been taken composed of the documentary evidence, the depositions of Clinton Winter, R. H. Bennett, G. W. Beebee, S. J. Beebee, S. B. Ludlow, and William Taylor, and the examination of the defendant, Robert M. Ludlow.

This report of the master was filed on 10th October, 1855. To some other details of his proceedings, exceptions were filed, but they were afterwards dismissed. No exception was taken on either side to his report of the agreement on the subject of the testimony.

The parties on both sides appear to have been desirous that a decision of the suits in the courts of the State should precede the final hearing of the present cause.

An insuperable difficulty opposed to a recovery in those courts by the draft holders who had sued in their own respect-

ive names, was in the doctrine already mentioned that the liability of a party to be made a defendant in an action *at law, sounding in contract,* cannot by a transfer or appropriation to which he has not expressly assented, be divided "into many causes of action in favor of different parties," with whom, respectively, he was not in original privity.* We have seen that in a court of equity this difficulty does not exist, or is avoided by the course of its practice.† In Aycinena *v.* Peries, 6 Watts & Serg. 243, 256 to 258, 2 Barr, 286, there was an original privity of interest in the plaintiff which had been recognized in the act under which the defendant had obtained the fund in which the plaintiff had a partial interest. The action was therefore maintained on the same footing as if it had been a bill in equity. But, when there is no such original privity, the course of chancery practice in this respect has never been adopted in the mixed system of law and equity under which the administration of justice was formerly regulated, and still is, to a great extent, regulated in Pennsylvania. (See 4 Watts, 410; 1 Wharton, 402, 407, 408; 7 Watts & Serg. 30; 2 Casey, 90.) In the present instance, the parties who sued in the courts of the State might, perhaps, have avoided *this* particular difficulty, by bringing a *single* action for their common use, in the name of S. B. Ludlow as plaintiff. But the suits in his name, *severally brought,* as they were, could not, in their multiplicate form, have been sustained, if no other difficulty had stood in their way.

Most of the suits which had been thus instituted by attachment were in the Supreme Court of the State. One of them was tried in the Court of Nisi Prius in January, 1855, before Lowrie, J., by whom the plaintiff was nonsuited. Another of the cases was tried in March, 1855, before Lewis, C. J. This, as well as the case before Judge Lowrie, was an action at the suit of a draft holder in his own name. The two cases, in the opinion of Chief Justice Lewis, did not materially differ. He rejected the evidence offered by the plaintiff to prove an appro-

---

* Ante, pp. 54, 55, and the note at foot.
† Ante, pp. 55, 56, 72, 73.

priation of the remittances in his favor. The letter of 14th of
October, 1851, from S. B. Ludlow to the defendants was a part
of the evidence thus offered. But, as Beebee & Co. were not
privy to it, and its date was after the last receipt of money by
them, it could not affect them so as to avail the plaintiff. The
assignment of the defendants, dated 1st September, 1851, was
*not* included in the offer. The deposition of William Taylor,
proving it, and containing a copy of it, had been taken in the
cause, and was on file. It is among the papers afterwards cer-
tified with the record to the court in banc. But it is *not* certi-
fied as a part of the *evidence offered* at the trial, nor was there
any offer of it in evidence. The evidence offered proved suffi-
ciently that the remittances had been appropriated for the se-
curity of Ludlow & Co. as intended acceptors of the remitter's
drafts. But under a distinction which has been stated, and
fully developed,* there was no evidence of such an appropria-
tion for the security of the drafts themselves as could avail
their holders. The Chief Justice thought that the evidence
offered did not tend to prove any such appropriation as would
enable the plaintiff to maintain the action; and remarked that
there was no privity of contract between the parties to the suit,
and that the contract of Beebee & Co. with Ludlow & Co. or
with S. B. Ludlow, could not be split up, against their consent,
into many causes of action in favor of different parties. The
verdict was for the defendants, in whose favor judgment was
rendered. The record, with a bill of exceptions, having been
certified to the court in banc, judgment for the defendants was
rendered there, after argument, on 22d May, 1856. The case
is reported in 2 Casey, 86. The opinion of the court was deliv-
ered by Black, J.

Against Beebee & Co., as defendants, in that case, their own
depositions, as witnesses, taken in this case, and the papers an-
nexed, if read in evidence as their *admissions,* might, in con-
nection with other evidence that could have been adduced, have
proved such a fraud on their part as would, perhaps, have ren-

* Pages 55 to 68.

dered them liable in damages, if the proceeding had been one of a different character. These depositions were not offered in evidence; and there was, perhaps, no sufficient evidence to have sustained a proceeding of any kind on the distinct ground of fraud. But this inquiry could not have been raised in an action of indebtitatus assumpsit, or in any form of action which *could* have been commenced by process of *foreign attachment.* The court in banc appear to have been of opinion that, if the transfer of the remittances had been made and received "for the fraudulent purpose of cheating" the draft holders, one of them could have maintained an action upon the case, in the form of tort, against Beebee & Co., but that "no proof of such fraudulent conspiracy between" them and "Ludlow & Co." would sustain "assumpsit." The judgment was rendered in the court in banc, as well on this ground as on the grounds upon which the decision had been rested in the Court of Nisi Prius.

Immediately after the verdict in March, 1855, others of the cases which had been instituted by attachment were, in succession, reached upon the trial list. In each of these cases, there was an entry of a non-suit, which was to be taken off if the opinion of the court in banc, in the cause that had been tried, should be in favor of the plaintiffs. After the adverse opinion of the court in banc, the plaintiffs, in one or more of these other suits, made a motion that the judgment of non-suit be taken off. This motion was overruled on 28th March, 1857, after which the plaintiffs appear to have again turned their attention to the proceedings in this Court, which had, in the meantime, been suspended.

When the cause afterwards came to be heard in this court, the principal evidence was that which had been taken in the master's office, and returned with his report. Notwithstanding the above mentioned agreement of the parties that he should report the testimony taken before him to the Court, the defendants objected, at the hearing, that the order of reference did not authorize an examination of parties or witnesses for any purpose other than that of ascertaining the proper subjects

of custody by the receiver whom the master was to appoint, and insisted that the depositions and examinations taken for this limited purpose were, consequently, not proper evidence for the general purposes of the cause.

To the depositions of the witnesses, Bennett and Clinton Winter, taken under the commission to California, this objection could not apply. The above mentioned agreement as to the return to this commission, made before that reported by the master, certainly rendered these depositions admissible in any stage of the cause. An independent subsequent agreement had also been made that no objection should be taken to the proof of the handwriting of letters annexed to the return of this commission, having been made by persons who might not be competent witnesses, the letters being subject, of course, to all other exceptions.

The objection was confined, therefore, to the other documentary evidence, and other depositions, and Robert M. Ludlow's examination.

The purpose of the order of reference, according to its proper interpretation, was not restricted within the narrow limits assigned to it by the argument in support of the objection. The hearing at which the order was made, though occurring upon the occasion of a motion for the appointment of a receiver, was not, for this reason, the less an interlocutory *hearing of the cause upon bill and answer,* when any interlocutory decree, proper in that stage of the cause, might have been made. After answer filed, and before or after the replication, a court of equity may make an interlocutory decree for an account, or for any other investigation which may be prosecuted while other parts of the litigation are either pending or suspended. The purposes of the interlocutory order in question were not, on its face, limited to those of the receivership. The necessity for the order arose, as has been stated, in part from the contents of the defendants' answer, but much more from its omissions. The question referred was not whether a receiver was to be appointed, or, if appointed, was to retain his office. He was already, in effect, appointed, because his appointment was *abso-*

*lutely* ordered, the duties of the master being in this respect
limited to the selection of the person and regulation of the
security.   The receiver's custody was to be that of the court.
The purposes of the ulterior investigations by the master, under
the order, were not only to ascertain the particulars composing
the remittances thus to be taken into the charge of the court,
and their amount or value, but also to investigate their title, in
order to ascertain the truth as to their alleged appropriation,
general or special, for the security of the billholders.   If the
agreement which is now under consideration had not been in-
terposed before the master, he might have so reported upon the
several points of the reference, that his report, if confirmed,
would afterwards have been properly recurred to in every stage
of the cause.   It might, perhaps, have alone constituted the
proper basis of a final decree.   It would, at all events, have been
evidence at the final hearing, to prove any such relevant facts
as he might, in pursuance of the reference, have reported.   Even
upon the trial of *another* cause, at law or in equity, involving
the same subjects of inquiry between the same parties, or
between privies in interest, such a report would, for and against
the opposing litigants, have been evidence of any such facts.
This is proved by the decision and reasoning in Hopkins *v.*
Lee, 6 Wheaton, 109, 116, and by the course of reasoning in
Lloyd *v.* Johnes, 9 Vesey, 54 to 60.   The report could not have
had *less* effect at a hearing of the original cause, of whose pro-
ceedings it would have been a part.   Now, the testimony in
question was an *agreed substitute* for such a report as, if made,
would have had this effect.   The testimony cannot, under the
agreement, have been intended to have *less* effect than would
have been attributable to the report which the agreement pre-
vented from being made.   Whatever facts would have been
properly deducible from the testimony by the master for
insertion in his report, might, therefore, under the agreement,
be deducible from it by the court for all the purposes of the
cause.

Had the purpose of the order of reference been restricted
to the question of *custody alone,* the result for which the de-

fendants contended under this head would not have ensued. However limited the *purpose* of the intended investigation, the *subjects* of it were precisely defined in the order. They were subjects of probable investigation at the final hearing. However material they may have been to the question of custody, or to whatever question was referred, they were not, for this reason, to be less material in ulterior stages of the cause. Had the master made his report upon the points referred, and returned the depositions with it, and had his return of them been sanctioned by the court's approval, many cases collected in books on Chancery practice indicate that, upon an exhibition of sufficient cause for an order that these depositions be read at the subsequent hearing, the court would, on an application of either party, have made such an order. An order of this kind may be made in Chancery where, without it, the depositions could not be read even upon proof of the death or absence of the witnesses, and in some cases where, upon proof of the death of the witnesses, their depositions could not be read upon a trial at law between the same parties. Whether the present case would have been a proper one for such an order as to these depositions, or whether, under the form of the reference to the master, the depositions might not have been read without such an order, though there had been no agreement of parties on the subject, are questions which the agreement reported by the master prevents from arising. The agreement was both a dispensation with, and an equivalent for, such an order of the court. It, in effect, was an agreement placing the depositions upon the same footing as if the master had been a commissioner appointed after a replication. This effect of the agreement becomes obvious when we consider that the parties having, by its terms, dispensed with a report of the master on the points referred, there was to be no stage of the cause *anterior* to the final hearing at which it *could* operate for any useful purpose. The parties cannot have intended that their agreement should be practically ineffectual, as it would have been if these depositions could not have been used at the final hearing.

William Taylor and S. B. Ludlow, whose depositions have been reported by the master under this agreement, are, however, witnesses who stand in relations to the cause which are peculiar. William Taylor, after his deposition had been taken, was made a party defendant in an amended bill, in which the paper of 1st September, 1851, purporting to assign the remittances to him, was fully set forth. Judgment against him that the bill be taken as confessed was afterwards rendered. This judgment was prior to the agreement of parties before the master, and to his return, under it, of the testimony. As to S. B. Ludlow, the want of whom as a party constitutes a difficulty of the case, it will be considered as if proceedings to make him a party had been instituted.

According to the practice of courts of equity, no party can be examined as a witness without a specific order upon an application for the purpose. If it appears distinctly that no beneficial interest of the proposed witness can be affected by any future decree in the cause, the order may be absolute. *After* hearing, the order is usually refused unless it can be thus made absolutely. (3 Johns. Ch. 612.) But *before* hearing, the usual course is to grant leave to take the deposition "saving all just exceptions." (2 Ves. & B. 401, 405; Ambler, 583, 584.) If, when the hearing comes on, the deposition should be adjudged inadmissible, it can, in the language of Chancellor Kent, "be entirely and safely suppressed." (3 Johns. Ch. 614.) It is thus inadmissible if any beneficial interest of the deponent can be affected by any future decree. Many cases might be cited confirmatory of the following statement made by Lord Redesdale, when at the bar: "There cannot be an adverse decree against a party whom plaintiff has examined as a witness. But, it is the continual practice to examine trustees, etc., as witnesses, and to have a decree against them specifically to do the very thing they prove is to be done. A man *cannot be examined* for his own interest, or *against it,* because there cannot be a decree for or *against* him, upon his own evidence." (1 Ves. Jr. 420.) According to the cases in Ambler, 583, 584, and 2 Ves. & B. 401, 406, a party, though interested in the

result of the cause, may be examined upon the points of it as to which he is not interested at the time of his examination. Though he should afterwards become interested in the subject of his examination, the subsequently acquired interest will not afford a reason for suppressing his deposition on those points. (See 1 P. Wms. 288; 2 Atk. 615; 2 Ves. Sen. 43.)

We have seen that the authority of the defendants, as agents of S. B. Ludlow, could not be delegated, and that they were incapable of creating, without his assent, such a trust in another person as the paper of 1st September, 1851, defined. As his ratification of that paper was not known at Philadelphia till about the 20th of November, 1851, after the misappropriation of the funds had been completed, William Taylor could not, without aid from the defendants, have prevented the misappropriation. As, therefore, no decree charging William Taylor personally can be made in the cause, his deposition is that of a person examined as a witness, and *afterwards made a party* in respect of an interest or liability not his own. Whether he stands in the position of a trustee having the legal interest, or not, his deposition, according to the decision of Cope *v.* Barry, 2 Jacob & Walker, 538, 539, is evidence at the hearing. It is not necessary, therefore, to inquire whether his deposition might not, at all events, have been read under the agreement reported by the master.

S. B. Ludlow's deposition is liable to the two-fold objection of his interest entitling him to protection when he may be made a party, and his interest as a witness entitling the original defendants to protection. But, so far as an appropriation by him of the remittances in question could have been effectual, they must have been *his own*. Upon the question whether they had or had not been appropriated for the security of a debt of his own, his interest was, therefore, balanced. Upon this point his testimony might perhaps be read. But the separation of the inadmissible portions of it would be very difficult. Against himself, it could not be read as proving his own liability to others for amounts which the complainants allege to have been payable out of the proceeds of the remittances. Against the

original defendants, it cannot be read as proof that he made the remittances, or as proof of their amount or value.

The examination of the defendant, Robert M. Ludlow, not as a witness, but as a party, requires consideration. We have seen that it is not a *deposition;* and we may add that it is not an extrajudicial admission. The latter proposition is proved by the rule above stated that a deposition of a party against his own interest will, at his instance, be suppressed. As an *extra-judicial* admission, the examination of a party cannot stand upon any other footing than a deposition. The examination of this defendant can be used against him, therefore, only as a *judicial* admission, or species of *answer.* To its use by the complainants, in the proper mode, under this character of an *answer,* the examinant cannot, on his own behalf, object. His examination was informally and, perhaps, in some particulars, irregularly conducted. But he was attended by his counsel and solicitor who could have objected before the master to such irregularities as might have been thought material, or could have obtained the court's interposition if an application for the purpose had been thought necessary. The examination having been engrossed, subscribed, and returned, without exception, may be read at the hearing, in the form in which it is presented.

But its effect as against his co-defendant, R. McKinney Ludlow, must be determined, before it can be considered for any of the purposes of the cause, as no decree can be made against one alone of these two parties. The two defendants have jointly answered. But their answers to the original bill, and to an amended bill, have been sworn by Robert M. Ludlow, the examinant, alone. Their answers to some subsequent amendments of the bill are not sworn to by either defendant. An unsworn answer, when the complainant proceeds without requiring that it be sworn, puts him to the proof of such averments of his bill as the answer does not admit. But it is not evidence, as a sworn answer is, in favor of the defendant, in support of his own responsive allegations. Against allegations of an unsworn answer, though they may be responsive to the bill, the

complainant may prove his case by the testimony of a single uncorroborated witness, however insufficient such proof might have been against a sworn answer. (5 Peters, 111, 112.) In this case, the effect of Robert M. Ludlow's oath to the answer of these defendants, which is the only oath in support of it, is, on certain points, destroyed, or neutralized, by his examination before the master. For the purpose of thus destroying or neutralizing the effect of their answer, this examination must operate against both defendants alike, if the examinant's previous oath to their answer would otherwise have rendered it in favor of his co-defendant, a sworn answer. In other words, unless the examination operates thus against R. McKinney Ludlow, *he* must be regarded as a defendant whose answer is unsworn.

Beyond this, if these defendants had not been copartners in the transactions to which Robert M. Ludlow's examination relates, it could not operate against R. McKinney Ludlow, who has neither been examined, nor adopted this examination as his own. A regular answer of a defendant in a cause, cannot be read or used against his co-defendant. (2 Wheaton, 383; 3 P. Wms. 310 to 312; 12 Ves. 361, 362; 7 Price, 193, 203.) An examination before a master cannot, on this point, stand on any footing more favorable to its reception as evidence against a co-defendant.

But the question of the admissibility of the examination of a defendant as evidence against a co-defendant, as to transactions in which they were *partners,* is different. In England, such an examination is received in the Court of Chancery, as evidence against a former co-partner. (See Pritchard *v.* Draper, 1 Russ. & Mylne, 191, affirming Tamlyn 332, so far as this point was concerned; and see 2 Bingh. 306.) In Van Reimsdyk *v.* Kane, (1 Gallison, 635, 636,) this rule was acted upon, as to an answer, in the first judicial circuit; and, on appeal to the Supreme Court, though not thus acted upon, was conceded to exist. (9 Cranch, 156.) It must, therefore, be considered as a rule established for the direction of this court. Under it, the examination in question is evidence against both defendants.

But, the examination of Robert M. Ludlow, and the depositions of William Taylor and S. B. Ludlow, might be expunged from the case entirely, without any change in its result. They have respectively been quoted, whenever they have been looked at for any purpose, in the foregoing report of the facts. All the material facts of the case are proved sufficiently by the correspondence, accounts, and other papers in evidence, the two California depositions which are unobjectionable, the New York depositions, and the defendants' joint admissions in their original answers. The facts reported, except so far as conceded at the hearing, have been deduced from these materials.

Upon these facts, if the case were decided between the complainants and the original defendants, it would be referred to a master for an account and a statement of distribution according to the principles which have been applied in the preceding parts of this opinion. The master, of course, would supply such omissions, and correct such errors of amounts, and of calculations, as may have occurred in the foregoing statements and estimates. His duty would be exercisable under three heads. Under the first he would report an account of the net avails of all of S. B. Ludlow's remittances, credited, as above, by Beebee & Co. to the defendants, but not credited by the defendants in the account annexed to their answer. The account of the bullion, under this head, should be separated from that of the bills no farther than may be necessary for placing the deduction mentioned below to the proper account. The first item of proceeds of bullion would be $14,115.66, credited on 5th September, 1851, to which interest should be added to the 19th of that month, when the next credit, $10,471.43, should be added. From the sum of these amounts, the balance, $21,622.67, due to the defendants in cash on the 25th August, 1851, with interest to 19th September, 1851, should be deducted. The difference, bearing interest from 19th September, 1851, would represent the first item from avails of bullion, in which the draft holders were interested under the paper of 1st September, 1851. The subsequent amounts of proceeds of bullion, with interest

from the respective dates of the credits in Beebee & Co.'s account, should, unless new evidence is introduced, be taken from that account, and from G. W. Beebee's deposition. The freights, insurances, and other charges in that account should be allowed, with such additions or deductions, if any, as might be proved. The credits for the proceeds of bills, beginning with $6,000 credited on 10th September, 1851, with interest respectively, would probably be subject to no particular deductions of charges; but this point would be open to inquiry before the master. The result of this account of the bills and bullion would be an amount which has been estimated above as $46,301.73,* more or less, with interest from a day not later than 7th October, 1851, the date of the last item. From the precise amount, when ascertained, should be deducted such part of the charges for services of counsel, paid or incurred by the defendants before August, 1858, as the master may deem a reasonable allowance to them, for the expense of defending themselves against the complainants' attempts to deprive them of the allowance of a credit for the balance of $21,622.67.

Under the second head, the master would, if either party should request it, report the disposition that was made of the residue of the remittances which arrived after August, 1851. They appear to have been composed exclusively of bullion, of which the invoiced values are given. If the defendants had not violated their duty as agents, they would have been in funds, after discharging the balance due to themselves, to prosecute the necessary measures for the reclamation of this bullion. The burden is on them of showing what became of it; what portions, if any, were attached, how, where, and at the suit of whom; what proceedings occurred under the attachments, and what measures, if any, were adopted or prosecuted by themselves, or by any, and what other person or persons, to contest or defend such attachments, and with what results.

Under the third head, the master would report a schedule of the drafts which are secured under the appropriation of 1st

* Page 159, and see p. 174.

September, 1851, and the distribution to be made, among their holders, of a fund which would be composed of the amount payable by the defendants upon the result of the account stated under the first head, the additional amount, if any, chargeable against them upon the result of the investigation under the second head, and the $14,000, with its increase in the custody of the receiver.

The master would be at liberty to report separately under each of the three heads. The amount due by the defendants under the first head may be readily ascertainable. If it should be ascertained before the proper time for an order of distribution, a decree that the defendants pay it into court, or to the receiver, might be made pending the investigation under the other heads.

## SUPPLEMENTAL OPINION, 11th JULY, 1859.

Upon one point, there has been a partial want of perfect concurrence on the bench. The judges concur in opinion that the defendants are entitled to a credit in account for such portion of their charges, paid, or incurred, for the services of counsel rendered before August, 1858, as may afford a reasonable compensation for defending them against the complainants' attempts to deprive them of the allowance of a credit for the balance due to them in general account at the time of their failure. Beyond this portion of their charges for professional aid, the district judge thinks that no credit of charges for such aid should be allowed them in account. He also thinks that no part of any allowance that may be proper under this head should be paid out of the fund in the custody of the receiver. His reason for this opinion is, that the balance due to the defendants had, before the present suit was instituted, been reimbursed out of the proceeds of the previous remittances, of which the defendants improperly transferred the surplus to Beebee & Co. If the defendants had not misappropriated that surplus, it would have been in the receiver's hands, as the proper fund for the payment of these charges. The district judge thinks that the proceeds of subsequent remittances in

the receiver's hands are exempt from liability to such charges. The former opinion prepared by him, in defining the purposes of such a reference for an account and report of distribution as will be required for the final disposition of the cause, contained, therefore, a remark that this allowance was to be deducted from the amount of the defendant's accountability for the misapplied surplus of the previous remittances.

The circuit judge is, however, of opinion that the litigation has been protracted from causes which make the question depend upon peculiar considerations. He thinks that the unusual frequency of the amendments of the pleadings on the part of the complainants, for which applications were unseasonably made, at and after the stage of the cause which ought properly to have been a final hearing, has cast upon the defendants' counsel an extraordinary amount of labor on multiplied occasions of attendance in court. He takes into view the circumstance that the fund in the receiver's hands has, under previous orders of court, made apparently without objection, already borne heavy charges, including the costs of the former reference, etc., which, as current expenses of the suit, would otherwise have been primarily payable by the complainants. He moreover takes into consideration the circumstance that the litigation is to be still further protracted under proceedings to bring in a new party, and that the measures heretofore adopted for the purpose by the complainants have been irregular, so as to require a recommencement hereafter of the suit which has been pending for almost eight years. He thinks that, under such circumstances, particularly as the case was begun with an admission of insolvency in the pleadings, the fund in court is properly chargeable, under this head, with the payment of $1,000 to the counsel of the defendants.

The district judge did not become a member of the court until the cause had been set down for a reargument after what might have been a final hearing. The duty of preparing the subsequent opinions of the court having devolved upon him, he is gratified that his views upon the other questions in the cause are unreservedly concurred in by the circuit judge. In

prior stages of the proceedings, the circuit judge has had the means of weighing practically the considerations which now influence his judgment on the point of partial difference of opinion. On this point, the district judge, having had no such advantage, thinks it his duty not to withhold his assent from an order, which will therefore be made conformably to the opinion of the circuit judge, that $1,000 be paid to the defendants' counsel out of the fund in the receiver's hands, and that an additional credit of $500 be allowed to the defendants by the master, as a deduction under this head from the amount of their personal accountability. But it is to be understood that if this order be thus made on the application of the present parties defendant, they waive any objection to a *present* reference to a master for an account, and for a report of distribution, conformably to the opinion of the court, of the fund in the receiver's hands, as well as the surplus of the proceeds of the previous remittances. The order of reference will, in that case, contain a provision saving S. B. Ludlow's rights. He will not be concluded or prejudiced by anything in the proceedings which he may afterwards properly contest; and no *final* disposition of the fund in the custody of the court will be made until he shall have had an opportunity for contestation.

AND NOW, 11th July, 1859, this cause having stood over upon the objection of the want of S. B. Ludlow as a party, the following decree is made, saving his rights:

It is considered and adjudged that the writing dated 1st September, 1851, of which a copy is annexed to the answer of the original defendants, is in force against them; that the net avails of S. B. Ludlow's remittances to them arrived before its date, but not then credited in account, and of his remittances which afterwards arrived, were, to the extent required, applicable in the first instance to the discharge of the balance of $21,622.67, due to them in general account, with interest; and that they are accountable to the draft holders who are secured by the said writing for the surplus of the net avails or value of such of his remittances as arrived after its date, with interest.

The cause is referred to Aubrey H. Smith, Esquire, as master, to report the amount for which the original defendants are thus accountable to the said draft holders, under the several heads which are specified in the opinion of the court filed of record, and according to the principles therein stated; and also to ascertain and report, without prejudice so far as the said S. B. Ludlow may be concerned, the distribution to and among the said draft holders, which under the trusts of the said writing, according to the opinion aforesaid, should be made of the amount of the defendants' accountability aforesaid, and of the funds in the custody of the receiver heretofore appointed by the court.

It is also ordered that the receiver, from the funds now in his hands, pay to D. W. C. Morris and L. Myers, Esquires, one thousand dollars allowed for their services as counsel of the accountants, as is in the said opinion stated; and that the master allow to the said original defendants, in the account which is to be reported by him as aforesaid, a credit for the additional amount of five hundred dollars, as is also in the said opinion stated.

## FINAL DECREE, 1 MAY, 1861.

This cause having been heard upon exceptions to the Master's Report, and argued by counsel, the Court is of opinion that the exceptions on behalf of Hardy & Brothers are not sustainable, and overrule and dismiss the same.

As to the exceptions on behalf of the complainants Winter, Latimer & Co., it appeared, by the bill book of the defendants Ludlow & Co. and other proofs, that the draft for $2,500, due on 17th September, 1851, had been received by the said Ludlow & Co. from S. Beebee Ludlow before the end of April, 1851, and had remained in their possession until after their failure, and had never been parted with or appropriated otherwise than for the benefit of the draft holders in whose favor the master has reported distribution—the Court is of opinion that although this draft was not appropriated by the writing of 1st September, 1851, for the purposes therein expressed,

it was, nevertheless, appropriated by S. Beebee Ludlow's letter of 14th October, 1851, for the purposes therein stated, and that the complainants cannot, in equity and good conscience, receive a dividend from the fund in Court without bringing the amount of this draft into the common fund as an addition to the amount for distribution. The Court is, therefore, of opinion that the result at which the master has arrived in his report is, in this particular, correct, and confirm the said report as to the result thus attained.

The master's report is, in all other respects, approved and confirmed.

Whereupon it is considered adjudged and decreed that the receiver do forthwith distribute, pay over, and transfer from the funds and securities in his hands, to the several parties named in the master's report, the several amounts therein reported as receivable by them respectively;—and that the receiver do state and report his account of such transfers and payments, as and when completed, or monthly, or oftener, as he may deem proper, or may be required so to do, until they shall have been completed.

It is adjudged, considered, and decreed that the defendant, Robert M. Ludlow, surviving partner of the late firm of Ludlow & Co., is, moreover, accountable in the cause for the sum of $71,383.97, which includes interest to the 17th day of February last, and that he shall and do forthwith pay that amount into the registry of this Court, and that the complainants do recover from him and that he pay, the costs of the suit, and that if, and so far as, he shall fail to comply with this decree, the complainants, and other draft holders interested, shall, upon the due ascertainment of such default, have leave to proceed, as they may be advised, and as may be conformable to the practice of the Court, afainst the estate and personal representatives of R. McKinney Ludlow, the deceased partner of the said late firm, for so much of the said sum of $71,383.97 and so much of the said costs as the said Robert M. Ludlow may fail to pay.

It is ordered that any party or parties shall be at liberty to apply from time to time for further directions.